**No. 25-6158**

In the United States Court of Appeals
for the Tenth Circuit

Dwain Edward Thomas,

*Plaintiff-Appellant*,

v.

Kevin Stitt, Steven Bickley, T. Hastings Siegfried,
Scott Crow, Tom Bates,

*Defendants-Appellees*,

On Appeal from the United States District Court for the
Western District of Oklahoma, Hon. Timothy D. DeGiusti
No. 5:20-CV-00944-D

# BRIEF FOR DWAIN EDWARD THOMAS

Emily Merki Long
Alyssa M. McClure
Caroline H. Robinson
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
(202) 389-5000
emily.long@kirkland.com
alyssa.mcclure@kirkland.com
caroline.robinson@kirkland.com

*Counsel for Dwain Edward Thomas*

**ORAL ARGUMENT REQUESTED**

# TABLE OF CONTENTS


TABLE OF AUTHORITIES ........ iii

GLOSSARY ........ vii

PRIOR OR RELATED APPEALS ........ 1

INTRODUCTION ........ 2

JURISDICTIONAL STATEMENT ........ 6

STATEMENT OF THE ISSUES ........ 6

STATEMENT OF THE CASE ........ 7

A. Legal Background ........ 7

B. Factual Background ........ 11

C. Procedural History ........ 26

SUMMARY OF THE ARGUMENT ........ 30

STANDARD OF REVIEW ........ 35

ARGUMENT ........ 36

I. THE DISTRICT COURT ERRED IN HOLDING THAT THOMAS'S EIGHTH AMENDMENT CLAIM WOULD REQUIRE EXPANDING *MILLER*. ........ 36

II. THE DISTRICT COURT ERRED BY FAILING TO ASSESS WHETHER OKLAHOMA'S PAROLE SYSTEM PROVIDES A "MEANINGFUL OPPORTUNITY" FOR RELEASE AND by FAILING TO VIEW THE FACTS IN A LIGHT MOST FAVORABLE TO THOMAS. ........ 41

A. The District Court Erred by Concluding That Thomas Failed to Show Oklahoma's Parole System Provides Juvenile Offenders With No Meaningful Opportunity for Release. ........ 43

B. The District Court Failed to View the Facts in the Light Most Favorable to Thomas. .......... 47

III. THE DISTRICT COURT ERRED IN DECLINING TO EXERCISE SUPPLEMENTAL JURISDICTION OVER THOMAS'S STATE LAW CLAIM. .......... 61

CONCLUSION .......... 62

STATEMENT REGARDING ORAL ARGUMENT .......... 62

CERTIFICATE OF SERVICE .......... 64

CERTIFICATE OF DIGITAL SUBMISSION .......... 66

ATTACHMENTS .......... 67

Order Granting Summary Judgment (filed Sept. 5, 2025) (Dkt. 145) .......... App. Vol. VIII at 121

Judgment signed by Chief Judge DeGiusti (filed Sept. 5, 2025) (Dkt. 146) .......... App. Vol. VIII at 154

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alverez v. Turner*,
422 F.2d 214 (10th Cir. 1970) .......... 38

*Bear Cloud v. State*,
334 P.3d 132 (Wyo. 2014) .......... 41

*Bias v. Stitt*,
2021 WL 3008606 (W.D. Okla. July 15, 2021) (unpublished) .......... 40

*Bowling v. Dir., Va. Dep't of Corr.*,
920 F.3d 192 (4th Cir. 2019) .......... 46

*Brown v. Precythe*,
46 F.4th 879 (8th Cir. 2022) .......... 46

*Budder v. Addison*,
851 F.3d 1047 (10th Cir. 2017) .......... 38, 56

*Collins v. Furlong*,
3 F. App'x 886 (10th Cir. 2001) (unpublished) .......... 35

*Davis v. McCollum*,
798 F.3d 1317 (10th Cir. 2015) .......... 39

*Diatchenko v. Dist. Att'y for Suffolk Dist.*,
27 N.E.3d 349 (Mass. 2015) .......... 39

*Fields v. State*,
501 P.2d 1390 (Okla. Crim. App. 1972) .......... 12

*Flores v. Stanford*,
2019 WL 4572703 (S.D.N.Y. Sept. 20, 2019) (unpublished) .......... 37

*Forth v. Laramie Cnty. Sch. Dist. No. 1*,
85 F.4th 1044 (10th Cir. 2023) .......... 35

*Graham v. Florida*,
560 U.S. 48 (2010) .. 2, 3, 5, 6, 8, 9, 31, 37, 38, 42, 43, 47, 51, 55, 59, 60

*Greiman v. Hodges*,
79 F. Supp. 3d 933 (S.D. Iowa 2015) .......................................... 37, 41

*Hawkins v. New York State Dep't of Corr. & Cmty. Supervision*,
30 N.Y.S.3d 397 (App. Div. 2016) .................................................. 39

*Howard v. Coonrod*,
134 F.4th 1136 (11th Cir. 2025) .................................................... 45

*Howard v. Coonrod*,
546 F. Supp. 3d 1121 (M.D. Fla. 2021) ........................................... 37

*Jones v. Mississippi*,
593 U.S. 98 (2021) ........................................................................ 10

*Lewis v. Okla. Pardon & Parole Bd.*,
2019 WL 1500671 (W.D. Okla. Apr. 5, 2019) (unpublished) ............. 40

*Md. Restorative Just. Initiative v. Hogan*,
2017 WL 467731 (D. Md. 2017) (unpublished) ................................. 41

*Miller v. Alabama*,
567 U.S. 460 (2012) ......... 2, 3, 5, 6, 9, 29, 31, 37, 38, 42, 43, 51, 55, 59

*Montgomery v. Louisiana*,
577 U.S. 190 (2016) ................................................ 2, 3, 10, 31, 38, 46

*Rodgers v. Whitten*,
2021 WL 735647 (W.D. Okla. Feb. 25, 2021) (unpublished) ............. 40

*Roper v. Simmons*,
543 U.S. 551 (2005) ........................................... 2, 8, 31, 37, 45, 47, 59

*State v. Zuber*,
152 A.3d 197 (N.J. 2017) ................................................................ 37

*Sw. Air Ambulance, Inc. v. City of Las Cruces*,
268 F.3d 1162 (10th Cir. 2001) ....................................................... 62

*Thomas v. Stitt*,
2022 WL 289661 (10th Cir. Feb. 1, 2022) (unpublished) ... 1, 11, 27, 31

*United States v. S. Ct. of New Mexico*,
839 F.3d 888 (10th Cir. 2016) ... 36

*Ward v. Lutheran Med. Ctr.*,
769 F. App'x 595 (10th Cir. 2019) (unpublished) ... 62

**Constitutions**

Okla. Const. art. II, § 9 ... 2

Okla. Const. art. VI, § 10 ... 11, 20

U.S. Const. amend. VIII ... 2

**Statutes & Regulations**

28 U.S.C. § 1291 ... 6

28 U.S.C. § 1331 ... 6

28 U.S.C. § 1367 ... 6

Okla. Admin. Code 515:25-7-2(b) ... 12

Okla. Admin. Code 515:25-9-1 ... 12, 17, 34, 57

Okla. Admin. Code 515:25-9-2 ... 17

Okla. Stat. tit. 57, § 332 ... 11, 20

Okla. Stat. tit. 57, § 332.7(A) ... 12

Okla. Stat. tit. 57, § 332.7(D)(1) ... 13

Okla. Stat. tit. 57, § 332.7(D)(2) ... 19

Okla. Stat. tit. 57, § 332.7(E)(1) ... 12

**Rules**

10th Cir. R. 28.1(A)(1) ... 1

## Other Authorities

Motion of Developmental Science Scholars and Nonprofits for Leave to File Amicus Br. in Support of Appellants in *Mich. v. Czarnkecki,* 2024 WL 5294438 (Mich.) (filed Dec. 20, 2024) .......... 59

October 2025 Parole Docket Results .......... 21

# GLOSSARY

| Abbreviation | Definition |
|---|---|
| BOC | Oklahoma Board of Corrections |
| DOC | Oklahoma Department of Corrections |
| PPB | Oklahoma Pardon and Parole Board |

## PRIOR OR RELATED APPEALS

In *Thomas v. Stitt*, No. 21-6011, Plaintiff-Appellant Dwain Edward Thomas ("Thomas") appealed the district court's adoption of a magistrate judge's report and recommendation dismissing his complaint for failure to state a claim. The Tenth Circuit reversed the district court's order and remanded for further proceedings, holding that Thomas "stated plausible claims for relief" and "the complaint contain[ed] enough well-pleaded facts to plausibly entitle him to relief." App. Vol. I at 123–24 (2/1/2022 Order and Judgment), 2022 WL 289661, at *4 (10th Cir. Feb. 1, 2022).[1] The court also noted that Thomas's claims "purport[] to address complex issues of first impression without an opportunity for the parties to develop the facts and their legal arguments." *Id.* at 123.

[1] References to the Appendix are by volume and page number pursuant to 10th Cir. R. 28.1(A)(1). *E.g.*, App. Vol. # at [page #] (description).

## INTRODUCTION

Oklahoma's parole system, both on its face and as applied to Plaintiff-Appellant Dwain Edward Thomas, flies in the face of the Supreme Court's clear constitutional mandate that, except for the rarest of offenders, a juvenile cannot remain in prison for the rest of his natural life without a meaningful and realistic opportunity to obtain release based on demonstrated maturity and rehabilitation.

In a series of landmark cases decided over the past two decades, the Supreme Court has interpreted the Eighth Amendment's prohibition of "cruel and unusual punishments"[2] to provide specific protections for juvenile offenders (those convicted of crimes committed before the age of 18)—in particular, protection from automatic sentencing to a mandatory life sentence without parole. *Roper v. Simmons*, 543 U.S. 551 (2005); *Graham v. Florida*, 560 U.S. 48 (2010); *Miller v. Alabama*, 567 U.S. 460 (2012); *Montgomery v. Louisiana*, 577 U.S. 190 (2016). That is because the Constitution views juveniles as categorically different from adults, and—excepting those "rarest" of children who are deemed "irretrievabl[y]

---

[2] *See* U.S. Const. amend. VIII. Article II, Section 9 of the Oklahoma Constitution likewise prohibits "cruel and unusual punishments." Okla. Const. art. II, § 9.

deprav[ed]" at the outset—it mandates parole as a way to "ensure[] that juveniles whose crimes reflected only transient immaturity—and who have since matured—will not be forced to serve a disproportionate sentence in violation of the Eighth Amendment." *Montgomery*, 577 U.S. at 208–209, 212. And the Supreme Court has been equally clear that the mere possibility of parole is not enough: juvenile offenders must be afforded "some ***meaningful*** opportunity to obtain release [from incarceration] based on demonstrated maturity and rehabilitation." *Graham*, 560 U.S. at 75 (emphasis added); *Miller*, 567 U.S. at 479 (quoting *Graham*, 560 U.S. at 75) (same).

Oklahoma does not consider growth, maturity, or rehabilitation for juvenile offenders at any stage of its process—indeed, Defendants-Appellees concede that Oklahoma's parole system treats adults and juvenile offenders exactly alike. App. Vol. V at 191 (C. Long Tr. 111:9–11) (Oklahoma Pardon and Parole Board employee testifying that, "under Oklahoma law, all inmates, when they come to us, we consider them as adults"). As a juvenile, Thomas was sentenced to two consecutive life sentences each with the possibility of parole. After serving 15 years of his first sentence, he became "eligible" for parole under Oklahoma's

parole system—a three-stage process involving the Oklahoma Pardon and Parole Board, Oklahoma Department of Corrections, Oklahoma Board of Corrections, and the Governor of Oklahoma. Thomas has been "considered" for parole six times in the last 16 years. Yet, despite a track record of maturity and rehabilitation—including extensive educational endeavors (such as paralegal and HVAC technician certifications and taking college courses), an outstanding work performance track record, and a record clear of violent misconducts for the past 26 years, Thomas has never made it past the first stage of Oklahoma's opaque, multi-stage parole process.

The district court's decision below erred in three important respects. First, it erred in holding that requiring Oklahoma to provide specific parole procedures ensuring juvenile offenders have a meaningful opportunity for release based upon demonstrated maturity and rehabilitation would be an "expansion of *Miller*." App. Vol. VIII at 149 (9/5/2025 Order Granting Mots. for Summ. J.) (hereinafter "9/5/2025 Order"). The Supreme Court's decades-long precedent in fact says the opposite. Because children are fundamentally different from adults and are entitled to additional protections under the Constitution, a parole

system that does not in fact provide juvenile offenders with a "meaningful opportunity for release" is simply inadequate under the Eighth Amendment. And determining whether there is an Eighth Amendment violation requires looking behind the curtain to see whether Oklahoma's parole procedures actually provide juvenile offenders with a "realistic" and "meaningful" opportunity for release. *Graham*, 560 U.S. at 75, 82; *Miller*, 567 U.S. at 479 (quoting *Graham*, 560 U.S. at 75). The district court did not do this.

Second, the district court erred in concluding that Thomas failed to establish any genuine issues of material fact regarding whether Oklahoma's parole system violates the Eighth Amendment. App. Vol. VIII at 152 (9/5/2025 Order). Specifically, the district court failed to credit extensive deposition and record evidence presented by Thomas that Oklahoma does not track juvenile inmates, has no way to distinguish juvenile offenders from adult offenders in the parole process, and that no entity at any stage of the Oklahoma parole process receives any training regarding how to consider juvenile status as part of a parole decision. App. Vol. V at 100–101; App. Vol. VII at 127–28. Lastly, for the same

reasons, the district court erred in granting summary judgment on Thomas's supplemental state law claim.

For the reasons below, Thomas respectfully asks this Court to reverse the district court's grant of summary judgment to Defendants, and to remand for further proceedings.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction over Thomas's claims under 28 U.S.C. § 1331, which arose under the Eighth Amendment to the United States Constitution, as well as under 28 U.S.C. § 1367, which arose under Oklahoma state law. This Court has appellate jurisdiction to review the district court's final order granting summary judgment in favor of Defendants-Appellees. 28 U.S.C. § 1291. The district court entered its final order and judgment on September 5, 2025. App. Vol. VIII at 121 (9/5/2025 Order), 154 (9/5/2025 Judgment). Thomas timely filed a notice of appeal on October 6, 2025. App. Vol. VIII at 155.

## STATEMENT OF THE ISSUES

1. Whether the "meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation" standard articulated in *Graham v. Florida*, 560 U.S. 48 (2010), and *Miller v. Alabama*, 567

U.S. 460 (2012), applies to juvenile homicide offenders serving life sentences with the ostensible (but not realistic) opportunity for parole.

2. Whether the district court failed to view the facts in the light most favorable to Thomas (as the non-moving party) and thus erred in finding Thomas failed to set forth a genuine dispute of material fact in holding that Thomas "has not provided evidence that Oklahoma's parole system provides him with no meaningful opportunity for release[.]" App. Vol. VIII at 152.

3. Whether the district court erred in declining to exercise supplemental jurisdiction over Thomas's state law claim.

## STATEMENT OF THE CASE

### A. Legal Background

Over twenty years of Supreme Court precedent establishes the ways in which juvenile offenders are inherently different from and therefore entitled to different considerations than adults under the Eighth Amendment. In a 2005 juvenile death penalty case, the Supreme Court recognized three salient differences between juveniles and adults: (1) "lack of maturity and an underdeveloped sense of responsibility"; (2) "more vulnerab[ility] or susceptib[ility] to negative influences and

outside pressures"; and (3) "more transitory, less fixed" character. *Roper*, 543 U.S. at 569–70. Taking these characteristics into account, *Roper* determined that juveniles are "categorically less culpable than the average criminal" and "cannot with reliability be classified among the worst offenders." *Id.* at 567–69. *Roper* concluded that the Eighth Amendment forbids imposing the death penalty on juvenile offenders. *Id.* at 578.

Five years later, the Court held that those same "salient characteristics" required a "categorial rule against life without parole for juvenile nonhomicide offenders." *Graham*, 560 U.S. at 48, 68 (citing *Roper*, 543 U.S. at 569–70). The Court reiterated "that '[f]rom a moral standpoint it would be misguided to equate the failings of a minor with those of an adult, for a greater possibility exists that a minor's character deficiencies will be reformed.'" *Id.* at 68 (quoting *Roper*, 543 U.S., at 570). *Graham* even went so far as to say that because an "offender's age is relevant to the Eighth Amendment," any "criminal procedure laws that fail to take defendants' youthfulness into account at all would be flawed." *Id.* at 76. Thus, while a "[s]tate need not guarantee the offender eventual release, . . . if it imposes a sentence of life it must provide [the offender]

with some ***realistic opportunity to obtain release before the end of that term***." *Id.* at 82 (emphasis added); *see also id.* at 75 ("What the State must do, however, is give defendants like Graham ***some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation***.") (emphasis added).

Two years later, in *Miller v. Alabama*, the Court further expanded the prohibition on automatic juvenile life-without-parole sentences to homicide cases. 567 U.S. 460 (2012). In line with the underlying morality concerns in *Roper* and *Graham*, *Miller* reasoned that "by requiring that all children convicted of homicide receive lifetime incarceration without possibility of parole, regardless of their age and age-related characteristics and the nature of their crimes, the mandatory-sentencing schemes . . . violate . . . the Eighth Amendment's ban on cruel and unusual punishment." *Id.* at 489. *Miller* also acknowledged *Graham*'s holding that a state "must provide 'some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation.'" *Id.* at 479 (quoting *Graham*, 560 U.S. at 75).

In 2016, the Court made retroactive *Miller*'s holding that juvenile homicide offenders cannot be sentenced to mandatory life without parole.

*Montgomery*, 577 U.S. at 206. Instead of prompting widespread resentencing, *Montgomery* held a "[s]tate may remedy a *Miller* violation by permitting juvenile homicide offenders to be considered for parole." *Id.* at 212. Here again, the Court's long-held recognition of the inherent differences between children and adult offenders came through: "In light of what this Court has said in *Roper*, *Graham*, and *Miller* about how children are constitutionally different from adults in their level of culpability," juvenile homicide offenders "must be given the opportunity to show their crime did not reflect irreparable corruption; and, if it did not, their hope for some years of life outside prison walls must be restored." *Id.* at 213.[3]

While the Supreme Court has yet to directly address how the Eighth Amendment's protections for juvenile offenders relate to the parole process, this Court previously recognized in this very case that "a

---

[3] Most recently, in *Jones v. Mississippi*, the Supreme Court held that a court sentencing a juvenile offender under a discretionary sentencing scheme must consider their "youth and attendant characteristics" but need not make a specific factual finding of "permanent incorrigibility" before imposing life without parole. 593 U.S. 98, 101 (2021). *Jones* did "not overrule *Miller* or *Montgomery*," *id.* at 118, but simply enforced the Court's rejection of a formal factfinding requirement, *see id.* at 103–08, 110. Thomas is not arguing for a formal factfinding requirement and therefore *Jones* is not pertinent here.

fair reading of [*Miller* and *Montgomery*] does not foreclose" that "the Eighth Amendment requires the State to ***operate a parole system*** that affords a meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation." App. Vol. I at 123 (2/1/2022 Order & Judgment), 2022 WL 289661, at *3 (emphasis added).

## B. Factual Background

### 1. Oklahoma's Parole Process

For juvenile offenders like Thomas, Oklahoma's parole system is a multi-stage, multi-agency process involving the Oklahoma Pardon and Parole Board ("PPB"), Oklahoma Department of Corrections ("DOC"), Oklahoma Board of Corrections ("BOC"), and the Governor of Oklahoma. *See generally* Okla. Stat. tit. 57, § 332; *see also* Okla. Const. art. VI, § 10. Each month five PPB board members vote on whether inmates eligible for parole should advance in the parole process. Okla. Const. art. VI, § 10. It is the responsibility of the DOC to notify inmates of PPB meetings, their stage of PPB consideration, changes to their scheduled parole hearing docket, and the parole board's ultimate recommendation. *See* App. Vol. VI at 131–33.[4] The DOC also provides information to PPB

[4] The Oklahoma Board of Corrections is the entity that governs the DOC and is responsible for establishing policies for the DOC's operation.

parole investigators to facilitate their creation of parole investigative reports, which often serve as the sole summary of information on which PPB members base their parole decisions. *See* App. Vol. IV at 132–33 (T. Bates Tr. 28:8–29:9).

In Oklahoma, an individual sentenced to life for a violent offense becomes eligible for parole consideration after completing one-third of the sentence, with reconsiderations occurring every three years. *See* Okla. Stat. tit. 57, §§ 332.7(A), 332.7(E)(1). The PPB uses 45 years as its benchmark for calculating parole eligibility for life sentences; an individual sentenced to life becomes eligible for parole consideration after serving 15 years (one-third of 45 years). *See Fields v. State*, 501 P.2d 1390, 1394 (Okla. Crim. App. 1972). For violent offenses, inmates eligible for parole consideration must pass three voting stages before release is granted. App. Vol. IV at 185 (Okla. Admin. Code 515:25-7-2(b)) (explaining two stages of PPB consideration for violent offenders); *id.* (Okla. Admin. Code 515:25-9-1) (indicating Governor decision as third and final stage).

---

App. Vol. VI at 279. This includes the policy regarding provision of inmate information as part of the parole process. App. Vol. VI at 295 (T. Siegfried Tr. 34:12–21).

a. Stage I

The first stage of parole consideration is called "Stage I" or "Jacket Review." App. Vol. IV at 183, 185. Consideration at this stage is based on PPB's review of an inmate's "jacket," which includes a parole investigative report prepared by the PPB and, potentially, letters of support or opposition submitted by the public. App. Vol. V at 268–69 (T. Bates Tr. 58:19–59:2). Based solely on their review of these materials, PPB members vote on whether the inmate should move forward in the parole process. *Id.* at 271 (T. Bates Tr. 70:2–17).

***The Parole Investigative Report.*** Before an inmate is considered for parole, a PPB parole investigator creates a "parole investigative report," which serves as the complete summary on which PPB members make decisions at Stage I. Okla. Stat. tit. 57, § 332.7(D)(1). There are two components of this document. First, the parole investigator interviews the inmate—but if the investigator is unavailable, a written questionnaire completed by the inmate may be used or, sometimes, input by the inmate may be forgone entirely. App. Vol. IV at 201–03; *see also, e.g.*, *id.* at 125 (2010 Investigative Report) ("No interview due to staff issues."), *id.* at 121 (2013 Investigative Report) ("No interview due to

temporary staff vacancy."). During this interview, the inmate has an opportunity to explain his account of the underlying offense, conduct during incarceration, and any steps he has taken toward rehabilitation. App. Vol. V at 211; *see also* App. Vol. V at 273 (T. Bates Tr. 273:2–279:13.

Second, the parole investigator reviews the inmate's DOC records, commonly referred to as a "field file." App. Vol. VII at 2 (DOC policy governing the mission and organization of the DOC); App. Vol. VI at 121 (DOC policy governing parole process procedures); App. Vol. VII at 12, 14 (confirming the PPB relies on the inmate's DOC-maintained field file for the investigative report). These records are maintained by DOC and include all written documentation associated with the inmate, including educational records, work records, and misconduct reports. App. Vol. IV at 203–226; App. Vol. VIII at 15–16 (T. Siegfried Tr. 90:4–91:8).

The parole investigator then synthesizes this information in a parole investigative report, which includes information about the inmate—including the inmate's birth date and current age and details about the inmate's underlying offense, security level,[5] substance abuse

---

[5] The inmate's security level is assigned by DOC using a custody assessment scale which uses several factors to assign the inmate to minimum, medium, or maximum security. App. Vol. VI at 146. These

and mental health history, work history, and education—and the investigator's recommendation as to parole. App. Vol. IV at 203–226; *see also id.* at 106–108.

Importantly, this report does not identify whether an inmate was a juvenile at the time of his underlying offense, nor can that date be calculated from the other dates that are available on the document. App. Vol. V at 193 (C. Long Tr. 214:4–12) (PPB employee explaining that there is no place to indicate juvenile status because "according to state law, there is no such thing as that"); *id.* at 165 (A. Luck Tr. 168:1–11) (former PPB Chairman testifying that the parole investigative report requires only the "type" and "length of sentence[,]" "as indicated [by] the case file, the title of their charge, and the amount of time that they were sentenced to"). The report includes the inmate's birth date, a "case file date" (the year the criminal complaint or indictment was filed), and a "reception date" (date of judgment or sentence)—but none of these dates indicate

---

factors include the severity of the conviction, serious offense history, escape history, active disciplinary convictions, serious disciplinary convictions, program participation, and age. *Id.* Per DOC policy, individuals serving life (like Thomas) are subject to mandatory overrides, meaning they are not permitted to progress below medium security. App. Vol. VI at 267 (DOC policy requiring mandatory override to "no lower than medium security" for individuals serving life sentences).

the date the underlying offense was committed or help someone reasonably calculate that date. App. Vol. IV at 118, 122, 127; App. Vol. VI at 258. In other words, the fact that an inmate was a juvenile at the time of the offense cannot be calculated from the information required in the investigative report. An investigator could include an inmate's juvenile offender status in the discretionary section of the report, but there is no requirement to do so. App. Vol. V at 236. Nor are investigators required to weigh an inmate's juvenile offender status in any particular way when making a parole recommendation. App. Vol. V at 195 (C. Long Tr. 252:6–12) ("Q. . . . [D]o the parole investigators get any type of guidance in terms of how to weigh the information in Section 13 when making a recommendation? A. That is at the discretion of the parole investigator.").

PPB board members receive parole investigative reports two to three weeks before each PPB meeting, which occur monthly. App. Vol. V at 148 (A. Luck Tr. 83:22–25). Leading up to each meeting, PPB members review documentation for "between 250 and 500 inmates" for "parole Stage I and Stage II, commutations [and] pardons." *Id.* at 176–77 (K. Doyle Tr. 56:13–57:9); *see also id.* at 202. Such documents are received

on a rolling basis in the two weeks leading up to the vote. *Id.* at 176–77 (K. Doyle Tr. 56:4–57:9).[6]

***The PPB Vote.*** There are no formal or informal factors that a PPB board member must consider in making parole decisions. *See, e.g.*, App. Vol. V at 160 (A. Luck Tr. 163:5–10). In fact, "[t]here are no limitations on the factors that the Board may consider when" reviewing an inmate for parole and "making its recommendation to the Governor" (for violent offenses) or "decision" (for non-violent offenses). App. Vol. IV at 185 (Okla. Admin. Code 515:25-9-1, 515:25-9-2). PPB members receive no training on whether or how to consider the information in the investigative report in making parole decisions and retain full discretion on how or whether they take *any* portion of the report into account when issuing their vote. App. Vol. V at 158 (A. Luck Tr. 123:17–21); *see also* App. Vol. IV at 185 (Okla. Admin. Code 515:25-9-1) ("no limitations to the factors that the Board may consider"). Likewise, there is no PPB policy that addresses how, or whether, PPB members should consider an

[6] Letters of support and protest as well as the district attorney letters, if any, would arrive at most about one week before the meeting, separate from the investigative report. *See* App. Vol. V at 181–82 (K. Doyle Tr. 72:24–73:12).

inmate's underlying offense age and, if so, how to do so to ensure juvenile offenders receive a meaningful opportunity for release. *See* App. Vol. V at 160–67 (A. Luck Tr. 163:16–20) ("Q. Are you aware of any PPB regulation or guideline that addresses how PPB members should consider the inmate's age at the time of the underlying offense? A. No.").

The parole board members' votes, given orally during a hearing, are codified on a voting sheet. App. Vol. IV at 105. In casting their votes, PPB members are afforded the opportunity to explain the basis for denial of parole—but are not required to do so.[7] If any explanation is offered, it is limited to six general categories:

1. "The aggravating factors associated with the original crime, including any DA or victim protests, currently outweigh any mitigating factors in support of parole at this time."
2. "Disruptive institutional behavior."
3. "Failure to fully or successfully engage in recommended programing."
4. "Prior Community Failure"
5. "Continued risk to the public."
6. "Forthcoming projected release or parole date."

---

7 Prior to September 2019, there was no opportunity for PPB members to provide a reason for their vote to deny parole to the inmate. App. Vol. V at 201.

App. Vol. V at 201 ("Parole Denial Reasons Adopted and Enacted September 2019"); *see also* App. Vol. V at 174 (K. Doyle Tr. 41:19–22) (confirming that if a parole denial reason was "to be communicated back to the inmate, it is limited to one of these six reasons"); *id.* at 145 (A. Luck Tr. 64:12–15) (confirming board members need not provide reason for denial). None of these six categories in any way account for age at the time of offense, let alone ensure it is viewed as a mitigating factor.

There are five voting members of the PPB, so if an inmate receives three "yes" votes, he will move forward to Stage II. If less than three "yes" votes are received, parole is denied. App. Vol. V at 150 (A. Luck Tr. 95:7–10).

b. Stage II

At Stage II, the inmate or interested parties are permitted to appear and speak before the PPB, after which the PPB conducts a vote. Okla. Stat. tit. 57, §§ 332.7(D)(2); App. Vol. IV at 141 (T. Bates Tr. 70:18–24). If an inmate receives fewer than three "yes" votes at Stage II, parole is denied. App. Vol. V at 150 (A. Luck Tr. 95:7–10). If an inmate receives three "yes" votes at Stage II, he moves forward to the final stage of parole consideration: the Governor. App. Vol. IV at 142–43 (T. Bates Tr. 71:21–

72:2). Similar to Stage I, there is no requirement that distinctive attributes of youth be considered. *See* App. Vol. VII at 178 (A. Luck Tr. 164:11–13) ("There is no established list of required factors board members have to consider when making a [parole] decision.").

c. The Governor

The PPB's recommendation at Stage II that an inmate be paroled is not final. The PPB recommendation is sent to the Governor, who makes the final decision as to parole. Okla. Const. art. VI, § 10; Okla. Stat. tit. 57, § 332. The Governor is provided with all evidence that was before the PPB, as well as the record of the PPB's vote and any explanation. App. Vol. IV at 185. If the Governor agrees with the PPB's recommendation, parole is granted. App. Vol. IV at 247 (K. Doyle Tr. 54:2–20). The Governor retains total discretion in making parole decisions under Oklahoma law. Okla. Stat. tit. 57, § 332; Okla. Const. art. VI, § 10.

2. <u>Thomas's Record of Parole "Consideration"</u>

In December 1995, at the age of 15, Thomas was arrested and charged with three counts of murder in the first degree. App. Vol. IV at 45, 47. After 467 days in detention, he accepted responsibility and pled guilty to all three counts and was sentenced "to a term of life

imprisonment" for each, with Count III to be served consecutive to Counts I and II. *Id.* at 42–45. In 1997, at age 17, he entered Oklahoma's DOC system and has been incarcerated in adult facilities ever since. *Id.* at 42.

Thomas first became eligible for parole consideration in 2010, after serving 15 years of his first sentence. App. Vol. IV at 128–130. Since 2010, Thomas has been placed on the parole docket for Stage I parole consideration every three years. *Id.* at 130. He has been "considered" six times,[8] but has never proceeded beyond Stage I of the parole process. *See* App. Vol. IV at 128 (Oct. 2010 PPB Voting Sheet); *id.* at 124 (Oct. 2013 PPB Voting Sheet); *id.* at 117 (Oct. 2016 PPB Voting Sheet); *id.* at 115 (Oct. 2019 PPB Voting Sheet); *id.* at 105 (Oct. 2022 PPB Voting Sheet).

---

[8] Thomas understands that he was last considered for parole in October 2025, after entry of the district court's final judgment. *See* October 2025 Parole Docket Results at 296, available at https://oklahoma.gov/content/dam/ok/en/ppb/documents/dockets/2025-dockets/10---october-2025/10.%20October%202025%20Parole%20Docket%20Results%202.pdf While that parole "consideration" post-dated the district court's decision, the district court considered the possibility that Thomas could be paroled at that hearing as part of its decision. App. Vol. VIII at 124, 130, 138. As with each of his prior parole considerations over the last 16 years, Thomas was denied parole at Stage I.

For the past 26 years (over half his life), Thomas's record shows steps toward maturity and rehabilitation:

- Since 2000, when he turned 20, Thomas has had no incidents of violent misconducts. App. Vol. IV at 96–97.[9] He has consistently been evaluated a "low risk" by prison officials. *See generally* App. Vol. VI at 145–249.

- In 2002, at age 22, he received high marks on his "Test of Adult Basic Education" at the Mack Alford Correctional Center. App. Vol. IV at 72.[10]

- That same year he began certification as an electrical and HVAC technician, and is now a credentialed HVAC Mechanic Journeyman and Electrical Apprentice. App. Vol. IV at 75–90.

- In 2005, at age 25, he received his "Thinking for a Change" certification and completed his Mechanical Journeyman Certification in May 2006 (age 26). *Id.* at 86–87.

- In 2006, at age 26, he received his "Biblical Interpretation" certification of achievement from the Center for Advanced Studies at Crossroad Bible Institute. *Id.* at 74.

- In 2009, at age 29, he received a collegiate assessment of academic proficiency. *Id.* at 82.

- In July 2014, at age 34, after taking 14 classes over two years, with an average grade of "97.09%," Thomas earned his paralegal certificate. *Id.* at 98.

---

[9] While Thomas's incarceration record reveals seven instances of "violent" conduct before 2000, all such incidents occurred while Thomas was aged 18 to 19 and spanned only six days over the course of two years. *See* App. Vol. IV at 96.

[10] Thomas secured his GED in April 1999, at age 19. App. Vol. IV at 71.

- Since 2018, Thomas has been pursuing a college degree in rehabilitation services (including psychology classes), *id.* at 50–51, and business administration, *id.* at 54.

- In April 2020, Thomas received a certificate for "Satisfactory Completion of SAMSHA Anger Management," *id.* at 61, and, in May 2020, a certificate of satisfactory completion for "Building Social Networks," *id.* at 63.

- Thomas has continued his work in maintenance at the correctional facility since 2017, earning complementary evaluations and becoming certified as a Residential Electrician's Assistant in July 2022. *Id.* at 75, 79; *id.* at 108 ("Maintenance, outstanding evaluations. (Work Reports)"); *id.* at 114 (same); *id.* at 119 (same); *id.* at 122 (same); *id.* at 127 (same).[11]

However, the successive investigative reports prepared for Thomas's parole consideration all either downplay or entirely omit this information. At Stage I, the sole opportunity for inmates to highlight their maturity and rehabilitation is during the inmate interview conducted in connection with the investigative report—assuming they receive one. App. Vol. IV at 201. Of the five parole "considerations" in the record, Thomas was interviewed for only three—in 2016, 2019, and

[11] In 2019, Thomas received a job offer to work as an electrician for a local company should he be released. App. Vol. VII at 102. Carla Thomas, founder of Albuquerque Energy Corporation, wrote a letter of support for Thomas's parole that year and noted he is "one of the finest electricians in the Oklahoma Correctional Facilities." *Id.* His supervisor in 2019 also commended his character and professionalism. *Id.* at 101.

2022.[12] In the years Thomas was not interviewed, the reports omitted details about his rehabilitative efforts and did not recommend him for parole. *See* App. Vol. IV at 121–23 (2013 Investigative Report); *id.* at 125–27 (2010 Investigative Report).

And only one of Thomas's investigative reports indicates his age at the time of the underlying offense, and it only appears under the investigator's "recommendation"—a section that is left purely to the investigator's discretion. *Compare* App. Vol. IV at 114 (2019 Investigative Report) ("Thomas was 15 at the time of his arrest") *and id.* at 120 (2016 Investigative Report) (Thomas has "been in DOC custody for these offenses since he was seventeen") *with id.* at 123 (2013 Investigative Report) (no mention of age), *id.* at 127 (2010 Investigative Report) (same), *id.* at 108 (2022 Investigative Report) (same). While Oklahoma investigative reports no longer expressly portray juvenile age as an aggravating factor on the face of the report, *see* App. Vol. V at 253–55 (2022 PPB Handbook), Thomas's 2010 and 2013 investigative reports

---

[12] Thomas was not interviewed in 2010 or 2013 due to "staff issues." App. Vol. IV at 121, 125. There is no record evidence as to whether Thomas was interviewed for his 2025 consideration or what information the 2025 investigative report contained.

affirmatively counted his juvenile age at the time of the offense against him, App. Vol. IV at 127 (2010 Investigative Report, Section 15) (assessing two points to "Overall Risk Score" for "Age at First Arrest: 16 years or younger"); *id.* at 122–23 (2013 Investigative Report, Section 17) ("Total Risk Score: 2 Overall Risk Level: Low Moderate Risk").

Each time Thomas has been considered for parole, the PPB has voted to recommend or deny parole based solely on his investigative reports. In 2010, 2013, and 2016, Thomas received no votes in his favor.[13] App. Vol. IV at 117, 124, 128. In 2019, Thomas received two votes in his favor to move to Stage II and three against, with two of the PPB members who voted "no" citing the "aggravating factors … [of] the original crime" and "[c]ontinued risk to the public" but providing no additional rationale. *See* App. Vol. IV at 115 (citing "A | E"); App. Vol. V. at 201 (defining parole denial reason "A" ("The aggravating factors associated with the original crime, including any DA or victim protests, currently outweigh any mitigating factors in support of parole at this time") and "E" ("Continued risk to the public")). In 2022, every member of the PPB voted to deny

[13] Because the "Reasons for Parole" denial did not exist until September 2019, no reasons for denial were given.

parole, again citing the "aggravating factors . . . [of] the original crime" as well as "[d]isruptive institutional behavior," which the associated investigative report make clear are instances from approximately *22 years prior*—before Thomas turned 20. *See* App. Vol. IV at 105 (citing "B" or "A | B" as the reason for denial); *see also* App. Vol. V at 201 (defining "B" as "Disruptive institutional behavior"). The public record of Thomas's 2025 parole consideration does not contain any details about the vote or reason for denial. Thomas remains incarcerated under his first life sentence and will next be eligible for parole in 2028.

### C. Procedural History

In September 2020, Thomas filed a *pro se* civil complaint in the United States District Court for the Western District of Oklahoma against the Governor of Oklahoma, the Executive Director of PPB, the Chair of BOC, and the Director of DOC. *See* App. Vol. I at 17 (Complaint). He alleged that Oklahoma's parole system is unconstitutional under the Eighth Amendment and Article II, § 9 of the Oklahoma Constitution because it fails to provide a meaningful opportunity to obtain release and sought declaratory and injunctive relief. *See id.*

The district court screened and dismissed Thomas's complaint for failure to state a claim. *Id.* at 62 (10/30/2020 Suppl. R&R); *id.* at 74 (12/2/2020 Obj. to 10/30/2020 Suppl. R&R); *id.* at 104 (12/21/2020 Order Adopting Suppl. R&R). Thomas appealed to the Tenth Circuit. *Id.* at 111.

This Court reversed the district court's order and remanded for further proceedings, holding that Thomas had "stated plausible claims for relief" and his "complaint contain[ed] enough well-pleaded facts to plausibly entitle him to relief." *Id.* at 123–24 (2/1/2022 Order & Judgment), 2022 WL 289661, at *4. In doing so, the Court recognized that "the Supreme Court has not specifically addressed Mr. Thomas's argument—whether the Eighth Amendment requires the State to operate a parole system that affords a meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation"—but stated that "a fair reading of the cases does not foreclose Mr. Thomas's claims." *Id.*

Upon remand, Defendants-Appellees moved to dismiss the Complaint, which Thomas opposed. *Id.* at 127 (5/16/2022 Mot. to Dismiss), 159 (7/21/2022 Opp. to Mot. to Dismiss), 195 (7/28/2022 Reply

ISO Mot. to Dismiss). The magistrate judge issued a report and recommendation granting the motion to dismiss. *Id.* at 201 (11/17/2022 Second Suppl. R&R). Thomas objected and the district court ultimately denied the motion to dismiss. *Id.* at 224 (12/21/2022 Obj. to Second Suppl. R&R), 255 (1/23/2023 Order Denying Mot. to Dismiss). Thereafter the parties engaged in fact discovery, at the conclusion of which Defendants-Appellees Kevin Stitt, T. Hastings Siegfried, Steven Harpe, and Tom Bates moved for summary judgment, which Thomas opposed. App. Vol. II at 1–App. Vol. V at 56 (Defendants' Motions); App. Vol. V at 57–App. Vol. VII at 283 (Plaintiff's Oppositions); App. Vol. VII at 284–App. Vol. VIII at 120 (Defendants' Replies).

On September 5, 2025, the district court granted Defendants' motions and entered judgment for Defendants. App. Vol. VIII at 121 (9/5/2025 Order); *id.* at 154 (9/5/2025 Judgment). As relevant here, the district court made three legal conclusions. First, the district court held that Thomas could not establish an Eighth Amendment violation "because he was a juvenile homicide offender sentenced to life with the possibility of parole, and *Miller* only requires that a sentencer consider a juvenile homicide offender's 'youth and attendant circumstances' ***prior***

to imposing a life-without-parole sentence." *Id.* at 147 (9/5/2025 Order) (emphasis added). The district court said that to hold "*Miller* entitles [Thomas] . . . to certain parole procedures necessarily requires an expansion of *Miller*'s holding." *Id.* at 149 (9/5/2025 Order).

Second, the district court concluded that there was no material dispute of fact regarding Thomas's Eighth Amendment claim as to any Defendant. In its reasoning, the district court identified three ways Thomas could show Oklahoma's parole system is unconstitutional: (1) "a policy or practice that prevents him from being granted parole"; (2) "that the PPB would refuse to grant Plaintiff a recommendation for parole regardless of the circumstances"; and/or (3) that the PPB is prohibited (by policy or statute) or simply "refuses to consider an inmate's age at the time of the offense when considering parole recommendations for juvenile offenders." *Id.* at 150 (9/5/2025 Order). The district court concluded that Thomas had not put forth evidence of any of these, relying on the testimony of two former PPB members who stated that they believed age at the time of the underlying offense was important and therefore considered age at time of conviction in making parole decisions, the fact that PPB members could technically consider any factor they wished in

making parole determinations, though they were not required to do so, and that DOC's mandatory override policy and custody assessment scale do not make Thomas ineligible for parole. *Id.* at 150–51 (9/5/2025 Order). The district court did not assess whether Oklahoma's parole procedures for juvenile offenders provide a meaningful opportunity for release based on demonstrated maturity and rehabilitation. *Id.* at 147–51.

Having dismissed Thomas's Eighth Amendment claims, the district court declined to exercise supplemental jurisdiction over Thomas's state law claim under the Oklahoma Constitution. *Id.* at 153 (9/5/2025 Order). Thomas now appeals the district court's summary judgment decision and entry of judgment against him.[14]

## SUMMARY OF THE ARGUMENT

The question here is whether the Eighth Amendment requires the state of Oklahoma to operate a distinct parole system for juveniles that actually, ***in practice***, "affords a meaningful opportunity to obtain release

---

[14] The district court concluded that Thomas did not have standing with respect to his claims against Defendant-Appellee Kevin Stitt, the Governor of Oklahoma. App. Vol. VIII at 137, 143 (9/5/2025 Order). While Thomas maintains that the Governor plays a role in Oklahoma's unconstitutional parole system, Thomas does not appeal this conclusion. As such, Thomas intends this instant appeal to relate only to Defendants-Appellees PPB, DOC, and BOC.

based on demonstrated maturity and rehabilitation." App. Vol. I at 123 (2/1/2022 Order & Judgment), 2022 WL 289661, at *3. The answer under *Graham* and *Miller* is clear: it does. *Graham*, 560 U.S. at 75, 82; *Miller*, 567 U.S. at 479.

The Supreme Court has consistently found that juveniles and adults should be treated as categorically distinct for purposes of parole. That is because "children are constitutionally different from adults in their level of culpability" and those convicted as juveniles "must be given the opportunity to show their crime did not reflect irreparable corruption; and, if it did not, their hope for some years of life outside prison walls must be restored." *Montgomery*, 577 U.S. at 213; *see also Roper*, 543 U.S. at 567, 569 (articulating critical differences from adults that make juvenile offenders "categorically less culpable than the average criminal"); *Graham*, 560 U.S. at 74 (categorically denying "the right to reenter the community" is "not appropriate in light of a juvenile nonhomicide offender's capacity for change and limited moral culpability"). The violent or non-violent nature of a juvenile's underlying offense does not alter this constitutional distinction. *Miller*, 567 U.S. at 471, 473 (noting that "children are constitutionally different from adults

for purposes of sentencing" and that "none of what [*Graham*] said about children—about their distinctive (and transitory) mental traits and environmental vulnerabilities—is crime-specific"). A system like Oklahoma's—one that provides no training as to how to account for juvenile age, no policies or procedures that require consideration of juvenile age as part of the parole process, and no other safeguards to ensure that juvenile offenders have a meaningful opportunity to show maturity and rehabilitation—simply cannot satisfy this constitutional standard. *See* App. Vol. V at 158 (A. Luck Tr. 123:17–21) (no training); *id.* at 160 (A. Luck Tr. 163:16–20) (no policies or procedures).

The district court erroneously concluded that requiring Oklahoma to maintain any particular set of "parole procedures [related to Thomas's juvenile offender status] necessarily requires an expansion of *Miller*'s holding." App. Vol. VIII at 149 (9/5/2025 Order). Setting aside that *Graham* and *Miller* contemplated the very parole procedures Thomas seeks—ones considering juveniles as distinct from adults—it is difficult to imagine how the district court determined that a "meaningful opportunity" for parole exists without actually analyzing how Oklahoma's parole procedures account for maturity and rehabilitation.

Had it done so, the district court would have concluded that the Oklahoma parole system has failed to provide Thomas and other juvenile offenders with a realistic and meaningful opportunity for parole, in violation of the Eighth Amendment.

The district court also erred in finding that there were no genuine issues of material fact because Thomas did not provide evidence that he is "serving the functional equivalent of a mandatory life-without-parole sentence." *Id.* at 152 (9/5/2025 Order). As an initial matter, this is the wrong analysis: again, the question is whether Oklahoma's system provides Thomas (and others like him) a ***meaningful*** opportunity for release based on demonstrated maturity and rehabilitation, not whether he has proven that Oklahoma has deprived him of ***all*** opportunity for parole.

The district court found no genuine dispute of material fact because there was no evidence: (1) of a "policy or practice that prevents [Thomas] from being granted parole"; (2) "that the PPB would refuse to grant Plaintiff a recommendation for parole regardless of the circumstances"; and/or (3) that the PPB is prohibited (by policy or statute) or simply "refuses to consider an inmate's age at the time of the offense when

considering parole recommendations for juvenile offenders." *Id.* at 150 (9/5/2025 Order). But even within the district court's framing, Oklahoma's system still fails. Thomas presented extensive evidence that Oklahoma's parole system gives no consideration to juvenile offender status, that age at the time of the underlying offense is not a required consideration when making parole decisions, and that there is no training provided to individuals making parole decisions regarding how to consider juvenile offender status at any stage of the Oklahoma parole process. *See* App. Vol. V at 158 (A. Luck Tr. 123:17–21); App. Vol. IV at 185 (Okla. Admin. Code 515:25-9-1) ("no limitations to the factors that the Board may consider"). Indeed, there is no PPB, DOC, or BOC policy or procedure that even references age of a juvenile offender—after all, by Defendants-Appellees' own admission the Oklahoma parole system treats all inmates the same, adults and juveniles alike. App. Vol. V at 191 (C. Long Tr. 111:9–11) ("under Oklahoma law, all inmates, when they come to us, we consider them as adults.") Nor is there any transparency at any stage of Oklahoma's parole decisions, leaving inmates like Thomas stuck cycle after cycle without the information necessary to make a meaningful case for their parole. Viewing these facts in the light most

favorable to non-movant Thomas reveals genuine issues of material fact that should have survived summary judgment. For the same reasons, the district court erred in granting summary judgment on Thomas's supplemental state law claim.

A parole process that functionally withholds a "meaningful opportunity to obtain release" for juvenile offenders cannot provide Thomas—or the other juvenile offenders in Oklahoma's system—with the protections required by the Eighth Amendment. This Court should therefore reverse the district court's decision and remand as to Thomas's claims against the PPB, DOC, and BOC.

## STANDARD OF REVIEW

This Court reviews *de novo* a district court's grant of summary judgment. *See Forth v. Laramie Cnty. Sch. Dist. No. 1*, 85 F.4th 1044, 1052 (10th Cir. 2023); *see also Collins v. Furlong*, 3 F. App'x 886, 888 (10th Cir. 2001) (reviewing *de novo* a summary judgment decision on an Eighth Amendment Section 1983 claim). Reversal is required if the district court "failed to credit evidence favorable to the nonmovant and draw all reasonable inferences in the nonmovant's favor." *Forth*, 85 F.4th at 1052.

## ARGUMENT

### I. THE DISTRICT COURT ERRED IN HOLDING THAT THOMAS'S EIGHTH AMENDMENT CLAIM WOULD REQUIRE EXPANDING *MILLER*.

The district court held that "[Thomas]'s claim that *Miller* entitles him, a juvenile homicide offender sentenced to life with the possibility of parole, to certain parole procedures necessarily requires an *expansion* of *Miller*'s holding," which it "decline[d] to do." App. Vol. VIII at 149 (9/5/2025 Order) (emphasis added). This was error. The district court acknowledged that *Miller* prohibits situations in which a juvenile is sentenced to life in prison without the meaningful possibility of parole. *Id.* at 144–46 (9/5/2025 Order). But it failed to put this principle into practice and actually look behind the curtain of Oklahoma's parole system to see whether it provides meaningful Eighth Amendment protection to juvenile offenders like Thomas. [15]

---

[15] The district court summarily held that Thomas cannot bring a facial challenge to Oklahoma's parole statutes because he did not explain how they are unconstitutional "in all, or virtually all, of [their] applications." App. Vol. VIII at 135–36 & 136 n.9. While the standard in this Circuit for reviewing a facial challenge is unclear, *United States v. S. Ct. of New Mexico*, 839 F.3d 888, 908–10, 912–16 (10th Cir. 2016), where a plaintiff brings both facial and as-applied claims, the same substantive framework should be applied to both. Thomas has clearly plead both here. *See* App. Vol. I at 27–28, 33, 35–37, 43, 50–51 (Complaint ¶¶ 17, 18, 21, 22, 47, 53, 56, 60, 61, 86, 107) (referencing

*Graham* and *Miller* require more. Parole consideration for juvenile offenders carries special constitutional significance because, "[f]rom a moral standpoint it would be misguided to equate the failings of a minor with those of an adult, for greater possibility exists that a minor's character deficiencies will be reformed." *Roper*, 543 U.S., at 570; *see also Graham*, 560 U.S. at 76 ("An offender's age is relevant to the Eighth Amendment, and criminal procedure laws that fail to take defendants' youthfulness into account at all would be flawed."); *Miller*, 567 U.S. at 479–480 (similar). These pivotal cases "teach us, in essence, that youth matters under the Constitution." *State v. Zuber*, 152 A.3d 197, 212 (N.J. 2017). And courts in other circuits have agreed that "the constitutional protections recognized by *Graham, Miller, and Montgomery* apply to parole proceedings." *Howard v. Coonrod*, 546 F. Supp. 3d 1121, 1131–32 (M.D. Fla. 2021); *Flores v. Stanford*, 2019 WL 4572703, at *9 (S.D.N.Y. Sept. 20, 2019) ("a parole board is the vehicle through which the rights recognized in *Graham*, *Miller*, and *Montgomery* are delivered"); *see also Greiman v. Hodges*, 79 F. Supp. 3d 933, 943 (S.D. Iowa 2015) (similar).

---

bringing claims on his behalf and on behalf of "those similarly situated"); App. Vol. V at 101 & 101 n.10 (same); App. Vol. VII at 141 (same).

The possibility of parole must be "***meaningful***." *Miller*, 567 U.S. at 479 (quoting *Graham*, 560 U.S. at 75) (emphasis added). Indeed, as this Circuit has previously observed, *Graham* specifically stated that "any sentence that denies a juvenile nonhomicide offender a realistic opportunity to obtain release in his or her lifetime, whether or not that sentence bears the specific label 'life without parole,'" was unconstitutional. *Budder v. Addison*, 851 F.3d 1047, 1057 (10th Cir. 2017). The same must be true for juvenile homicide offenders under *Miller*. 567 U.S. at 479 (quoting *Graham*, 560 U.S. at 75).

The distinction between adults and juveniles is salient here. While parole for adult offenders has generally been deemed a matter of "legislative grace," *Alverez v. Turner*, 422 F.2d 214, 217 (10th Cir. 1970), for juvenile offenders, a parole opportunity is a constitutional *requirement* necessary to "ensure[] that juveniles whose crimes reflected only transient immaturity—and who have since matured—will not be forced to serve a disproportionate sentence in violation of the Eighth Amendment." *Montgomery*, 577 U.S. at 212; *see also Graham*, 560 U.S. at 75, 79, 82 (similar); *Miller*, 567 U.S. at 479–80, 489 (similar). As such, a parole board must "take [] into account the offender's status as a child

when the crime was committed." *Diatchenko v. Dist. Att'y for Suffolk Dist.*, 27 N.E.3d 349, 368 (Mass. 2015); *see also Hawkins v. New York State Dep't of Corr. & Cmty. Supervision*, 30 N.Y.S.3d 397, 400 (App. Div. 2016) ("A parole board is no more entitled to subject a[] [juvenile] offender to the penalty of life in prison in contravention of" the Eighth Amendment "than is a legislature or a sentencing court."). Thus, juvenile offenders must be afforded both the theoretical ***and the actual*** opportunity to obtain parole.

Against the backdrop of this Eighth Amendment jurisprudence, the district court erred by ruling that Thomas's claim would necessarily require expanding *Miller*. The district court reasoned that this Circuit over 10 years ago characterized the right in *Miller* as "narrowly drawn." App. Vol. VIII at 148–49 (9/5/2025 Order) (citing *Davis v. McCollum*, 798 F.3d 1317, 1321 (10th Cir. 2015)); *Davis*, 798 F.3d at 1321 ("*Miller* said nothing about non-mandatory life-without-parole sentencing schemes and thus cannot warrant granting relief from a life-without-parole sentence imposed under such a scheme."). The district court extrapolated that because the Eighth Amendment permits some discretionary life-without-parole sentences for juveniles, and Thomas was sentenced to life

with the possibility of parole, he cannot establish an Eighth Amendment claim. App. Vol. VIII at 148–49 (9/5/2025 Order). That entirely misses the point. Thomas was not discretionarily sentenced to life without the possibility of parole—but the Oklahoma parole system has *de facto* imposed this sentence upon him because he has not been afforded a meaningful opportunity for release. That is an Eighth Amendment violation.[16]

Docketing an inmate for parole "consideration" without even taking the inmate's juvenile offender status into account or appropriately reviewing facts attendant to their maturity and rehabilitation is not the consideration mandated by the Constitution. The district court's holding will permit Oklahoma to continue offering juvenile offenders sentenced to life the possibility of parole on paper, while in practice prohibiting such inmates from ever exercising their Eighth Amendment protections. In

---

16 The three cases the district court cited in a footnote similarly miss the mark. App. Vol. VIII at 147 n.12 (9/5/2025 Order). These cases focus on the imposed sentence as it is written on paper and not how Oklahoma's parole system actually functions. *See Rodgers v. Whitten*, 2021 WL 735647, at *1 (W.D. Okla. Feb. 25, 2021) (no analysis of Oklahoma's parole system as it applies to juvenile offenders); *Lewis v. Okla. Pardon & Parole Bd.*, 2019 WL 1500671, at *1 (W.D. Okla. Apr. 5, 2019) (same); *Bias v. Stitt*, 2021 WL 3008606, at *1 (W.D. Okla. July 15, 2021) (same).

this way it perpetuates "a *de facto* life without parole sentence that is prohibited by *Graham* and its progeny." *Greiman v. Hodges*, 79 F. Supp. 3d 933, 944 (S.D. Iowa 2015); *Bear Cloud v. State*, 334 P.3d 132, 141–44 (Wyo. 2014) (similar); *Md. Restorative Just. Initiative v. Hogan*, 2017 WL 467731, at *19–20 (D. Md. 2017) (similar). This Court should therefore reverse and remand the district court's ruling regarding *Miller*.

## II. THE DISTRICT COURT ERRED BY FAILING TO ASSESS WHETHER OKLAHOMA'S PAROLE SYSTEM PROVIDES A "MEANINGFUL OPPORTUNITY" FOR RELEASE AND BY FAILING TO VIEW THE FACTS IN A LIGHT MOST FAVORABLE TO THOMAS.

The district court also erred in holding that Thomas has not "provided evidence that Oklahoma's parole system provides him with no meaningful opportunity for release, such that he is serving the functional equivalent of a mandatory life-without-parole sentence" or "established a genuine dispute of material fact." App. Vol. VIII at 152 (9/5/2025 Order). The district court's view of the evidence at summary judgment was flawed for two reasons.

First, the district court erred to the extent it equated proof of Thomas's lack of "meaningful opportunity for release" with "the functional equivalent of life without parole." *See* App. Vol. VIII at 152.

That is not the correct standard under *Miller*. Thomas is not required to prove that Oklahoma's system is the functional equivalent of life without parole. Thomas must show only that Oklahoma's system does not afford him, and others like him, a "meaningful opportunity for release based on demonstrated maturity and rehabilitation." *Miller*, 567 U.S. at 479 (quoting *Graham*, 560 U.S. at 75). The district court cited no case law to the contrary. *See generally* App. Vol. VIII at 146–52. Relying on this misaligned analysis, the district court failed to actually analyze Oklahoma's parole system and instead perfunctorily concluded that Thomas had not proven it insufficient.

Second, the district court ignored evidence put forward by Thomas showing that Oklahoma's parole system—which fails to track juveniles or establish any policy, procedure, or other mechanism to provide consistent consideration of juvenile status—unquestionably ***does not*** in fact provide juvenile offenders a meaningful opportunity for release. Had the district court considered this evidence and viewed it in a light most favorable to Thomas, it would have found a genuine issue of material fact as to the constitutionality of Oklahoma's juvenile parole system facially and as applied to Thomas.

### A. The District Court Erred by Concluding That Thomas Failed to Show Oklahoma's Parole System Provides Juvenile Offenders With No Meaningful Opportunity for Release.

The district court erred by determining that, because the Oklahoma parole system does not expressly prohibit consideration of juvenile age, it provides juvenile inmates with a meaningful opportunity for release. App. Vol. VIII at 150 (9/5/2025 Order) ("The crux of Plaintiff's claims is the PPB's lack of youth-consideration during parole decisions"). This flips the meaningful opportunity standard on its head.

The Supreme Court has clearly stated that "criminal procedure laws that fail to take defendants' youthfulness into account at all would be flawed." *Graham*, 560 U.S. at 76; *Miller*, 567 U.S. at 471–72 (noting that "children are constitutionally different from adults"). At the very least, that means that juvenile age at the time of the underlying offense must actually be considered to satisfy the Eighth Amendment. The district court's read would mean that a state that merely ***did nothing*** with respect to juvenile age—like Oklahoma's—could satisfy the Eighth Amendment's special protections for juveniles. That cannot be true under *Graham*, *Miller*, and their progeny.

Thomas put forth evidence at summary judgment that, in Oklahoma, there is no difference between adult and juvenile offenders for purposes of parole consideration, and in fact there is no way to accurately distinguish between adult and juvenile offenders at any stage of Oklahoma's parole process. For example, PPB parole investigator Carl Leroy Long testified that "under Oklahoma law, all inmates, when they come to us, we consider them as adults." App. Vol. V at 191 (C. Long Tr. 111:4–11); *see also id.* at 165 (A. Luck Tr. 168:1–11) (former PPB Chairman testifying that PPB is not required to identify in the parole investigative report whether an inmate was sentenced to life as a juvenile); *id.* at 295 (C. Castleberry Tr. 73:6–10) (DOC employee testifying that DOC's custody assessment does not consider juvenile status at the time of the offense).

Without any way to consistently track juveniles separately from adults, or even determine which inmates were juveniles at the time of the underlying offense, PPB members are unable to consider ***how*** Thomas's (or other similarly situated individuals') juvenile age—including unique characteristics associated with age like (1) "lack of maturity and an underdeveloped sense of responsibility"; (2) "more vulnerab[ility] or

susceptib[ility] to negative influences and outside pressures"; and (3) "more transitory, less fixed" character, *Roper*, 543 U.S. at 569–70—factors into his maturity and rehabilitation. Oklahoma's choice not to track, identify, or educate about the salient characteristics of youth or greater potential for reform for juveniles means that juvenile offenders do not receive any opportunity for release distinct from that of adults.

In this sense, Oklahoma's parole system suffers even in comparison to the other state parole systems courts have recently considered in the Eighth Amendment context. In those systems, juveniles were actually tracked and treated differently from adults. For example, the Eleventh Circuit held that Florida's parole system did not violate the Eighth Amendment because, among other things, juveniles and adults were considered under different release matrices: "[t]he 'youthful offender matrix' produces substantially more generous guideline release dates than does the adult matrix." *Howard v. Coonrod*, 134 F.4th 1136, 1141 (11th Cir. 2025). In other words, unlike Oklahoma, Florida's system

actually tracked juvenile offenders separately from adults and had processes in place to account for juvenile status.[17]

Again, at summary judgment, the district court completely ignored the lack of consideration of age in Oklahoma's parole system and omitted this fact from its analysis entirely. The district court simply stated: "Plaintiff has not provided any evidence that the PPB refuses to consider an inmate's age at the time of the offense when considering parole recommendations for juvenile offenders like Plaintiff, or that any policy or statute prevents the PPB from considering an inmate's juvenile-offender status." App. Vol. VIII at 150 (9/5/2025 Order). Refusal to consider juvenile status is not the test for constitutionality—the standard is whether actual consideration is being regularly given.

---

[17] The same is true of Virginia and Missouri's parole systems. *See Bowling v. Dir., Va. Dep't of Corr.*, 920 F.3d 192, 198 (4th Cir. 2019) (Virginia's parole process "allowed the Parole Board to ***fully consider*** the inmate's age at the time of the offense . . . and account for the concern at the heart of *Graham* and *Miller*: 'that children who commit even heinous crimes are capable of change'") (quoting *Montgomery*, 577 U.S. at 212) (emphasis added); *Brown v. Precythe*, 46 F.4th 879, 887 (8th Cir. 2022) (Missouri's parole process as to juvenile offenders did not violate *Miller* because, among other things, Missouri's parole board members are "require[d] . . . to consider . . . the ***defendant's age***, maturity, intellectual capacity, and mental and emotional health and development ***at the time of the offense***.") (emphasis added).

Indeed, per *Graham*, "it would be misguided to equate the failings of a minor with those of an adult, for a greater possibility exists that a minor's character deficiencies will be reformed." *Graham*, 560 U.S. at 68 (quoting *Roper*, 543 U.S. at 570). The practical effect of the district court's analysis is that only a parole system that explicitly ***prohibits*** consideration of juvenile offender status could violate *Miller*. *See generally id.* at 149–52. That contradicts the Supreme Court's own jurisprudence, and the district court's ruling should be reversed.

### B. The District Court Failed to View the Facts in the Light Most Favorable to Thomas.

In holding Oklahoma's parole system constitutional, the district court also incorrectly analyzed key facts in a light most favorable to Defendants—not Thomas—on three key determinations: (1) that Oklahoma's parole system does not require inclusion of juvenile status at the time the offense was committed in the investigative reports relied on for parole decisions, App. Vol. VIII at 150 (9/5/2025 Order); (2) that two former parole board members calculated inmate age at the time the criminal complaint was filed and/or the juvenile was received by the DOC after sentencing, *id.* at 150–51; and (3) that DOC's mandatory override

policy[18] and custody assessment scale do not affirmatively prohibit Thomas from demonstrating rehabilitation for purposes of parole consideration, *id.* at 151 & n.15.

The district court's ruling therefore ignored facts showing that the "distinctive attributes of youth" or age at the time of offense are not regularly considered at any stage of the Oklahoma parole process.[19] Viewed in a light most favorable to the non-movant, Thomas, those facts should have led the district court to deny summary judgment and allow this case to proceed to trial.

1. <u>The District Court Failed to Consider Evidence That Parole Investigative Reports Are Insufficient.</u>

First, the district court erred in determining that parole investigative reports provide ample information to confirm juvenile status such that juvenile age and distinctive attributes of youth can be considered. App. Vol. VIII at 150 & n.13 (9/5/2025 Order).

---

[18] The BOC "establish[es] and maintain[s] written policies for the operation of the Oklahoma Department of Corrections," including the mandatory override policy. App. Vol. V at 92.

[19] Oklahoma's lack of any procedures that account for juvenile age would fail under any standard, be it meaningful opportunity or otherwise.

There is no PPB policy requiring consideration of juvenile status, which means such status is either considered inconsistently or not at all. That is itself a "policy or practice [which] prevents the PPB from considering an inmate's juvenile-offender status." *Id.* at 150. The parole investigative report does not indicate the inmate's age at the time of the offense. *See, e.g.*, App. Vol. V at 192–93 (C. Long Tr. 199:8–16, 214:4–12) (PPB employee explaining that there is no place to indicate juvenile offender status because "according to state law, there is no such thing as that"); *id.* at 163 (A. Luck Tr. 168:1–11) (former PPB Chairman testifying that the parole investigative report requires only the "type" and "length of sentence[,]" "as indicated [by] the case file, the title of their charge, and the amount of time that they were sentenced to"). While the report includes an inmate's "birth date," that date has no relation—other than being a mathematical input—to the age he was at the time the underlying offense was committed.

The one place where age is sometimes (albeit inconsistently) included in the parole investigative report is the investigator's recommendation. App. Vol. IV at 226 (recommendation "based on the totality of information available"). Thomas's parole investigative reports

reveal the glaring and regular omission of his youth at the time of the offense. Only one investigative report referenced Thomas's age in the recommendation section—an entirely discretionary inclusion. App. Vol. IV at 114 (2019 Investigative Report) ("Thomas was 15 at the time of his arrest . . .").[20] None of Thomas's other four investigative reports noted his age at the time of the underlying offense at all. App. Vol. IV at 106–08, 118–123, 125–27.[21]

Contrary to the district court's conclusion, age at the time of the underlying offense also cannot be determined by other dates in the report. At best, the reports include age at "first arrest," age in the year the criminal complaint was filed, and age when the inmate was sentenced or received by the Oklahoma DOC to serve the sentence. App. Vol. IV at 203–05. But the date the inmate committed the underlying offense is not included, so none of these "ages" are the age at the time the inmate committed the offense. The case file date (year charges filed) and

---

[20] In this single instance where age at the time of the offense was included, the investigator recommended parole. *See* App. Vol. IV at 114.

[21] Thomas's 2016 investigative report recommendation, which also recommends parole, recognizes "Thomas has been in custody for these offenses since he was seventeen" but failed to recognize he was merely 15 at the time of the underlying offenses. App. Vol. IV at 120.

reception date (year sentenced) necessarily post-date the time of the underlying offense, and do not indicate juvenile status in all circumstances. *See id.* at 122, 127. And age at first arrest does not permit a calculation of juvenile status, since the age at first arrest and age at the time of the offense are not necessary the same. *See, e.g.*, *id.*at 37–38.

The district court erred in concluding that the investigative reports themselves consistently provide information about the age of the inmate at the time the underlying offense was committed, let alone dictate any special consideration of that information in recommending parole. *See* App. Vol. VIII at 126–27 (9/5/2025 Order). Again, the mere possibility that one ***could*** deduce the age of the offender from any or all of the information in any investigative report is not enough. It is axiomatic that juvenile age at the time of the offense must be calculated accurately if it is to be used to identify which inmates must be afforded the "meaningful opportunity" for parole to which they are entitled. *Miller*, 567 U.S. at 479 (quoting *Graham*, 560 U.S. at 75). Put simply, the district court erred in failing to consider the evidence that Oklahoma's system does not require any such calculation or consideration of juvenile status in the

investigative reports in the light most favorable to Thomas. App. Vol. VIII at 149–50 (9/5/2025 Order).

2. The District Court Failed to View Facts Regarding PPB's Inadequate and Inconsistent Attempts to Consider Age at the Time of the Underlying Offense in the Light Most Favorable to Thomas.

The district court also erred in concluding that Thomas did not "provide[] any evidence that the PPB refuses to consider an inmate's age at the time of the offense when considering parole recommendations for juvenile offenders like [Thomas], or that any policy or statute prevents the PPB from considering an inmate's juvenile-offender status." App. Vol. VIII at 150 & n.13 (9/5/2025 Order). Here, the district court was heavily persuaded by two former PPB board members' testimony, particularly as to their personal recollections of considering age in making parole recommendations. *See id.* at 127; *id.* at 94 (K. Doyle Tr. 67:12–23); App. Vol. II at 115 (A. Luck. Tr. 116:2–14). In particular, the district court found it to be sufficient that, "at times[,] PPB members calculate an offender's age at the time of the offense by subtracting the offender's birth date from the case file date." App. Vol. VIII at 126–27 (9/5/2025 Order). Such proxy calculations are hardly accurate.

As made clear above, the case file date notes only the date when charges were filed against the inmate, not the date when the offense was committed. App. Vol. IV at 208. This calculation therefore does not and cannot capture all inmates who were juvenile offenders. Consider an inmate whose offense was committed when he was 17, but he turned 18 before charges were filed against him. If a PPB member tried to calculate the offender's age at the time of the offense from their birth date and case file date alone, they would determine the inmate was *not* a juvenile at the time of the offense. As a result, no PPB member could recognize that this offender was a juvenile at the time of the offense, let alone consider his juvenile status separate from the hundreds of other inmates being considered. *Id.* at 176–77 (K. Doyle Tr. 56:13–57:9) (former PPB member testifying that PPB members review documentation for "between 250 and 500 inmates" for "parole Stage I and Stage II, commutations [and] pardons"). The district court failed to consider these facts in the light most favorable to Thomas.

And setting aside whether such calculations are accurate, they cannot be sufficient. The fact that two former PPB members may have occasionally considered juvenile status does not negate the fact that there

is no Oklahoma policy, procedure, or practice to ensure age at the time of the offense is considered for all juvenile offenders. *Compare* App. Vol. VIII at 126–27 (9/5/2025 Order) (recognizing that "at times" two PPB members calculated age at the time of the offense by subtracting the birth date from the case file date) *and* App. Vol. V at 187–88 (C. Long Tr. 38:24–39:3) (PPB employee testifying that "when we do document inmates, it's under – everybody is considered an adult when they come to the Department of Corrections").

Even if PPB members wanted to consistently consider juvenile status as part of their parole decisions—despite the limitations of the investigative report as discussed above—they do not receive any training on the differences between juveniles and adults that would educate them regarding meaningful consideration of juvenile status. *See* App. Vol. V at 266–67 (T. Bates Tr. 46:22–47:2) (PPB Director testifying to no training regarding parole consideration of inmates who were juveniles at the time of the offense); *id.* at 170–73 (K. Doyle Tr. 16:23–17:1, 17:13–18, 18:1–8, 31:8–11) (former PPB member testifying to no training on how to consider the age of the inmate at the time of the underlying offense); *id.* at 187–90 (C. Long Tr. 38:13–39:3, 40:21–41:10, 111:4–11) (PPB

employee testifying to no training as to inmates sentenced as juveniles and that all inmates are considered adults and juvenile offenders are not documented in Oklahoma's parole system). And, again, there is no PPB policy that addresses how, if at all, PPB members should consider an inmate's age at the time of the offense when making parole recommendations. *See id.* at 160 (A. Luck Tr. 163:11–15). Without such a policy, there is no safeguard that the PPB will in fact provide juveniles with "meaningful" consideration let alone a meaningful opportunity to obtain release. *Miller*, 567 U.S. at 479 (quoting *Graham*, 560 U.S. at 75). The district court erred in finding otherwise.

#### 3. The District Court Used the Wrong Standard to Find Lack of DOC or BOC Policies and Procedures Considering Juvenile Age Sufficient.

Finally, the district court erred in determining that "Plaintiff has failed to show that [certain DOC and BOC] policies render him ineligible for parole, or that he is incapable of showing his rehabilitation as a result of the policies," App. Vol. VIII at 151 (9/5/2025 Order), and, again, did so by not viewing the facts in the light most favorable to Thomas. Here, the district court simply asked the wrong question: the question is not whether a policy or procedure rendered Thomas "ineligible for parole."

*Id.* The question is whether Oklahoma's failure to account for juvenile status results in juvenile offenders being disadvantaged in their ability to demonstrate maturity and rehabilitation under the Eighth Amendment. *See, e.g.*, *Budder*, 851 F.3d at 1056 ("The Court in *Graham* focused, not on the label attached to the sentence, but on the irrevocability of the punishment.").

Like PPB, DOC and BOC do not consider juvenile status at the time of the offense in ***any*** of their policies or procedures. App. Vol. VII at 15 (D. Romine Tr. 119:8–12) ("Q. And you've never seen a parole policy at DOC specific to inmates who were juveniles at the time of their offense, correct? A. Correct."). In fact, BOC's policies do not require or instruct DOC to create its operating policies with any consideration of juvenile status. *See* App. Vol. VI at 277–90 (BOC Operating Procedures and Policies).

For example, DOC does not consider whether the inmate was a juvenile offender in the inmate's initial DOC custody assessment, which in turn determines the inmate's security-level classification. *See, e.g.*, *id.* at 256 (DOC policy regarding classification and mandatory override); App. Vol. V at 295 (C. Castleberry Tr. 73:6–10) (testifying that no

consideration is given to juvenile status at the time of the offense as part of the custody assessment). This has an important ripple effect. Security-level classification is one of the first data points PPB members see when they review an investigative report. App. Vol. IV at 106; *id.* at 203. Since PPB members have complete discretion when making parole recommendations, they could use security-level classification as a proxy for an inmate's risk assessment. *See* App. Vol. IV at 185 (Okla. Admin. Code 515:25-9-1) ("no limitations to the factors that the Board may consider"). This has real effects. Throughout his incarceration, Thomas has been assigned to medium security due to a DOC mandatory override policy that fails to account for juvenile status, *see* App. Vol. VI at 267, even when he would have otherwise been assessed at minimum security, *see e.g.*, App. Vol. V at 297–98 (C. Castleberry Tr. 80:4–12, 84:11–18) (confirming Thomas was assessed for minimum security in 2019, but ineligible due to mandatory minimum override). By default, the mandatory override failed to account for Thomas's juvenile status. *Id.* And his parole investigative reports did nothing to correct that fact. App. Vol. IV at 203 (PPB Investigator Handbook directing investigator only to "[i]ndicate the security level of the facility where the offender is

physically housed, not that indicated by security points"). In short, without any procedural safeguards requiring meaningful consideration of juvenile status vis-à-vis security classification at any stage of Oklahoma's process, inmates like Thomas are facing a deck stacked against them from the very start, making it harder to demonstrate rehabilitation and obtain release.[22]

This is not the only system failure, either. DOC does not require its employees to stay up to date on federal sentencing laws regarding parole or juvenile parole. App. Vol. VII at 16–17 (D. Romine Tr. 120:16–25, 121:5–9). Nor does DOC conduct any training for their employees regarding inmates who were juveniles at the time of the offense. *Id.* at 13 (D. Romine Tr. 89:10–20) ("Q. And you haven't received any training specific to inmates going through the parole process who were juveniles at the time of the offense, correct? A. No. Q. And you're not aware of any training that's provided to case managers at DOC specific to inmates

---

[22] There are certain programs and educational services that are only available at minimum security prisons and therefore are unavailable to Thomas. *See* App. Vol. V at 290–91 (C. Castleberry Tr. 29:23–30:8). This too serves as another roadblock to proving rehabilitation.

going through the parole process who were juveniles at the time of the offense, correct? A. Correct.”).

These failures, taken together, withhold from Thomas a “meaningful” or “realistic” opportunity to demonstrate rehabilitation in a way that is distinct from an adult offender. *Miller*, 567 U.S. at 479 (quoting *Graham*, 560 U.S. at 75); *Graham*, 560 U.S. at 82. That is unacceptable under Supreme Court precedent, because juveniles are distinct from adults and must be treated as such. This is borne out by the developmental science relied upon by the Supreme Court in *Roper* and its subsequent line of cases, and with data collected since those decisions regarding juveniles. *See generally Roper*, 543 U.S. at 569; Motion of Developmental Science Scholars and Nonprofits for Leave to File Amicus Br. in Support of Appellants in *Mich. v. Czarnkecki,* 2024 WL 5294438 (Mich.) (filed Dec. 20, 2024). A system that fails to “take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison” violates the Eighth Amendment. *Miller*, 567 U.S. at 480.

Viewing the facts in the light most favorable to Thomas, there is a dispute of material fact as to whether the lack of DOC and BOC policies

as to juvenile offenders affects the ability of inmates like Thomas to demonstrate rehabilitation to PPB. The district court erred in finding otherwise.

* * *

In short, under Oklahoma's parole system, juvenile age at the time of the underlying offense receives no consistent acknowledgement, let alone consideration, as required by the Eighth Amendment. Thomas's own juvenile offender status has been accurately identified only *once* in the past 16 years. And that single instance (that tellingly resulted in the investigator recommending parole) does not substitute for a well-established policy or practice of actually providing juveniles with a meaningful opportunity for release.[23] *See Graham*, 560 U.S. at 76 ("An offender's age is relevant to the Eighth Amendment, and criminal procedure laws that fail to take defendants' youthfulness into account at all would be flawed.").

[23] The idea that "anything" can be considered in a parole decision does not equate to the "meaningful consideration" of juvenile age that is required by the Eighth Amendment. The evidence shows that "[t]here is no established list of required factors board members have to consider when making a decision." App. Vol. V at 161 (A. Luck Tr. 164:11–13); *see also id.* at 160 (A. Luck Tr. 163:5–10) (same).

Viewed in the light most favorable to Thomas, Oklahoma's consistent failure to consider juvenile status and the characteristics attendant to youth infects every stage of the Oklahoma parole process and compounds as the inmate navigates through the parole system. There is no meaningful and distinct parole system for juveniles in Oklahoma and the district court erred in finding no genuine dispute of material fact on this score. This case should therefore be reversed and remanded.

## III. THE DISTRICT COURT ERRED IN DECLINING TO EXERCISE SUPPLEMENTAL JURISDICTION OVER THOMAS'S STATE LAW CLAIM.

Because remand is warranted on Thomas's Eighth Amendment claim, the Court should also reverse and remand the district court's decision to decline to exercise supplemental jurisdiction over Thomas's claim under the Oklahoma Constitution. The district court declined to exercise supplemental jurisdiction on Thomas's state law claim solely because it found "no Eighth Amendment violation for purposes of Plaintiff's Section 1983 claim." App. Vol. VIII at 153 (9/5/2025 Order). However, if the Court remands for reconsideration of Thomas's federal claim, then the district court's rationale for dismissing the state law

claim evaporates. As such, the Court should order the district court to "remand for the federal district court to reconsider whether to exercise supplemental jurisdiction over [Thomas's] pendent state law claims." *Sw. Air Ambulance, Inc. v. City of Las Cruces*, 268 F.3d 1162, 1179 (10th Cir. 2001); *Ward v. Lutheran Med. Ctr.*, 769 F. App'x 595, 599 (10th Cir. 2019).

## **CONCLUSION**

For the foregoing reasons, the Court should reverse the district court's grant of summary judgment and remand the case to the district court for trial.

## **STATEMENT REGARDING ORAL ARGUMENT**

Thomas respectfully requests oral argument. This case presents complex issues of first impression, namely whether Oklahoma's parole system as it relates to juvenile homicide offenders violates the Eighth Amendment of the United States Constitution and the Oklahoma Constitution because it does not provide a realistic and meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation.

Dated: February 13, 2026

Respectfully submitted,

*/s/ Emily Merki Long*

Emily Merki Long
Alyssa M. McClure
Caroline H. Robinson
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
Phone: (202) 389-5000
Email: emily.long@kirkland.com
alyssa.mcclure@kirkland.com
caroline.robinson@kirkland.com

*Counsel for Plaintiff-Appellant Dwain Edward Thomas*

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing opening brief was electronically filed on February 13, 2026, with the Clerk of Court using CM/ECF system, which will send a notification to the attorneys of record in this matter, who are registered with the CM/ECF system.

*/s/ Emily Merki Long*

Emily Merki Long
*Counsel for Plaintiff-Appellant*

## CERTIFICATE OF COMPLIANCE

I hereby certify that (1) this motion complies with the type-volume limitations of Fed. R. App. P. 32(g) and 32(a)(7)(B)(i) because, excluding the parts of the motion exempted by Fed. R. App. P. 32(f) and 10th Cir. R. 32(B), it contains 12,821 words as calculated by the word-counting function of Microsoft Word 365, and (2) this motion complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in a 14-point Century font.

*/s/ Emily Merk Long*

Emily Merki Long
*Counsel for Plaintiff-Appellant*

## CERTIFICATE OF DIGITAL SUBMISSION

I hereby certify that with respect to the foregoing:

(1) All required privacy redactions have been made per 10th Cir. R. 25.5;

(2) If required to file additional hard copies, that the ECF submission is an exact copy of those documents; and

(3) The digital submissions have been scanned for viruses with the most recent version of a commercial virus scanning program, Symantec Protection Engine 9.1 (updated as of 9/18/2024), and according to the program they are free of viruses.

*/s/ Emily Merki Long*

Emily Merki Long
*Counsel for Plaintiff-Appellant*

# ATTACHMENTS

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| DWAIN EDWARD THOMAS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. CIV-20-944-D |
| | ) | |
| KEVIN STITT, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER**

Before the Court are Defendants' Motions for Summary Judgment [Doc. Nos. 114, 115, 116, 119]. Plaintiff Dwain Edward Thomas filed responses [Doc. Nos. 126, 127], and each defendant filed a reply [Doc. Nos. 132-135]. The matters are fully briefed and at issue.

**BACKGROUND**

Plaintiff is a state prisoner that was sentenced to life imprisonment with the possibility of parole for crimes he committed when he was 15 years old. Plaintiff is currently parole-eligible and has been denied parole five times. In this action brought pursuant to 42 U.S.C. § 1983, Plaintiff alleges that Oklahoma's parole system violates the Eighth Amendment of the United States Constitution and Article II, § 9 of the Oklahoma Constitution by denying Plaintiff—a juvenile homicide offender sentenced to life with the possibility of parole—a "meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation." *See Graham v. Florida*, 560 U.S. 48, 75 (2010). The Complaint seeks declaratory and injunctive relief and names as defendants the Governor of Oklahoma, the Executive Director of Oklahoma's Pardon and Parole Board (PPB), the

Appellate Case: 25-6158 Document: 41 Date Filed: 02/13/2026 Page: 77

Chair of the Board of Corrections (BOC), and the Director of the Oklahoma Department of Corrections (ODOC).[1] Each defendant is sued in their official capacity only.

Summarizing Plaintiff's requested relief, he seeks the following:

- Declare that Defendants have operated, and continue to operate, a parole scheme that denies Plaintiff—a juvenile offender sentenced to life with the possibility of parole—a meaningful and realistic opportunity for release, in violation of the Eighth Amendment and Oklahoma Constitution;
- Declare that Plaintiff is serving *de facto* life-without-parole sentences, in violation of the Eighth Amendment and Oklahoma Constitution;
- Declare that Okla. Stat. tit. 57, § 332.7 is unconstitutional because it does not require the PPB to consider juvenile-offender status when considering parole;
- Declare that Article VI, § 10 of the Oklahoma Constitution (and Okla. Stat. tit. 57, §§ 332, 332.16(B)), which grant exclusive authority to the Governor to parole individuals convicted of violent crimes, are unconstitutional as applied to juvenile offenders;
- Declare that Defendants' reliance upon risk assessment tools that discriminate against juvenile offenders has denied Plaintiff a meaningful opportunity to obtain release upon a showing of maturation and rehabilitation, in violation of the Eighth Amendment;
- Declare that—by denying juvenile offenders access to critical rehabilitative programs and automatically prohibiting inmates serving life sentences from being classified below medium security—Defendants have denied Plaintiff a meaningful opportunity to demonstrate rehabilitation, in violation of the Eighth Amendment; and
- Enjoin Defendants to discontinue these practices and provide Plaintiff a meaningful and realistic opportunity to demonstrate his readiness for release.

[Doc. No. 1, at 38-40].[2]

---

[1] Currently, Tom Bates is the PPB's Executive Director; Steven Harpe is ODOC's Director; and Stephan Moore is the Chair of the BOC.
[2] Throughout this Order, the Court uses the ECF header pagination when referring to documents filed in this case.

Appellate Case: 25-6158 Document: 41 Date Filed: 02/13/2026 Page: 78

Upon screening, pursuant to 28 U.S.C. § 1915A, the Complaint was dismissed for failure to state a plausible claim under the Eighth Amendment. The Tenth Circuit reversed on appeal, finding that Plaintiff had stated plausible claims for relief. *See Thomas v. Stitt*, No. 21-6011, 2022 WL 289661, at *4 (10th Cir. Feb. 1, 2022) (unpublished) (noting that the district court's order "purport[ed] to address complex issues of first impression without an opportunity for the parties to develop the facts and their legal arguments.").

Now before the Court are Defendants' Motions for Summary Judgment [Doc. Nos. 114-116, 119], in which Defendants argue that Plaintiff's claims are barred by *res judicata*; Plaintiff lacks standing; and Plaintiff has failed to exhaust his administrative remedies prior to bringing suit. Defendants also argue that the line of Supreme Court cases limiting the types of sentences that can be imposed on certain juvenile offenders do not apply to Plaintiff, who was a juvenile homicide offender sentenced to life with the possibility of parole. Finally, Defendants contend that Plaintiff has received a meaningful opportunity to obtain release by being considered for parole, and thus no Eighth Amendment violation has occurred.

## UNDISPUTED MATERIAL FACTS[3]

In 1997, Plaintiff was convicted of three counts of first-degree murder in the District Court of Sequoyah County, Oklahoma, following a guilty plea. Plaintiff was 15 years old at the time of the offenses. Plaintiff was sentenced to life with the possibility of parole for

[3] The following facts were either uncontroverted or viewed in the light most favorable to the non-movant. The Court takes judicial notice of all applicable statutes and regulations.

each of the three counts, with the first two counts running concurrently and the third count running consecutively. At the time of Plaintiff's sentencing, Oklahoma mandated that "a person who is convicted of … murder in the first degree shall be punished by death, by imprisonment for life without parole or by imprisonment for life." Okla. Stat. tit. 21, § 701.9(A) (1991). [Def. Bates' UMF Nos. 1, 2; Pl.'s Resp. to Def. Bates' UMF Nos. 1, 2; Def. Stitt's UMF No. 3; Pl.'s Resp. to Def. Stitt's UMF No. 3].

Plaintiff is currently parole-eligible. In 2010, Plaintiff first became eligible for parole consideration after completing 1/3 of his sentence, or 15 years. *See* Okla. Stat. tit. 57, § 332.7(A) (1991) ("Upon completion of one-third (1/3) of the sentence of any person in the custody of the Department of Corrections, such person shall be eligible for consideration for a parole…."). Plaintiff has been considered for and denied parole by the PPB five times: October of 2010; October of 2013; October of 2016; October of 2019; and October of 2022. Plaintiff's next parole consideration is in October of 2025, and he can be reconsidered for parole every three years. *See* Okla. Stat. tit. 57, § 332.7(E)(1). [Def. Stitt's UMF Nos. 8, 9, 11, 13; Pl.'s Resp. to Def. Stitt's UMF Nos. 8, 9, 11, 13].

For violent offenders, there is a two-step process for parole. The first step is called "stage one" or "jacket review." During stage one, PPB members review materials provided to the PPB and vote on whether to pass the inmate to stage two. A parole investigator is responsible for conducting an investigation, and preparing, drafting, and submitting an investigative report in advance of the parole hearing. At this stage, the inmate has an opportunity to provide information to the parole investigator. Parole investigators conduct face-to-face interviews with each offender eligible for parole, unless an interview is not

possible, or an exception applies. If a face-to-face interview is not possible, parole investigators conduct personal interviews via telephone or utilize interview questionnaires.[4] The parole investigator makes a recommendation as to whether an offender should be recommended for parole, which recommendation is not binding on the PPB. [Def. Bates' UMF Nos. 10, 17; Pl.'s Resp. to Def. Bates' UMF Nos. 10, 17; Def. Harpe's UMF No. 42; Pl.'s Resp. to Def. Harpe's UMF No. 42; Def. Stitt's UMF Nos. 12, 14; Pl.'s Resp. to Def. Stitt's UMF Nos. 12, 14].

Materials given to the PPB include the investigative report prepared by the parole investigator, support letters, victim letters, and any district attorney narratives. The investigative report includes: the name, date of birth, and gender of the inmate; the docket information, security level and reception date, and other details regarding the inmate's current incarceration and any prior incarcerations; information about the controlling case, to include offense type, offense, sentence, county of conviction, and any prior parole considerations; information on concurrent or consecutive sentences; the district attorney's version of the offense; a paraphrasing of the inmate's version of the offense; other information the parole investigator deems relevant, to include undocumented felony convictions, explanations of discrepancies between information, explanations for information for which the inmate is the sole source, and informal disciplinary sanctions; ODOC disciplinary records, including all misconducts for violent behavior and drug/alcohol rule violations imposed within the past ten years; information about substance

[4] The parole interview questionnaire includes a section for the inmate to "tell the story of what happened from [their] point of view." [Doc. No. 114-11, at 2].

abuse and mental health history; information regarding documented violent behavior[5] to illustrate behavioral progression; information on the inmate's parole plan; the inmate's personal information, to include job skills and employment history prior to incarceration; and the parole investigator's recommendation. [Def. Bates' UMF Nos. 25-38; Pl.'s Resp. to Def. Bates' UMF Nos. 25-38].

During stage one, the offender, victim(s), and the district attorney are not allowed to speak to PPB members. If the PPB votes to move a violent offender to stage two, the inmate makes a personal appearance before the PPB. From stage two, the PPB can deny parole or recommend to the Governor that parole be granted. Only the Governor can approve parole for violent offenders like Plaintiff, pursuant to Okla. Stat. tit. 57, §§ 332, 332.16(B). There are no limitations on the factors the PPB or the Governor may consider when considering parole. [Def. Bates' UMF Nos. 20-22; Pl.'s Resp. to Def. Bates' UMF Nos. 20-22].

PPB members have discretion to consider age at the time of the underlying offense for parole consideration, but they are not required by statute to do so. Section 332.7(L) requires the PPB to "make inquiry into the conduct and the record of the [inmate] during his custody in the Department of Corrections, which shall be considered as a basis for consideration of said person for recommendation to the Governor for parole." Okla. Stat. tit. 57, § 332.7(L). Some investigative reports include an offender's age at the time of the

[5] In this section, the parole investigator is directed to document previous instances of the inmate's violent behavior and misconduct reports even if they occurred more than ten years prior. [Doc. No. 115-8, at 27].

offense, but at times PPB members calculate an offender's age at the time of the offense by subtracting the offender's birth date from the case file date. Former PPB member Kelly Doyle testified that she calculated the inmate's age at the time of the offense because she "found it to be an important factor in [her] decision[-]making." [Doc. No. 134-3, at 6]. The offender's birth date and case file date are available on every investigative report. Former PPB member Adam Luck testified that it was "common" for parole investigative reports to include the fact that an inmate was a juvenile at the time of their arrest. [Doc. No. 114-12, at 12; Def. Bates' UMF No. 22; Pl.'s Resp. to Def. Bates' UMF No. 22; Def. Stitt's UMF No. 16, Pl.'s Resp. to Def. Stitt's UMF No. 16].

In each of Plaintiff's five investigative reports, his birth year (1980) and case file year (1995) reveal that he was 15 years old at the time the charges were filed against him. Further, in each of Plaintiff's investigative reports, the personal information or risk assessment sections include that Plaintiff was a high school student or 16 years or younger when arrested. In the parole investigator's recommendation for Plaintiff's parole consideration in 2016 and 2019, the investigator recommended parole to the consecutive sentence, noting that Plaintiff was a juvenile at the time of the offenses. [Doc. No. 119-2, at pp. 2-4, 8-10, 14-16, 17-19, 21-23].

In 2010, 2013, and 2022, Plaintiff's parole investigator recommended denying parole based on the following narratives:

> 2010: No. Mr. Thomas is incarcerated for violent offenses for the death of three people. He has accumulated nine total misconduct reports, including four for assaultive behavior and three for possession of a home made knife. Given the nature of his offenses, I would need to see a longer period of non

Appellate Case: 25-6158 Document: 41 Date Filed: 02/13/2026 Page: 83

> assaultive behavior to make a favorable recommendation. The risk assessment instrument indicates he is a low moderate risk.
>
> 2013: No. The offender is incarcerated for three violent offenses. He has accumulated ten misconduct reports, including four for assaultive behavior, and three for possession of a home made knife. Parole is not recommended.
>
> 2022: No, parole is not recommended. Even though it is his first incarceration, the violent nature of the crimes and consistent pattern of misconducts show[] that the offender is still a continued risk to the public.

[Doc. No. 119-2, at 4, 19, 23].

As noted in Plaintiff's parole investigative reports, Plaintiff has earned multiple misconducts during his incarceration with ODOC, to include ten Class X misconducts.[6] Plaintiff's ODOC records reflect misconducts for battering an ODOC employee; battering another inmate; three instances of possessing weapons; battering an ODOC employee by jumping on their back and trying to choke them with their microphone cord; threatening an ODOC employee in a sexual manner; testing positive for methamphetamines; making homemade intoxicants; and five instances of possessing banned cell phones. [Doc. No. 119-1, at 55-56]. The violent behavior and possession of weapons occurred in Plaintiff's first few years in ODOC custody, after Plaintiff reached adulthood. *Id.* Plaintiff's

[6] Plaintiff argues that Defendant Bates' UMFs describing Plaintiff's misconducts while incarcerated are irrelevant to Plaintiff's claims. However, the Court finds that Plaintiff's misconducts, referenced in three of his parole investigator's recommendations as reasons to deny parole, are relevant to Plaintiff's claims that he is not currently receiving a constitutional parole consideration. Aside from his relevance objection, Plaintiff does not dispute that he received the referenced misconducts while in ODOC custody.

misconducts for testing positive for methamphetamines and making homemade intoxicants occurred in 2017 and 2020, respectively. *Id.*

Plaintiff cannot progress below medium security, per ODOC policy. ODOC's "mandatory override" policy bars inmates serving life sentences from progressing below medium security, regardless of the inmate's age at the time of the offense. [Def. Harpe's UMF Nos. 60-61; Pl.'s Resp. to Def. Harpe's UMF Nos. 60-61; OP-060103(M), Doc. No. 126-16, at 12].

While incarcerated, Plaintiff has completed several programs. Plaintiff received his GED certificate, has attended and completed several college courses (66 credit hours) through Langston University and received college achievement credits. Plaintiff also completed Module 1 of the Licensed Trades Academy program, and he earned 30 credits for completing six months of Session 3 of the Licensed Trade Academy program. Plaintiff completed the Victim Impact – Listen & Learn program, the Building Social Networks program, the SAMHSA Anger Management program, the Biblical Interpretation program, and the Thinking for a Change program. Plaintiff applied for and was approved for a maintenance job, and he received his Refrigeration Technician certification. Plaintiff also received his Residential Electrician's Assistant certification and his Commercial/Industrial Electrician's Assistant certification. Plaintiff completed the HVAC Esco Institute training and received his Universal Technician certification through the Esco Institute. Plaintiff attended the RMC Research Corp. and took the critical thinking CAPP (college assessment of academic proficiency) test. Plaintiff participated in and completed the 2006 Mechanical Code Training, passed his Mechanical Journeyman examination, and received his license

from the State of Oklahoma Construction Industries Board. Plaintiff also completed the Paralegal Studies Certificate Program through Blackstone Career Institute. [Doc. No. 119-1; Def. Bates' UMF No. 64; Pl.'s Resp. to Def. Bates' UMF No. 64].

Plaintiff alleges that ODOC's policy barring him from progressing below medium security prevents him from demonstrating his rehabilitation because some programs are not available at medium-security facilities. Clint Castleberry testified that there are certain programs and educational services available at minimum-security prisons that are not available at medium-security prisons. [Doc. No. 126-8, at 4]. However, Mr. Castleberry confirmed that if a program is available at a medium-security facility, the content would be the same as that program offered at a minimum-security facility. *Id.* at 4-5. In Plaintiff's previous parole investigative reports, it is noted that Plaintiff is not permitted to participate in substance abuse programs because he has too many days remaining on his sentence. [Doc. No. 119-2, at 10, 15].

Plaintiff has never received enough votes from the PPB to progress to stage two of parole consideration. Plaintiff will be considered for parole again in October of 2025. [Def. Bates' UMF No. 49; Pl.'s Resp. to Def. Bates' UMF No. 49].

## STANDARD OF DECISION

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A material fact is one that "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is genuine if the facts and evidence are such that a reasonable jury could return

Appellate Case: 25-6158 Document: 41 Date Filed: 02/13/2026 Page: 86

a verdict for the nonmoving party. *Anderson*, 477 U.S. at 248. All facts and reasonable inferences must be viewed in the light most favorable to the nonmovant. *Id.* at 255.

A movant bears the initial burden of demonstrating the absence of a dispute of material fact warranting summary judgment. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). If the movant carries this burden, the nonmovant must then go beyond the pleadings and "set forth specific facts" that would be admissible in evidence and that show a genuine issue for trial. *See Anderson*, 477 U.S. at 248; *Celotex*, 477 U.S. at 324. "To accomplish this, the facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998); *see* FED. R. CIV. P. 56(c)(1)(A). The inquiry is whether the facts and evidence identified by the parties present "a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52.

## DISCUSSION

### I. Res Judicata (Claim Preclusion) and Collateral Estoppel (Issue Preclusion)

Defendants contend that Plaintiff's claims are subject to claim preclusion and issue preclusion. As Defendants note, the Oklahoma Court of Criminal Appeals has previously found that Plaintiff "has a material opportunity to obtain release on parole." [Doc. No. 119-13, OCCA Order Affirming Denial of Post-Conviction Relief, No. PC-2019-116].

However, claim preclusion and issue preclusion are both affirmative defenses, which may be waived. *See Johnson v. Spencer*, 950 F.3d 680, 712 (10th Cir. 2020) ("It is beyond cavil that claim preclusion is an affirmative defense, as to which the defendant

bears the burden of proof."); *see also Taylor v. Sturgell*, 553 U.S. 880, 907 (2008) ("Claim preclusion, like issue preclusion, is an affirmative defense."). Under Fed. R. Civ. P. 8(c)(1), "[i]n responding to a pleading, a party must affirmatively state any avoidance or affirmative defense, including … estoppel… [and] res judicata." Fed. R. Civ. P. 8(c)(1). Generally, "a defendant waives an affirmative defense by failing to plead it." *Burke v. Regalado*, 935 F.3d 960, 1040 (10th Cir. 2019).

Plaintiff argues that Defendants waived the affirmative defenses of claim preclusion and issue preclusion by not raising them in their Motion to Dismiss [Doc. No. 37] or Answer [Doc. No. 63]. The Court agrees. The Tenth Circuit "treat[s] invocations of untimely affirmative defenses as constructive motions to amend the answer." *United States v. Travis*, No. 24-2086, 2024 WL 5220731, at *2 (10th Cir. Dec. 26, 2024) (unpublished).[7] However, Defendants did not respond to Plaintiff's waiver argument in their replies [Doc. Nos. 132-135]. Without any explanation from Defendants as to why they waited until the summary judgment stage to raise the issues of claim preclusion and issue preclusion, the Court finds that Defendants acted with undue delay in raising these affirmative defenses. *See Ahmad v. Furlong*, 435 F.3d 1196, 1202 (10th Cir. 2006) (explaining that a motion to amend an answer may be denied on grounds such as undue delay). For these reasons, the Court determines that Defendants have waived their claim preclusion and issue preclusion arguments.

[7] Unpublished opinions are cited pursuant to Fed. R. App. P. 32.1(a) and 10th Cir. R. 32.1(A).

## II. Exhaustion of Administrative Remedies (PLRA)

Defendants Harpe (ODOC) and Moore (BOC) contend that Plaintiff has failed to exhaust his administrative remedies as required by the Prison Litigation Reform Act, 42 U.S.C. § 1997e (PLRA). Under the PLRA, "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). In its previous Order [Doc. No. 59], the Court found that the PLRA's exhaustion requirement does not apply to this case because Plaintiff's claims challenge the constitutionality of Oklahoma's parole procedures, not prison conditions or prison life [Doc. No. 59, at 4].

In their motions for summary judgment, Defendants again argue that the PLRA requires exhaustion of Plaintiff's claim challenging ODOC's policy of prohibiting inmates serving life sentences from progressing to any security level below medium security. Defendants purportedly re-urge this argument due to evidence revealed through discovery. *See* Doc. No. 115, at 23 ("[A]fter discovery[,] the record is clear that plaintiff's lawsuit concerns conditions of his confinement."). However, Defendants do not provide any new reason to find that Plaintiff's claims are subject to the PLRA. Rather, Defendants merely quote one sentence of Plaintiff's Complaint, where he "admits" that "security classifications determine virtually all aspects of an individual's conditions of confinement." [Doc. No. 1, at 90].

As clarified by Plaintiff, his argument concerning security classification is "merely one piece" of the Oklahoma parole system that Plaintiff claims is unconstitutional [Doc.

Appellate Case: 25-6158 Document: 41 Date Filed: 02/13/2026 Page: 89

No. 126, at 70]. Plaintiff asserts that—because he can never progress to a minimum-security classification—he is prevented from participating in programs that demonstrate rehabilitation to the PPB. Plaintiff does not seek any "injunctive relief or other remedy requiring Defendants to assign him to a lower security level." *Id.* at 70. For these reasons, the Court finds no cause to disturb its prior finding that the PLRA's exhaustion requirement is inapplicable to Plaintiff's claims challenging the constitutionality of Oklahoma's parole system.[8]

## III. Standing

Article III of the United States Constitution limits federal court jurisdiction to actual cases and controversies. U.S. CONST. Art. III. To confer standing, a plaintiff must show (1) that the plaintiff suffered an injury in fact—an "invasion of a legally protected interest" which is concrete, particularized, and "actual or imminent, not conjectural or hypothetical"; (2) a "causal connection between the injury and the conduct complained of"; and (3) that it is "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) (internal quotations and citation omitted). "The party invoking federal jurisdiction bears the burden of establishing these elements." *Lujan*, 504 U.S. at 561.

As an initial matter, the Court finds that Plaintiff does not have standing to bring claims as to "similarly situated" individuals. At times, Plaintiff attempts to couch his claims

[8] For the same reasons, the Court rejects Defendant Harpe's argument that Plaintiff's action is proscribed by Okla. Stat. tit. 57, § 566.4(C), which bars state prisoners from seeking injunctive relief for claims related to prison management.

as brought on behalf of all juvenile offenders, but Plaintiff has not sought class certification. Accordingly, Plaintiff lacks standing to bring claims on behalf of other third parties not before the Court. *See Cnty. Court of Ulster Cnty., N.Y. v. Allen*, 442 U.S. 140, 154-55 ("A party has standing to challenge the constitutionality of a statute only insofar as it has an adverse impact on his own rights. As a general rule, if there is no constitutional defect in the application of the statute to a litigant, he does not have standing to argue that it would be unconstitutional if applied to third parties in hypothetical situations."); *see also Cotner v. Hopkins*, 795 F.2d 900, 902 (10th Cir. 1986) (affirming dismissal of an inmate's § 1983 claim that alleged prison conditions affected the constitutional rights of Oklahoma State Penitentiary inmates because, generally, "a plaintiff must assert his own constitutional rights."); *see also Adams v. James*, 784 F.2d 1077, 1080 (11th Cir. 1986) (explaining that outside of the class-action context, a prisoner has no standing to litigate another prisoner's constitutional claims).

Plaintiff attempts to avoid this outcome by claiming—for the first time—that he also brings a facial challenge to Oklahoma's parole statutes. However, throughout this litigation, Plaintiff has only described his claims as as-applied challenges. In his responses, Plaintiff makes one-sentence references to his facial challenge [Doc. No. 126, at 54; Doc. No. 127, at 12], but he never explains how Oklahoma's parole statutes are unconstitutional on their face.[9] For these reasons, the Court finds that Plaintiff does not have standing to bring claims

---

[9] Recently, the Tenth Circuit considered whether a plaintiff brought a facial or as-applied challenge where he argued that 18 U.S.C. § 922(g)(3) was unconstitutional as applied to non-intoxicated marijuana users. *See United States v. Harrison*, __ F.4th __, 2025 WL 2452293, at *3-4 (10th Cir. 2025). Although the plaintiff apparently abandoned his facial challenge on appeal, the Tenth

on behalf of "similarly situated" individuals or other juvenile offenders not before the Court.

A. Injury in Fact

As stated above, an injury in fact is one that is "actual or imminent," and not conjectural or hypothetical. *Lujan*, 504 U.S. at 560. While "standing for retrospective relief may be based on past injuries, … claims for prospective relief require a continuing injury." *PeTA, People for the Ethical Treatment of Animals v. Rasmussen*, 298 F.3d 1198, 1202 (10th Cir. 2002). Where a plaintiff claims a past constitutional injury, the plaintiff "cannot maintain a declaratory or injunctive action unless he or she can demonstrate a good chance of being likewise injured in the future." *Facio v. Jones*, 929 F.2d 541, 544 (10th Cir. 1991).

In this litigation, Plaintiff claims in part that the Oklahoma constitutional provision and state statutes that vest in the Governor exclusive authority to grant parole for violent offenders are unconstitutional as applied to Plaintiff. *See* OKLA. CONST. Art. VI, § 10; Okla. Stat. tit. 57, §§ 332, 332.16(B). The crux of Plaintiff's claim is that he is not receiving a meaningful opportunity to obtain release because the Governor has unfettered discretion to grant or deny parole recommendations, the Governor can grant or deny parole for any reason, and the Governor is not required to consider a juvenile offender's youth at the time of the offense when considering parole recommendations.

---

Circuit advised that "[t]o succeed on a facial challenge, [the plaintiff] would need to 'establish that no set of circumstances exists under which the Act would be valid.'" *Harrison*, 2025 WL 2452293, at *3 (citation omitted). "A facial challenge is a head-on attack [of a] legislative judgment, an assertion that the challenged statute violates the Constitution in all, or virtually all, of its applications." *Id.* (quotations and citation omitted). Here, Plaintiff has not argued that Oklahoma's parole system is unconstitutional in all, or virtually all, of its applications.

In his motion for summary judgment [Doc. No. 114], Governor Stitt contends that Plaintiff has not established an injury-in-fact with respect to this claim because it is undisputed that the Governor has never received a favorable recommendation by the PPB for Plaintiff's parole. The Governor asserts, then, that Plaintiff's injury is speculative and insufficient to confer standing. The Court agrees. The Governor's discretion to grant parole recommendations is entirely contingent on first receiving a favorable recommendation by the PPB, and it is uncertain when or if the PPB will recommend Plaintiff for parole. If the PPB recommends Plaintiff for parole at some point in the future, it is mere speculation as to what factors the Governor will consider (or will be required to consider) at that time. *See Rodgers v. Whitten, et al.*, Case No. CIV-20-839-PRW, 2021 WL 735647, at *2 (W.D. Okla. Feb. 25, 2021) ("There is no way to know what parole rules Oklahoma will have in place by the time Petitioner is considered for parole, so it makes little sense to engage now in a hypothetical analysis of Oklahoma's current rules as applied to Petitioner's future parole application."). Accordingly, the Court finds that Plaintiff does not have standing for his claim regarding Governor Stitt's exclusive authority to grant parole to violent offenders.

Plaintiff also alleges that he is being denied a meaningful opportunity to obtain release because: 1) the PPB is not required to consider an inmate's juvenile-offender status when determining whether to recommend parole; 2) the PPB does not receive training on how to consider an inmate's juvenile-offender status; 3) there are no evidentiary rules, no right to obtain expert assistance or testimony, no cross-examination, and no assistance of counsel during the parole process; and 4) ODOC's mandatory override policy and risk

assessment tools prevent Plaintiff from participating in critical programs needed to establish his rehabilitation for purposes of parole consideration.

For establishing an injury-in-fact with respect to these claims, Plaintiff has provided evidence that these policies exist, that Plaintiff has been denied parole by the PPB five times, and that he will face the PPB again in October of 2025. Although Plaintiff does not ultimately prevail on his constitutional challenge, the Court finds that Plaintiff has sufficiently established a concrete injury-in-fact and likelihood of future injury from these procedures. *See Makthepharak v. Kelly*, Case No. 23-2121-DDC, 2025 WL 1282649, at *8 (D. Kan. May 2, 2025) (concluding the plaintiff—in his Eighth Amendment challenge to Kansas' parole scheme via a Section 1983 claim—had established "a likelihood of future injury in that he's still subject to the challenged parole scheme[.]").

B. Causal Connection

To establish causation, "a plaintiff must show that his or her injury is 'fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court.'" *Nova Health Systems v. Gandy*, 416 F.3d 1149, 1156 (10th Cir. 2005) (citing *Lujan*, 504 U.S. at 560). This requires a showing "of a substantial likelihood that the defendant's conduct caused plaintiff's injury in fact." *Id.*

In *Petrella v. Brownback*, the Tenth Circuit analyzed whether a group of students and parents had standing to sue the Kansas Governor and Attorney General to challenge Kansas' school district financing act. 697 F.3d 1285, 1291 (10th Cir. 2012). The Tenth Circuit soundly rejected the Governor and Attorney General's arguments that neither defendant took any specific action that caused the plaintiffs' alleged harm:

> It cannot seriously be disputed that the proper vehicle for challenging the constitutionality of a state statute, where only prospective, non-monetary relief is sought, is an action against the state officials responsible for the enforcement of that statute. Nor can it be disputed that the Governor and Attorney General of the state of Kansas have responsibility for the enforcement of the laws of the state. *See* KAN. CONST. Art. I § 3; Kan. Stat. Ann. § 75-702.

*Id.* at 1293-94 (internal citation omitted).

In his reply, Governor Stitt points out a key difference between Kansas and Oklahoma. In *Petrella*, the Tenth Circuit noted that, under the Kansas Constitution, "[t]he supreme executive power of this state shall be vested in a governor, who shall be responsible for the enforcement of the laws of this state." *See* KAN. CONST. Art. I § 3; *Petrella*, 697 F.3d at 1294. However, the Oklahoma constitution does not vest in the governor a general power to enforce the laws of Oklahoma. *See* OKLA. CONST. Art. VI, § 2 ("The Supreme Executive power shall be vested in a Chief Magistrate, who shall be styled 'The Governor of the State of Oklahoma.'"); *see also Bishop v. Oklahoma*, 333 F. App'x 361, 365 (10th Cir. 2009) (unpublished) ("Here, the Oklahoma officials' generalized duty to enforce state law, alone, is insufficient to subject them to a suit challenging a constitutional amendment they have no specific duty to enforce."). Accordingly, to establish causation with respect to Governor Stitt, Plaintiff must show that Governor Stitt had a specific duty to enforce the challenged parole procedures.

The Court finds that Plaintiff has established the requisite causation for standing as applied to Governor Stitt. Even though the Court previously found that Plaintiff does not have standing for his claims challenging Governor Stitt's exclusive authority to grant

parole to violent offenders, Governor Stitt is sufficiently connected to the enforcement of the challenged parole procedures for which Plaintiff has established an injury-in-fact. It is undisputed that Governor Stitt appoints three out of five of the PPB members, giving Governor Stitt appointing authority for a majority of the PPB. *See* OKLA. CONST. Art. VI, § 10 ("There is hereby created a Pardon and Parole Board to be composed of five members; three to be appointed by the Governor[.]"). Plaintiff has also provided excerpts from a grand jury report that outlines various issues with the PPB. [Doc. No. 126-25]. Although most of the report concerns Oklahoma's commutation process, it also references testimony concerning Governor Stitt's meeting with PPB members about to take office regarding "how they would handle their duties regarding deciding paroles, commutation recommendations, and pardon recommendations[.]" [Doc. No. 126-25, at 18]. The grand jury report further notes that Governor Stitt's ability to appoint a majority of the PPB "effectively allows the Board to be controlled by that single appointing authority." *Id.* at 24.[10] These circumstances establish a sufficient causal connection between Governor Stitt and Plaintiff's challenges to the PPB's parole procedures for which Plaintiff has shown an injury-in-fact.

Defendant Bates, the Executive Director of the PPB, does not argue that Plaintiff lacks standing for his claims against him. Undoubtedly, the PPB owes a specific duty to enforce Oklahoma's parole procedures. *See* OKLA. CONST. Art. VI, § 10 ("It shall be the

---

[10] Notably, only Defendant Bates (PPB) addressed the grand jury report in his reply, merely noting that the report mostly concerned commutation decisions, not parole decisions [Doc. No. 134, at 6]. Governor Stitt's reply [Doc. No. 135] includes no mention of the grand jury report.

Appellate Case: 25-6158 Document: 41 Date Filed: 02/13/2026 Page: 96

duty of the [PPB] to make an impartial investigation and study of applicants for commutations, pardons or paroles, and by a majority vote make its recommendations to the Governor of all persons deemed worthy of clemency."). And Plaintiff asserts in this lawsuit that he is not receiving a "meaningful opportunity for release" in part because the PPB has not considered—and is not required to consider—Plaintiff's juvenile-offender status when deciding whether to recommend Plaintiff for parole. For these reasons, the causation element is met as applied to Defendant Bates.

The Court also finds causation is met as to Defendant Harpe (ODOC) and Defendant Moore (BOC). Plaintiff claims that ODOC's mandatory override policy and risk assessment tools discriminate against him as a juvenile offender and bar him from progressing below medium security. Although Plaintiff does not seek injunctive relief requiring Defendants to re-classify Plaintiff to minimum-security, Plaintiff claims that ODOC's policies prevent him from participating in programs that are necessary to demonstrate his rehabilitation to the PPB. It is undisputed that ODOC establishes policies and procedures for security classifications, which include ODOC's mandatory override policy and custody assessment scale. Plaintiff has also provided evidence that the BOC is charged with establishing policies for ODOC. *See* Okla. Stat. tit. 57, § 504 ("The [BOC] shall have the following powers and duties: (1) to establish policies for the operation of the Department [of Corrections]; [and] (2) to establish and maintain such institutions as are necessary or convenient for the operation of programs for the education, training, vocational education and rehabilitation of prisoners under the jurisdiction of the Department[.]"); *see also* Doc. No. 126-20, Legislative Initiative Process, at 2 ("[ODOC]

evaluates its operations within the context of current law, statutes, and court rulings; ODOC may propose legislation [to BOC] to enhance operations, facilitate court decisions, implement new programs and functions, enhance fiscal operations, establish incarceration strategies and policy, and maintain constitutional compliance in meeting the mission of the agency."). For these reasons, the Court finds causation is met as to Defendants Harpe (ODOC) and Moore (BOC) with respect to the mandatory override policy and risk assessment tools.

C. Redressability

"Article III further requires that the plaintiff demonstrate a substantial likelihood that the relief requested will redress its injury in fact." *Nova Health Systems*, 416 F.3d at 1158 (citation omitted). "The plaintiff must show that a favorable judgment will relieve a discrete injury, although it need not relieve his or her every injury." *Id.* (citing *Larson v. Valente*, 456 U.S. 228, 243 n.15 (1982)).

The Court finds that Plaintiff's requested declaratory and injunctive relief related to claims for which he has established an injury-in-fact would redress his claimed Eighth Amendment violations. Such relief would change the PPB's behavior when it evaluates Plaintiff's upcoming parole recommendation. Additionally, a declaration that ODOC's mandatory override policy and risk assessment tools are unconstitutional as applied to Plaintiff in that they prevent him from demonstrating rehabilitation to the PPB would similarly redress Plaintiff's injury. Accordingly, the Court finds redressability is established. *See Makthepharak*, 2025 WL 1282649, at *11 ("Defendants' redressability argument repeats their 'no authority to enforce parole procedures' argument that the court

rejected on the causation prong. The court has already decided that [the] Secretary [of Corrections] and Governor Kelly were involved in enforcing the parole statutes, and so now it likewise concludes the relief plaintiff seeks against the defendants is likely to redress plaintiff's purported constitutional injury.").

## IV. Ripeness

For Article III jurisdiction, a plaintiff's claim must also be ripe. *Peck v. McCann*, 43 F.4th 1116, 1133 (10th Cir. 2022). "Standing and ripeness are closely related in that each focuses on whether the harm asserted has matured sufficiently to warrant judicial intervention." *Peck*, 43 F.4th at 1133. "In evaluating ripeness the central focus is on whether the case involves uncertain or contingent future events that may not occur as anticipated, or indeed may not occur at all." *S. Utah Wilderness All. v. Palma*, 707 F.3d 1143, 1158 (10th Cir. 2013) (quotations and citation omitted).

Governor Stitt argues that Plaintiff's claim related to the Governor's exclusive authority to grant parole to violent offenders is not ripe because Plaintiff has not been recommended for parole by the PPB. The Court agrees. Plaintiff's claims regarding the Governor's authority and discretion to grant Plaintiff parole are contingent on the uncertain and speculative event of Plaintiff receiving a favorable parole recommendation from the PPB. And if Plaintiff receives a favorable recommendation at some point in the future, Plaintiff can only speculate as to what factors the Governor will consider or be required to consider at that time. Thus, the Court concludes that this claim is not ripe.

## V. Section 1983 Claim Based on Eighth Amendment

Plaintiff bases his Section 1983 claim on alleged violations of his Eighth Amendment rights.[11] "To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988).

### A. Eighth Amendment Precedent

The Eighth Amendment prohibits cruel and unusual punishments, "guarantee[ing] individuals the right not to be subjected to excessive sanctions." *Roper v. Simmons*, 543 U.S. 551, 560 (2005). In this case, Plaintiff claims that the Oklahoma parole system subjects him to cruel and unusual punishment by denying him a meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation. Plaintiff's claims are premised on the following Supreme Court precedent, which define and clarify Eighth Amendment protections in the context of sentencing juvenile offenders.

First, in *Roper*, the Supreme Court held that the Eighth Amendment prohibits death-penalty sentences for juvenile offenders. *Roper*, 543 U.S. at 578. Next, in *Graham*, the Supreme Court imposed a categorical bar on life-without-parole sentences for juveniles

[11] As Plaintiff expressly denies raising any due process challenge, the Court does not analyze Plaintiff's claims under the Fourteenth or Fifth Amendments. [Doc. No. 127, at 27] ("Moreover, [Plaintiff] does not claim, and explicitly disavowed, that he has a '*liberty* interest in receiving a meaningful opportunity for parole under Oklahoma law'; his allegations under federal law are based on *only* the Eighth Amendment.").

who did not commit homicide. 560 U.S. at 74. In doing so, the *Graham* Court explained that:

> A State is not required to guarantee eventual freedom to a juvenile offender convicted of a nonhomicide crime. What the State must do, however, is give defendants like Graham some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation. It is for the State, in the first instance, to explore the means and mechanisms for compliance. It bears emphasis, however, that while the Eighth Amendment prohibits a State from imposing a life without parole sentence on a juvenile nonhomicide offender, it does not require the State to release that offender during his natural life. Those who commit truly horrifying crimes as juveniles may turn out to be irredeemable, and thus deserving of incarceration for the duration of their lives. The Eighth Amendment does not foreclose the possibility that persons convicted of nonhomicide crimes committed before adulthood will remain behind bars for life. It does prohibit States from making the judgment at the outset that those offenders never will be fit to reenter society.

*Id.* at 75.

Following *Graham*, the Supreme Court held in *Miller v. Alabama* that the Eighth Amendment forbids a sentencing scheme that mandates life-without-parole for juvenile homicide offenders. 567 U.S. 460, 479 (2012). In *Miller*, the Supreme Court clarified that "*Graham*'s reasoning implicates any life-without-parole sentence imposed on a juvenile, even as its categorical bar relates only to nonhomicide offenses." *Id.* at 473. Thus, under *Miller*, a sentencer must "consider[] an offender's youth and attendant characteristics" before sentencing a juvenile homicide offender to life without parole. *Id.* at 483.

In *Montgomery v. Louisiana*, the Supreme Court held that *Miller* announced a substantive rule of constitutional law, and thus should be applied retroactively. 577 U.S. 190, 212 (2016). As clarified by *Montgomery*, the Court in *Miller* certainly outlined the

procedure for considering an offender's youth and attendant characteristics before imposing a life-without-parole sentence, but the Court also substantively held "that life without parole is an excessive sentence for children whose crimes reflect transient immaturity." *Id.* In *Montgomery*, the Court explained that states may cure *Miller* violations not only by resentencing offenders, but also by "permitting juvenile homicide offenders to be considered for parole." *Id.*

Finally, in *Jones v. Mississippi*, the Supreme Court further clarified that *Miller* does not require a "separate factual finding of permanent incorrigibility" before sentencing a juvenile homicide offender to life without parole. 593 U.S. 98, 104 (2021). Rather,

> *Miller* followed the Court's many death penalty cases and required that a sentencer consider youth as a mitigating factor when deciding whether to impose a life-without-parole sentence. *Miller* did not require the sentencer to make a separate finding of permanent incorrigibility before imposing such a sentence. And *Montgomery* did not purport to add to *Miller*'s requirements.

*Id.* at 109. As made clear by *Jones*, *Miller* requires a discretionary sentencing scheme, and such a scheme "helps ensure that life-without-parole sentences are imposed only in cases where that sentence is appropriate in light of the defendant's age." *Id.* at 111-12.

B. Plaintiff's Claims Under *Graham* and *Miller*

In this case, Plaintiff alleges that Oklahoma's parole system is unconstitutional as applied to Plaintiff—a juvenile homicide offender—because it denies him a "meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation." *See Graham*, 560 U.S. at 75. It is undisputed that Plaintiff was convicted of homicide; he was sentenced to life *with* the possibility of parole; and he is currently eligible for parole.

Plaintiff maintains that "[d]espite receiving a life sentence under which he is eligible for parole, [he] has never received the parole consideration due to him under the Eighth Amendment and Oklahoma Constitution." [Doc. No. 127, at 8].

Plaintiff appears to concede that—as a juvenile *homicide* offender—Plaintiff cannot establish a *Graham* violation. [Doc. No. 127, at 26] ("Mr. Thomas is not arguing that he can make out a *Graham* violation. He is simply trying to vindicate his Eighth Amendment rights in the *parole* process as first pronounced in *Miller*."). Accordingly, the Court will address whether Plaintiff has established a genuine dispute of material fact with respect to his claims premised on *Miller*.

Defendants assert that Plaintiff cannot establish a *Miller* violation because he was a juvenile homicide offender sentenced to life *with* the possibility of parole, and *Miller* only requires that a sentencer consider a juvenile homicide offender's "youth and attendant circumstances" prior to imposing a life-*without*-parole sentence. The Court agrees.[12]

---

[12] This Court has repeatedly concluded that *Miller* does not extend to juvenile offenders sentenced to life *with* the possibility of parole. *See Rodgers v. Whitten*, Case No. CIV-20-839-PRW, 2021 WL 735647, at *1 (W.D. Okla. Feb. 25, 2021) (adopting magistrate judge's conclusion that "Petitioner's life sentence does not implicate the Supreme Court's decision in *Miller v. Alabama* … because Petitioner was not subject to a mandatory life without parole sentence, as plainly evidenced by the fact that Petitioner received a life sentence."); *Lewis v. Okla. Pardon & Parole Bd.*, Case No. CIV-18-1205-G, 2019 WL 1500671, at *1 (W.D. Okla. Apr. 5, 2019) (agreeing with magistrate judge's conclusion that "*Miller* is inapplicable because 'Plaintiff was not sentenced to life-without-parole and has in fact been considered for parole on at least six occasions.'"); *Bias v. Stitt*, Case No. CIV-20-989-SLP, 2021 WL 3008606, at *1 (W.D. Okla. July 15, 2021) (agreeing with magistrate judge's conclusion that *Miller* and *Montgomery* did not apply to the plaintiff because he "ha[d] not been sentenced to life without parole" and "ha[d] been considered for parole.").

In *Howard v. Coonrod*, the Eleventh Circuit cited to *Graham*, *Miller*, and *Jones* and explained:

> None of the cases speaks directly to homicide offenders sentenced to life *with* the possibility of release. But it follows from *Miller* and *Jones* that such a sentence is allowed under the Eighth Amendment. As just explained, according to those decisions, juvenile homicide offenders can be sentenced to life *without* parole, provided that the sentence isn't mandatory and the proper process is observed. And if the stiffer sentence of life without the possibility of parole isn't a cruel and unusual punishment, then the more lenient sentence of life *with* the possibility of parole (or another sentence that similarly provides for potential future release) can't possibly be cruel and unusual. Put simply—if a little imprecisely—the greater power to impose life *without* parole includes the lesser power to impose life *with* parole.

134 F.4th 1136, 1144 (11th Cir. 2025); *see also Heredia v. Blythe*, 638 F.Supp.3d 984, 1001 (W.D. Wisc. Nov. 2, 2022) ("If it is permissible under the Eighth Amendment for a sentencing court to preclude the possibility of parole at the outset for a juvenile offender convicted of homicide, then it follows that the Eighth Amendment places few, if any, limitations on a parole board's decision whether to grant or deny parole to the same offender later."). These interpretations are supported by *Montgomery*'s ruling that states may cure *Miller* violations by "permitting juvenile homicide offenders to be considered for parole." *Montgomery*, 577 U.S. at 212.

The Tenth Circuit has previously explained that the right recognized in *Miller* "is narrowly drawn: it protects juveniles who commit crimes from the mandatory imposition of life without possibility of parole." *Davis v. McCollum*, 798 F.3d 1317, 1321 (10th Cir. 2015). The *Davis* Court rejected the plaintiff's assertion that "*Miller*'s logic reaches beyond

invalidating mandatory life-without-parole sentencing schemes for juveniles." *Davis*, 798 F.3d at 1321. More recently, a plaintiff attempted to rely on the Tenth Circuit's opinion in the instant case (*Thomas v. Stitt*, No. 21-6011, 2022 WL 289661 (10th Cir. Feb. 1, 2022)) to argue that his Eighth Amendment rights were violated by the aging-prisoner parole system. *See Jackson v. Harpe*, No. 24-6011, 2024 WL 3738195, at *2 (10th Cir. 2024) (unpublished). In *Jackson*, the Tenth Circuit described its opinion in the instant case as "unpublished authority recognizing the Eighth Amendment prohibits the imposition of *mandatory* life in prison *without* the possibility of parole for juvenile homicide offenders." *Id.* (citing *Thomas*, 2022 WL 289661, at *2) (emphasis added).

Based on the foregoing, the Court finds Plaintiff's claim that *Miller* entitles him, a juvenile homicide offender sentenced to life with the possibility of parole, to certain parole procedures necessarily requires an expansion of *Miller*'s holding, which this Court declines to do.

The Tenth Circuit has at least implied in this case that *Miller* would not permit a State to merely label a sentence as "life-with-parole," while operating a parole system that provides no meaningful opportunity to obtain release. *See Thomas*, 2022 WL 289661, at *4. At the time of Plaintiff's sentencing, it was mandatory that Plaintiff be sentenced to either the death penalty, life without parole, or life with parole. Thus, it could be argued that Plaintiff's mandatory life-with-parole sentence—if paired with a sham parole system—is the functional equivalent of a mandatory life-without-parole sentence, which *Miller* barred.

Considering, then, whether Plaintiff is serving the functional equivalent of a mandatory life-without-parole sentence, Plaintiff has not come forth with evidence

establishing a policy or practice that prevents him from being granted parole under Oklahoma's parole system. Nor has Plaintiff established that the PPB would refuse to grant Plaintiff a recommendation for parole regardless of the circumstances. The crux of Plaintiff's claims is the PPB's lack of youth-consideration during parole decisions. However, Plaintiff has not provided any evidence that the PPB refuses to consider an inmate's age at the time of the offense when considering parole recommendations for juvenile offenders like Plaintiff, or that any policy or statute prevents the PPB from considering an inmate's juvenile-offender status.[13] Conversely, Defendants have provided evidence of PPB board members actually considering youth during parole decisions. [Doc. No. 134-3, at 6 (Kelly Doyle's testimony that she calculated an inmate's age at the time of the offense because she "found it to be an important factor in [her] decision[-]making."); Doc. No. 134-1, at 7-8 (Adam Luck's testimony that he would look at an inmate's birthday and case file date "to determine the age of an individual at the time the crime was committed.")]. Plaintiff's assertion that the PPB is not required to consider age at the time

[13] At most, Plaintiff has shown that, at times, PPB members calculate on their own an offender's age at the time of the offense by subtracting the date the inmate's charges were filed from the inmate's age, and that this calculation may not always reveal that an offender was a juvenile *at the time of the offense* due to the delay between the offense and the charges being brought. However, Plaintiff concedes that in his case, any delay between the offense and charges being filed does not conceal his juvenile-offender status because he was a minor at the time of the offense, when charges were brought against him, and when he entered ODOC custody [Doc. No. 126, at 57 n.12]. Further, the testimony that PPB members calculate an offender's age at the time of the offense based on the dates on the parole report supports a finding that PPB members consider juvenile-offender status when considering parole.

of the offense—but is merely permitted to do so—does not render Oklahoma's parole system unconstitutional as applied to Plaintiff.[14]

Plaintiff challenges ODOC's "mandatory override" policy, which prevents inmates serving life sentences from progressing below medium security. Plaintiff also challenges ODOC's custody assessment scale, which assigns a higher number of custody points to inmates 29 years and younger.[15] As stated above, Plaintiff does not ask that the Court order ODOC to move Plaintiff to minimum security. Rather, Plaintiff challenges ODOC's policies as they allegedly prevent him from establishing his rehabilitation to the PPB. But Plaintiff has failed to show that these policies render him ineligible for parole, or that he is incapable of showing his rehabilitation as a result of the policies. *See Makthepharak*, 2025 WL 1282649, at *20 (rejecting the plaintiff's claim that being categorically barred from work release hindered his parole eligibility because "there's no evidence that work release is a prerequisite to parole or requirement to demonstrate maturity and rehabilitation."). Plaintiff has completed various programs while incarcerated, and he has not identified any specific programs he cannot participate in due to his medium-security classification.[16] Further, Defendants have provided evidence that PPB members are aware that some

---

[14] The Court reaches the same conclusion on Plaintiff's argument that the PPB does not receive special training for how to consider an inmate's age at the time of the offense when determining parole recommendations.

[15] The Court questions whether ODOC's policy regarding age points has ever prevented Plaintiff from progressing below medium security for two reasons. First, Plaintiff has at all times been subject to the mandatory override policy due to his life sentence. Second, Plaintiff's argument that age points prevented him from moving to minimum security ignores the fact that Plaintiff has also received points for non-age factors, such as incidents of misconduct.

[16] Plaintiff does show that he is ineligible to participate in substance abuse treatment due to the length of time remaining on his life sentence. But, importantly, Plaintiff has not demonstrated that substance abuse treatment is a prerequisite for parole eligibility.

Appellate Case: 25-6158 Document: 41 Date Filed: 02/13/2026 Page: 107

courses may not be available at every facility and take that into account in making parole decisions. [Doc. No. 134-1, at 9].

In his Complaint, Plaintiff alleges that each time he was up for parole consideration, the parole investigator "gave favorable recommendations to the PPB," which were rejected solely due to the "aggravating factors associated with the original crime." [Doc. No. 1, at ¶¶ 16, 111]. However, Plaintiff's parole investigator recommended denying parole in 2010, 2013, and 2022 [Doc. No. 119-2, at 4, 19, 23]. In each of those recommendations, the investigator referenced Plaintiff's multiple misconduct reports or "consistent pattern of misconducts" while incarcerated. *Id.* Although the recommendations also note the violent nature of the underlying offenses, they do not support Plaintiff's assertion that he is being denied parole solely due to the violent nature of the original crimes, and without any regard to any demonstrated rehabilitation. Nor has Plaintiff cited to any authority for the proposition that a parole board must consider *only* an inmate's age at the time of the offense and any maturity/rehabilitation thereafter when making parole decisions.

To summarize, Plaintiff has not established a genuine dispute of material fact with respect to his Eighth Amendment claims premised on *Miller*. Plaintiff has not provided evidence that Oklahoma's parole system provides him with no meaningful opportunity for release, such that he is serving the functional equivalent of a mandatory life-without-parole sentence. Defendants have established the absence of a dispute of material fact, and Plaintiff has failed to set forth specific facts that show a genuine issue for trial, and Defendants are entitled to judgment as a matter of law on Plaintiff's § 1983 claim based on the Eighth Amendment.

## VI. State Law Claim

Because the Court finds no Eighth Amendment violation for purposes of Plaintiff's Section 1983 claim, the Court declines to exercise supplemental jurisdiction over Plaintiff's claim alleging that Oklahoma's parole system violates Okla. Const. Art. II, § 9. *See* 28 U.S.C. § 1367(c)(3); *cf. Smith v. City of Enid ex rel. Enid City Comm'n*, 149 F.3d 1151, 1156 (10th Cir. 1998) ("When all federal claims have been dismissed, the court may, and usually should, decline to exercise jurisdiction over any remaining state claims.").

## CONCLUSION

For these reasons, Defendants' Motions for Summary Judgment [Doc. Nos. 114, 115, 116, 119] are **GRANTED**. A separate judgment shall be entered.

**IT IS SO ORDERED** this 5th day of September, 2025.

TIMOTHY D. DeGIUSTI
Chief United States District Judge

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| DWAIN EDWARD THOMAS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. CIV-20-944-D |
| | ) | |
| KEVIN STITT, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**JUDGMENT**

Pursuant to the Court's Order entered this date, the Court enters judgment in favor of Defendants, and against Plaintiff.

**ENTERED** this 5th day of September, 2025.

TIMOTHY D. DeGIUSTI
Chief United States District Judge