No. 25-6158

---

## UNITED STATES COURT OF APPEALS
## FOR THE TENTH CIRCUIT

---

Dwain Edward Thomas,
*Plaintiff-Appellant,*

v.

Kevin Stitt, et al.,
*Defendants-Appellees.*

---

On Appeal from the United States District Court
for the Western District of Oklahoma
Case No. 5:20-cv-00944-D

---

## BRIEF OF FORTY-ONE DEVELOPMENTAL SCIENCE SCHOLARS AND NONPROFITS AS *AMICI CURIAE* IN SUPPORT OF PLAINTIFF-APPELLANT AND REVERSAL

---

Kathleen R. Hartnett
**Cooley LLP**
3 Embarcadero Center
San Francisco, CA 94111
(415) 693-2000
khartnett@cooley.com

Ryan Liu
**Cooley LLP**
350 South Grand Ave., Suite 3200
Los Angeles, CA 90071
(213) 561-3250
rliu@cooley.com

Raymond P. Tolentino
Matt K. Nguyen
Cole A. Poppell
**Cooley LLP**
1299 Pennsylvania Ave. NW,
Suite 700
Washington, D.C. 20004-2400
(202) 842-7800
rtolentino@cooley.com
mnguyen@cooley.com
cpoppell@cooley.com

*Counsel for Amici Curiae*

## CORPORATE DISCLOSURE STATEMENT

There is no information to disclose pursuant to Fed. R. App. P. 26.1.

# TABLE OF CONTENTS

Page

CORPORATE DISCLOSURE STATEMENT............................................. i

TABLE OF AUTHORITIES.................................................................. iii

STATEMENT OF QUESTION PRESENTED .......................................... 1

IDENTITY AND INTEREST OF *AMICI CURIAE*................................... 1

INTRODUCTION AND SUMMARY OF THE ARGUMENT.................. 3

I.    The Eighth Amendment Prohibits the Government from
      Subjecting Adolescents to Disproportionate Sentences.................. 6

II.   Profound Developmental Changes in Adolescence Render
      Overly Punitive Sentences Disproportionate for Adolescent
      Offenses............................................................................................ 8

      A.    Incomplete Brain and Behavioral Development
            Throughout Adolescence Results in Poor
            Decisionmaking, Vulnerability to Peer Pressure, and
            Heightened Potential for Rehabilitation............................. 10

            1.    *Incomplete development of key brain regions
                  governing decisionmaking persists throughout
                  adolescence.*.............................................................. 11

            2.    *Transformative brain and behavioral development
                  primes adolescents for long-term rehabilitation.*........ 21

III.  The Eighth Amendment Requires Meaningful Parole
      Consideration for Adolescent Offenders, Including Mr.
      Thomas............................................................................................ 28

CONCLUSION ..................................................................................... 36

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Budder v. Addison,*
851 F.3d 1047 (10th Cir. 2017) ....................................................... 30, 31

*Commonwealth v. Mattis,*
493 Mass. 216 (2024) .............................................................................. 2

*Commonwealth v. Robinson,*
493 Mass. 303 (2024) .............................................................................. 2

*Flores v. Stanford,*
No. 18 CV 2468 (VB), 2019 WL 4572703 (S.D.N.Y. Sept.
20, 2019) ................................................................................................ 28

*Godinez v. Williams,*
No. 21-cv- 00695-RBJ, 2022 WL 1642497 (D. Colo. May
24, 2022) ................................................................................................ 29

*Graham v. Florida,*
560 U.S. 48 (2010) .............................................................. 3, 5, 6, 7, 31

*Jones v. Mississippi,*
593 U.S. 98 (2021) .............................................................................. 4, 8

*Makthepharak v. Kelly,*
No. 23-2121-DDC, 2025 WL 1282649 (D. Kan. May 2,
2025) ...................................................................................................... 28

*Md. Restorative Just. Initiative v. Hogan,*
No. ELH-16-1021, 2017 WL 467731 (D. Md. Feb. 3, 2017) ................ 29

*Miller v. Alabama,*
567 U.S. 460 (2012) ................................................... 3, 5, 6, 7, 9, 10, 21

*Montgomery v. Louisiana,*
577 U.S. 190 (2016) ........................................................ 3, 4, 5, 6, 8, 35

*People v. Parks*,
510 Mich. 225 (2022) ............................................................. 1

*People v. Taylor*,
No. 166428, 2025 WL 1085247 (Mich. Apr. 10, 2025) ......................... 2

*Rainer v. Hansen*,
952 F.3d 1203 (10th Cir. 2020) ............................................ 34

*Roper v. Simmons*,
543 U.S. 551 (2005) ............................................ 6, 7, 9, 10, 27

*Swatzell v. Tenn. Bd. of Parole*,
No. 18-cv-01336, 2019 WL 1533445 (M.D. Tenn. Apr. 9,
2019) ....................................................................... 28-29

*Thomas v. Stitt*,
No. 21-6011, 2022 WL 289661 (10th Cir. Feb. 1, 2022) ............... 29, 30

*Thomas v. Stitt*,
No. CIV-20-944-D, 2025 WL 2586072 (W.D. Okla. Sept. 5,
2025) ....................................................... 5, 31, 32, 33, 34, 35

*Wershe v. Combs*,
No. 12-CV-1375, 2016 WL 1253036 (W.D. Mich. Mar. 31,
2016) ....................................................................... 29

## Statutes

Okla. Stat. Title 57, § 332.7(L) .............................................. 31

## Other Authorities

Alexa Mousley et al., *Topological Turning Points Across the
Human Lifespan*, 16 Nature Comm'ns 10055 (Oct. 2025) .......... 14, 17

Alexandra O. Cohen et al., *When Is an Adolescent an Adult?
Assessing Cognitive Control in Emotional and
Nonemotional Contexts*, 27 Psych. Sci. 549 (Feb. 2016) .................... 21

iv

Amy Garrett et al., *Longitudinal Changes in Brain Function Associated with Symptom Improvement in Youth with PTSD*, 114 J. Psychiatric Rsch. 161 (July 2019) ............................... 23

Anders M. Fjell et al., *Development and Aging of Cortical Thickness Correspond to Genetic Organization Patterns*, 112 Procs. Nat'l Acad. Sci. 15462 (Sept. 2015) ................................... 17

Arielle Baskin-Sommers et al., *Toward Targeted Interventions: Examining the Science Behind Inventions for Youth Who Offend*, 5 Ann. Rev. Criminology 345 (June 2021) ................................................................................. 23

Arielle R. Baskin-Sommers et al., *Callous-Unemotional Traits Trajectories Interact with Earlier Conduct Problems and Executive Control to Predict Violence and Substance Use Among High Risk Male Adolescents*, 43 J. Abnormal Child Psych. 1529 (June 2015).......................................... 25

B.J. Casey, *Beyond Simple Models of Self-Control to Circuit-Based Accounts of Adolescent Behavior*, 66 Ann. Rev. Psych. 295 (Jan. 2015) ......................................................... 19

B.J. Casey et al., *Making the Sentencing Case: Psychological and Neuroscientific Evidence for Expanding the Age of Youthful Offenders*, 5 Annu. Rev. Criminology 321 (Jan. 2022) .............................................................. 10, 11, 13, 27

B.J. Casey et al., *Structural and Functional Brain Development and Its Relation to Cognitive Development*, 54 Biological Psych. 241 (2000) ................................................ 12, 14, 15

Barbara R. Braams et al., *Longitudinal Changes in Adolescent Risk-Taking: A Comprehensive Study of Neural Responses to Rewards, Pubertal Development, and Risk-Taking Behavior*, 35 J. Neuroscience 7226 (May 2015) .................................................................................. 11

C. Liston, B. S. McEwen & B.J. Casey, *Psychosocial Stress Reversibly Disrupts Prefrontal Processing and Attentional Control*, 106 Procs. Nat'l Acad. Sci. 912 (Jan. 2009) ................................................................................ 23

Catherine Lebel, Sarah Treit & Christian Beaulieu, *A Review of Diffusion MRI of Typical White Matter Development from Early Childhood to Young Adulthood*, 32 NMR Biomedicine e3778 (Sept. 2019) ........................................... 19

Dale Purves et al., *Increased Conduction Velocity as a Result of Myelination*, Neuroscience, 2d ed. (2001) ...................................... 15

Daniel J. Simmonds et al., *Developmental Stages and Sex Differences of White Matter and Behavioral Development Through Adolescence: a Longitudinal Diffusion Tensor Imaging (DTI) Study*, 92 Neuroimage 356 (May 2014) ..................... 19

Daphne Bavelier et al., *Removing Brakes on Adult Brain Plasticity: from Molecular to Behavioral Interventions*, 30 J. Neuroscience 14964 (Nov. 2010).................................................... 10

Dustin Albert et al., *The Teenage Brain: Peer Influences on Adolescent Decision Making*, 22 Current Directions Psych. Sci. 114 (2013) ........................................................ 13

Dylan G. Gee & B.J. Casey, *The Impact of Developmental Timing for Stress and Recovery*, 1 Neurobiology of Stress 184 (Jan. 2015)................................................................. 24

Dylan G. Gee, *Early Adversity and Development: Parsing Heterogeneity and Identifying Pathways of Risk and Resilience*, 178 Am. J. Psychiatry 998 (Nov. 2021) ........................... 21

Elizabeth M. Rollins & AliceAnn Crandall, *Self-Regulation and Shame as Mediators Between Childhood Experiences and Young Adult Health*, 12 Frontiers in Psychiatry 1 (Apr. 2021)................................................................... 22

Elizabeth R. Sowell et al*., Mapping Cortical Change Across the Human Life Span*, 6 Nature Neuroscience 309 (Jan. 2003) ................ 17

Elizabeth Schilling, Robert H. Aseltine Jr. & Susan Gore,
*Adverse Childhood Experiences and Mental Health in
Young Adults: A Longitudinal Survey*, 7 BMC Pub.
Health 30 (Mar. 2007)............................................................22

Erik H. Erikson, *Identity: Youth and Crisis*, 14 Behav. Sci.
154 (1968) ..............................................................................9

Erin C. Dunn et al., *Developmental Timing of Child
Maltreatment and Symptoms of Depression and Suicidal
Ideation in Young Adulthood: Results from the National
Longitudinal Study on Adolescent Health*, 30 Depress
Anxiety 955 (Oct. 2013) ........................................................22

Fabienne El-Khoury et al., *Childhood Adversity Trajectories
and PTSD in Young Adulthood: A Nationwide Danish
Register-Based Cohort Study of More than One Million
Individuals*, 136 J. Psychiatric Rsch. 274 (Mar. 2021)......................22

*From Youth Justice Involvement to Young Adult Offending*,
Nat'l Inst. of Just. (Mar. 2014) ............................................26

Grace Icenogle et al., *Adolescents' Cognitive Capacity
Reaches Adult Levels Prior to Their Psychosocial
Maturity: Evidence for a "Maturity Gap" in a
Multinational, Cross-Sectional Sample*, 43 Law Hum.
Behav. 69 (Feb. 2019) ..........................................................21

Hugo G. Schnack et al., *Changes in Thickness and Surface
Area of the Human Cortex and Their Relationship with
Intelligence*, 25 Cerebral Cortex 1608 (June 2015) ..........................17

Isabelle M. Rosso et al., *Cognitive and Emotional
Components of Frontal Lobe Functioning in Childhood
and Adolescence*, 1021 Annals N.Y. Acad. Sci. 355 (June
2004) .......................................................................9

Jeffrey Arnett, *Reckless Behavior in Adolescence: A
Developmental Perspective*, 12 Dev. Rev. 339 (1992) ..........................9

Jennifer K. Forsyth & David A. Lewis, *Mapping the Consequences of Impaired Synaptic Plasticity in Schizophrenia Through Development: An Integrative Model for Diverse Clinical Features*, 21 Trends Cognitive Scis. 760 (Oct. 2017) ........................................................... 16

Johanna Bick & Charles A. Nelson, *Early Adverse Experiences and the Developing Brain*, 41 Neuropsychopharmacology Revs. 177 (2016) ...................................... 23

Kathryn L. Mills et al., *The Developmental Mismatch in Structural Brain Maturation During Adolescence*, 36 Dev. Neuroscience 147 (June 2014) ....................................................... 11, 18

Keith Stephen Dobson et al., *The Long Shadow of Adverse Childhood Experiences (ACEs): 1. Mental Health Outcomes in a Community Sample*, 6 Am. J. Preventative Med. & Pub. Health 119 (Sept. 2020) ................................................. 22

L.D. Selemon, *A Role for Synaptic Plasticity in the Adolescent Development of Executive Function*, 3 Translational Psychiatry e238 (Mar. 2013) ........................................ 14

Laura Cohen, *Freedom's Road: Youth, Parole, and the Promise of Miller v. Alabama and Graham v. Florida*, 35 Cardozo L. Rev. 1031 (2014) ........................................................... 11, 13

Laurence Steinberg & Elizabeth S. Scott, *Less Guilty by Reason of Adolescence: Developmental Immaturity, Diminished Responsibility, and the Juvenile Death Penalty*, 58 Am. Psych. 1009 (Dec. 2003) ................................................ 9

Linda Patia Spear, *Adolescent Neurodevelopment*, 52 J Adolescent Health 7 (Feb. 2013) .......................................................... 14

Lucinda M. Sisk & Dylan G. Gee, *Stress and Adolescence: Vulnerability and Opportunity During a Sensitive Window of Development*, 44 Current Op. Psych. 286 (Apr. 2022) ................................................................... 24

Megan R. Gunnar et al., *Pubertal Stress Recalibration Reverses the Effects of Early Life Stress in Postinstitutionalized Children*, 116 Procs. Nat'l Acad. Sci. 23984 (Nov. 2019) ................................................................ 23

Natasha Duell, et al., *Age Patterns in Risk Taking Across the World*, 47 J. Youth & Adolescence 1052 (May 2018) ................. 27

Nitin Gogtay et al., *Dynamic Mapping of Human Cortical Development During Childhood Through Early Adulthood*, 101 Procs. Nat'l Acad. Sci. 8174 (May 2004) .................... 9

Raj Chetty, Nathaniel Hendren & Lawrence F. Katz, *The Effects of Exposure to Better Neighborhoods on Children: New Evidence from the Moving to Opportunity Experiment*, 106 Am. Econ. Rev. 855 (Apr. 2016) .............................. 23

Samuel W. Hawes et al., *Modulation of Reward-Related Neural Activation on Sensation Seeking Across Development*, 147 Neuroimage 763 (Feb. 2017) ................................ 21

*See* Nico Dosenbach et al., *Prediction of Individual Brain Maturity Using fMRI*, 329 Sci. 1358 (Sept. 2010) ............................ 20

Silvia A. Bunge et al., *Immature Frontal Lobe Contributions to Cognitive Control in Children: Evidence from fMRI*, 33 Neuron 301 (Jan. 2002) ...................................................... 9

## STATEMENT OF QUESTION PRESENTED

Whether the Eighth Amendment requires Oklahoma's parole system to afford Plaintiff-Appellant Dwain Edward Thomas—who was sentenced to life with the possibility of parole for adolescent homicide offenses—meaningful parole consideration based on youthfulness, maturation, and/or rehabilitation.

## IDENTITY AND INTEREST OF *AMICI CURIAE*[1]

As forty-one of the nation's leading scholars of developmental science (including neuroscience, psychology, and juvenile justice) and their partner nonprofit organizations, *amici* are experts in the study of brain development and adolescent behavior. The U.S. Supreme Court, this Circuit, and courts around the country routinely draw upon the scientific literature in these fields to assess the constitutionality of life-determinant sentences for adolescent offenders. In the last few years alone, *amici* have assisted several appellate courts in applying this foundational science, including in *People v. Parks*, 510 Mich. 225 (2022),

---

[1] Counsel for *amici* authored the proposed brief in full. No person or entity, including counsel or *amici*, made a monetary contribution intended to fund the preparation or submission of the brief. The names, titles, and affiliations of *amici* are detailed in the Appendix of this brief.

*Commonwealth v. Mattis*, 493 Mass. 216 (2024), *Commonwealth v. Robinson*, 493 Mass. 303 (2024), and *People v. Taylor*, No. 166428, 2025 WL 1085247 (Mich. Apr. 10, 2025).

*Amici* submit this brief to (1) detail the overwhelming scientific consensus on incomplete brain and behavioral development for people who, like Mr. Thomas, were adolescents at the time of their offenses, and (2) explain how Oklahoma's parole system failed to consider this science, which is necessary to ensure adolescent offenders have a meaningful opportunity for parole as the Eighth Amendment requires. By virtue of their still-developing brains and personalities, and their vulnerability to external influences like peer pressure, adolescents are more likely than fully-developed adults to engage in irrational, risky, and impulsive behavior. But as their brains develop and their capacity for reasoned decisionmaking improves, they tend to grow beyond these behaviors. These scientific findings have profound implications for adolescent sentencing and parole. *Amici* therefore have a strong interest in ensuring that this Court has access to this science in reviewing the legality of Oklahoma's parole process, and as applied to Mr. Thomas.

## INTRODUCTION AND SUMMARY OF THE ARGUMENT

The U.S. Supreme Court has made clear that "fundamental differences" in the brains and behaviors of adolescents still undergoing transformative brain and behavioral development, *Graham v. Florida*, 560 U.S. 48, 68 (2010), render them "constitutionally different" as compared to fully-developed adults, *Miller v. Alabama*, 567 U.S. 460, 471 (2012). These fundamental differences are both a matter of "common sense," *id.*, and of overwhelming scientific consensus on incomplete adolescent development, *see infra* Part I.

Given these scientific realities, the Eighth Amendment precludes certain life sentences for offenses committed in adolescence. *Montgomery v. Louisiana*, 577 U.S. 190, 206 (2016) (citing *Miller*, 567 U.S. at 470 n.4). This constitutional prohibition, in the words of the Supreme Court, stems from the fact that imposing life punishment based on "transient immaturity" of adolescents—who from the perspective of brain and behavioral development will have "matured" and shown long-term rehabilitative potential down the line—constitutes a "disproportionate sentence in violation of the Eighth Amendment." *Id.* at 212.

3

While the Supreme Court has not foreclosed life sentences in certain circumstances, it has still emphasized that life imprisonment should be reserved for "the rarest of juvenile offenders, those whose crimes reflect permanent incorrigibility," *Montgomery*, 577 U.S. at 209, and left open "as-applied Eighth Amendment claim[s] of disproportionality," *Jones v. Mississippi*, 593 U.S. 98, 120 (2021). Here, Mr. Thomas is serving life with the possibility of parole for homicide offenses committed as a 15-year-old. Over his 28 years of imprisonment, the parole board (the "Board") has denied Mr. Thomas parole six times. The factual record—construed most favorably for Mr. Thomas in this summary judgment posture—reveals that the Board failed to properly consider Mr. Thomas's incomplete brain and behavioral development at the time of his offenses or his profound growth since then reflecting demonstrated maturation and rehabilitative potential.

Instead, the record shows that the Board and its flawed processes failed to consider these developmental factors at all—much less consider them as mitigating as the Constitution requires. In doing so, the system failed to afford Mr. Thomas *any* "opportunity to obtain release" based on indisputable hallmarks of youthfulness, later maturation, and

4

rehabilitation. *Miller*, 567 U.S. at 479 (quoting *Graham*, 560 U.S. at 75). Stated differently, the Board effectively converted Mr. Thomas's indeterminate life sentence into life **without** parole ("LWOP"), violating "the truth of *Miller*'s central intuition—that children who commit even heinous crimes are capable of change"—thereby violating the Eighth Amendment. *Montgomery*, 577 U.S. at 212.

Despite this, the district court granted summary judgment to the Oklahoma Defendants, concluding: (1) *Miller* does not apply "because he was a juvenile homicide offender sentenced to life *with* the possibility of parole," and consideration of youthfulness as a mitigating factor is only required for "a life-*without*-parole sentence," *Thomas v. Stitt*, No. CIV-20-944-D, 2025 WL 2586072, at *12 (W.D. Okla. Sept. 5, 2025); and (2) Plaintiff has not shown that Oklahoma's parole system is "the functional equivalent of a mandatory life-without-parole sentence, which *Miller* barred," *id.* at 13. *Amici* respectfully submit that both conclusions rest on scientific and legal errors that warrant reversal by this Court.

I.    **The Eighth Amendment Prohibits the Government from Subjecting Adolescents to Disproportionate Sentences.**

The Eighth Amendment prohibits cruel and unusual punishments, "guarantee[ing] individuals the right not to be subjected to excessive sanctions." *Roper v. Simmons*, 543 U.S. 551, 560 (2005). The Supreme Court has repeatedly recognized that individuals who have committed offenses as adolescents are uniquely situated given their incomplete brain and behavioral development during adolescence. *Montgomery*, 577 U.S. 190; *Miller*, 567 U.S. 460; *Graham*, 560 U.S. 48; *Roper*, 543 U.S. 551.

According to the Court, due to this incomplete development, adolescents suffer from "transient rashness, proclivity for risk, and inability to assess consequences"—which operate to "lessen[] [their] 'moral culpability' and enhance[] the prospect that, as the years go by and neurological development occurs, [their] 'deficiencies will be reformed.'" *Miller*, 567 U.S. at 472 (quoting *Graham*, 560 U.S. at 68). In recognition of their diminished self-control, vulnerability to peer pressure, and heightened prospects for redemption—all confirmed by brain and behavioral science—the Court has repeatedly held that subjecting adolescents to certain life sentences is cruel and unusual.

6

Beginning with *Roper* and continuing through *Jones*, the Court has articulated a framework that recognizes that adolescents' incomplete development render them categorically less culpable and more capable of change and rehabilitation. *Roper*, 543 U.S. at 569-70. These characteristics map directly onto neurobiological reality. *Infra* Part II.

In *Graham*, the Court extended *Roper* to hold that LWOP sentences for adolescent nonhomicide offenders violate the Eighth Amendment, requiring instead that the government provide "meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation." 560 U.S. at 75. *Graham* confirmed that, while the Eighth Amendment does not guarantee release, it prohibits the government from "making the judgment at the outset" that an adolescent offender will never "be fit to reenter society." *Id.*

*Miller* then clarified that "*Graham*'s reasoning implicates any life-without-parole sentence imposed on a juvenile, even as its categorical bar relates only to nonhomicide offenses." 567 U.S. at 473. *Miller* held that courts must "consider[] an offender's youth and attendant characteristics" before imposing the harshest sentences. *Id.* at 483. *Montgomery* explained that the government "may remedy . . . *Miller*

7

violation[s] by permitting juvenile homicide offenders to be considered for parole." 577 U.S. at 212. Critically, *Montgomery* specified that parole consideration must "ensure[]" that adolescents whose crimes reflected "transient immaturity" and "who have since matured" are "not forced to serve a disproportionate sentence in violation of the Eighth Amendment." *Id.* This language confirms that a parole system must consider whether adolescents' transient immaturity at the time of their offenses and subsequent demonstrated maturation and rehabilitation warrant granting parole.

*Jones* confirmed that *Miller* "required that a sentencer consider youth as a mitigating factor," while declining to require specific procedural formalities at the time of sentencing. 593 U.S. 98 at 109. But *Jones* solely addressed courts' sentencing discretion at the outset—not parole consideration for persons sentenced for adolescent offenses. And crucially, *Jones* expressly left open "any as-applied Eighth Amendment claim of disproportionality." *Id.* at 120.

## II.   Profound Developmental Changes in Adolescence Render Overly Punitive Sentences Disproportionate for Adolescent Offenses.

In reaching its seminal holdings, the Supreme Court relied extensively on the scientific literature on adolescent immaturity and

ongoing brain development.[2]    This incomplete development sets

adolescents apart as inherently less culpable because it explains their

"'lack of maturity,'" their "'underdeveloped sense of responsibility,'

leading to recklessness, impulsivity, and heedless risk-taking," and their

"'vulnerab[ility] to negative influences and outside pressures,' including

from their family and peers."  *Miller*, 567 U.S. at 471 (quoting *Roper*, 543

U.S. at 569-70).  This incomplete development also leaves no question

that their "traits are 'less fixed,'" such that offenses committed during

adolescence rarely reflect "'irretrievable depravity'"; instead, adolescents

---

[2] *See, e.g.*, Jeffrey Arnett, *Reckless Behavior in Adolescence: A Developmental Perspective*, 12 Dev. Rev. 339 (1992) [Link] (cited in *Roper*, 543 U.S. at 569); Laurence Steinberg & Elizabeth S. Scott, *Less Guilty by Reason of Adolescence: Developmental Immaturity, Diminished Responsibility, and the Juvenile Death Penalty*, 58 Am. Psych. 1009 (Dec. 2003) [Link] (cited in *Roper*, 543 U.S. at 569); Erik H. Erikson, *Identity: Youth and Crisis*, 14 Behav. Sci. 154 (1968) [Link] (cited in *Roper*, 543 U.S. at 570); Isabelle M. Rosso et al., *Cognitive and Emotional Components of Frontal Lobe Functioning in Childhood and Adolescence*, 1021 Annals N.Y. Acad. Sci. 355 (June 2004) [Link] (submitted in *Graham*); Silvia A. Bunge et al., *Immature Frontal Lobe Contributions to Cognitive Control in Children: Evidence from fMRI*, 33 Neuron 301 (Jan. 2002) [Link] (submitted in *Graham*); Nitin Gogtay et al., *Dynamic Mapping of Human Cortical Development During Childhood Through Early Adulthood*, 101 Procs. Nat'l Acad. Sci. 8174 (May 2004) [Link] (submitted in *Graham*).

possess significant rehabilitative potential once they have matured into fully-developed adults.  *Id.* (quoting *Roper*, 543 U.S. at 570).

A. **Incomplete Brain and Behavioral Development Throughout Adolescence Results in Poor Decisionmaking, Vulnerability to Peer Pressure, and Heightened Potential for Rehabilitation.**

All human brains possess remarkable capacity for change, referred to as "plasticity," across the lifespan.[3]  This capacity is dramatically heightened among adolescents, as their brains have yet to undergo many essential developmental processes.[4]  As their brains mature, adolescents begin to develop critical capacities for impulse control, reasoned decisionmaking, and emotional regulation—the very traits courts and parole boards rely on to evaluate a person's relative culpability at the time of their offense, future dangerousness, and rehabilitative potential.

---

[3] *See* Daphne Bavelier et al., *Removing Brakes on Adult Brain Plasticity: from Molecular to Behavioral Interventions*, 30 J. Neuroscience 14964, 14964-65 (Nov. 2010) [Link].

[4] B.J. Casey et al., *Making the Sentencing Case: Psychological and Neuroscientific Evidence for Expanding the Age of Youthful Offenders*, 5 Annu. Rev. Criminology 321, 329-30 (Jan. 2022) [Link].

### 1. *Incomplete development of key brain regions governing decisionmaking persists throughout adolescence.*

Neurological maturation during adolescence involves a cascade of developmental processes across several key systems within the brain.[5]

Subcortical regions, including the ventral striatum and amygdala, undergo earlier structural and functional development to establish neurological pathways for reward-response and emotional learning and processing.[6]   By contrast, the prefrontal cortex—which guides self-control, future planning, and complex decisionmaking—takes far longer to mature and continues to exhibit profound structural and functional change throughout adolescence, into the early twenties.[7]

---

[5] *Id.* at 329 (collecting studies showing dynamic brain circuit changes over a person's life and "especially during the first two decades").

[6] Kathryn L. Mills et al., *The Developmental Mismatch in Structural Brain Maturation During Adolescence*, 36 Dev. Neuroscience 147, 148 (June 2014) [Link]; Barbara R. Braams et al., *Longitudinal Changes in Adolescent Risk-Taking: A Comprehensive Study of Neural Responses to Rewards, Pubertal Development, and Risk-Taking Behavior*, 35 J. Neuroscience 7226, 7236-37 (May 2015) [Link].

[7] Laura Cohen, *Freedom's Road: Youth, Parole, and the Promise of Miller v. Alabama and Graham v. Florida*, 35 Cardozo L. Rev. 1031, 1047 (2014) [Link] ("[E]ach region of the brain matures at a different rate, with the frontal lobes, the parietal lobes, and the temporal lobes, all of which are required for abstract reasoning, maturing last.").

While both brain systems play important roles in decisionmaking, the limbic circuitry that dominates in adolescence governs short-term reward-seeking and pleasure (through the ventral striatum and orbitofrontal cortex) and emotional arousal (through the amygdala, hippocampus, and ventromedial prefrontal cortex).  By contrast, the prefrontal circuitry (latefral prefrontal cortex and posterior parietal cortex) that only becomes dominant in fully-developed adulthood regulates cognitive control responses such as abstract reasoning, sustained attention, future planning, and strategic memory retrieval.

Into the early twenties, the brain exhibits a crucial shift towards relying predominantly on cognitive control or prefrontal circuitry.[8]  This produces cognition that is no longer primarily reliant on emotional, or limbic, circuitry, but rather permits reasoned decisionmaking even under conditions of stress or emotional arousal.  So, when fully developed, this brain system enables individuals to efficiently engage in complex

———————————

[8] B.J. Casey et al., *Structural and Functional Brain Development and Its Relation to Cognitive Development*, 54 Biological Psych. 241, 245-46 (2000) [Link] (reviewing studies examining prefrontal cortical activity in adolescents and concluding that increased cognitive capacity coincides with a loss of some synapses and strengthening of remaining synapses).

decisionmaking by weighing alternative choices and courses of action based on future objectives and long-term consequences.

But before the prefrontal cortex is fully developed, adolescents operate without the full complement of cognitive tools necessary for mature decisionmaking and for development of the character traits that sentencing and parole decisions assess. Adolescents thus experience a protracted window where their brains' excitatory and emotional response mechanisms predominate over key parts of their brains that regulate self-control and decisionmaking. During this period of adolescence, rash emotional response plays an outsized (and, at times, detrimental) role in adolescent misbehavior and criminality.[9]

As the prefrontal cortex develops, the brain also sheds unnecessary neurological connections to facilitate rapid and efficient communication

---

[9] *See also* Cohen, *supra* note 7, at 1045-46 (explaining how adolescents' "heightened neural responses to social stimuli" make them more susceptible to peer pressure (citing Dustin Albert et al., *The Teenage Brain: Peer Influences on Adolescent Decision Making*, 22 Current Directions Psych. Sci. 114, 115 (2013))); Casey, *Making the Sentencing Case*, *supra* note 4, at 327 ("'[A]dolescents' and young adults' heightened susceptibility to social influences places them at risk for criminal activity, an idea corroborated by evidence that most youths commit crimes with accomplices.'" (citation omitted)).

across the brain through a process known as synaptic pruning.[10]

Throughout adolescence, this developmental process discards unused

excitatory synapses (connections between neurons)—dramatically

increasing the efficiency of communication between neural pathways.[11]

At the same time, key brain regions experience reductions of about half

of their synaptic connections, resulting in a transformative "'rewiring' of

brain connections into adult-typical patterns."[12]   This refinement is

---

[10] *See* L.D. Selemon, *A Role for Synaptic Plasticity in the Adolescent Development of Executive Function*, 3 Translational Psychiatry e238, 1 (Mar. 2013) [Link] ("Synaptic pruning of excitatory contacts is the signature morphologic event of late brain maturation during adolescence.").

[11] *Id.*; Casey, *Structural and Functional Brain Development*, *supra* note 8, at 245-46, (reviewing studies examining prefrontal cortical activity in adolescents and concluding that increased cognitive capacity coincides with a loss of some synapses and strengthening of remaining synapses); Alexa Mousley et al., *Topological Turning Points Across the Human Lifespan*, 16 Nature Comm'ns 10055, 7 (Oct. 2025) [Link] (explaining how between nine to thirty-two years old, "all topological measures [are] significantly correlated with age, characterized by increasing network integration and complex segregation and centrality patterns.").

[12] Linda Patia Spear, *Adolescent Neurodevelopment*, 52 J Adolescent Health 7, 8 (Feb. 2013) [Link].

integral for learning, cognition, and reasoned decision making, and typically remains incomplete until the early twenties.[13]

Along similar lines, the gradual "myelination" of brain tissue further facilitates rapid cognition by fine-tuning neural connections between disparate regions of the brain.[14] Myelin is the fatty, insulative tissue that surrounds axons (the parts of nerve cells along which electrical impulses travel).[15] The process of myelination speeds nerve signals by allowing electrical signals to "jump" between gaps in the myelin sheath, signaling up to 15 times as quickly as unmyelinated axons.[16] Myelination strengthens the connections between brain systems responsible for processing cognitive, emotional, and social information—pathways that are crucial to the full development of the prefrontal cortex needed for self-control and decisionmaking. Until this developmental process is complete, adolescents lack the capacity to marshal all their processing and deliberative cognitive resources simultaneously, which

---

[13] Casey, *Structural and Functional Brain Development*, *supra* note 8, at 245-46.

[14] *Id.*

[15] Dale Purves et al., *Increased Conduction Velocity as a Result of Myelination*, Neuroscience, 2d ed. (2001) [Link].

[16] *Id.*

15

makes them far more vulnerable to poorly-reasoned decisionmaking under conditions of stress or emotional arousal.



Figure 1 – Density and maturation of various neutral circuitry through early adulthood. Jennifer K. Forsyth & David A. Lewis, *Mapping the Consequences of Impaired Synaptic Plasticity in Schizophrenia Through Development: An Integrative Model for Diverse Clinical Features*, 21 Trends Cognitive Scis. 760, 32 (Oct. 2017) [Link].

Structural changes across the brain throughout adolescence also refine the brain's gray and white matter connections, enabling adolescents to improve their decisionmaking, self-control, and social and emotional responses. Imaging tools, like functional magnetic resonance imaging ("fMRI"), have allowed researchers to document the transition toward long-distance neural connections during adolescence, reflecting maturation of regions of the brain responsible for foresight, planning, and

self-control. These studies reveal dramatic increases in white matter volume and decreases in gray matter volume as the brain develops.[17]



Figure 2 – Changes in white and gray matter volume throughout life. Elizabeth R. Sowell et al*., Mapping Cortical Change Across the Human Life Span*, 6 Nature Neuroscience 309, 314 (Jan. 2003) [Link].

The thinning and refinement of cortical gray matter (the regions containing most of the brain's neuronal cells) is associated with improved decisionmaking and self-control.[18] Regions that experience the most gray-matter volume reduction are the same ones most essential for

---

[17] Mousley, *supra* note 11, at 10 ("[S]ignificant changes in white matter integrity and topological development occur around the beginning of the fourth decade of life.").

[18] Hugo G. Schnack et al., *Changes in Thickness and Surface Area of the Human Cortex and Their Relationship with Intelligence*, 25 Cerebral Cortex 1608 (June 2015) [Link]; Anders M. Fjell et al., *Development and Aging of Cortical Thickness Correspond to Genetic Organization Patterns*, 112 Procs. Nat'l Acad. Sci. 15462, 15463-64 (Sept. 2015) [Link].

17

reasoned decisionmaking.   The prefrontal cortex, responsible for cognitive control and decisionmaking, undergoes a 17% reduction in gray matter volume from ages 6 through 18, and beyond.[19]   Meanwhile, subcortical regions such as the amygdala and striatum—which are implicated in emotional and motivational processing—exhibit a 7% reduction from ages 6 through 18, and beyond.[20]   Because these regions of the brain are essential to planning, self-control, and emotional processing, gray matter reduction throughout adolescence is integral to mature decisionmaking capacity after the brain is fully developed.



Figure 3 – Gray matter volume in the amygdala, ventral striatum, and prefrontal cortex from childhood to early adulthood.  Mills, *supra* note 6, at 153.

---

[19] Mills, *supra* note 6, at 153.
[20] *Id.*

18

While gray matter recedes, white matter maturation contributes to heightened brain processing efficiency, improved impulse control, and enhanced reasoned decisionmaking capacity.[21]  This process is associated with the myelination process described above and continues through age 18 and beyond.  It improves the brain's speed of stimuli processing, contributing to improved self-control as neurocognitive adulthood is reached.[22]  Incomplete white matter development is associated with diminished self-control and increased impulsive and risky behavior.[23]

Studies using fMRI demonstrate that both at rest and when responding to tasks, mature brains exhibit strengthened long-distance (distal) connections rather than primarily local ones.  This shift allows mature brains to respond more effectively to stimuli when under

---

[21] Catherine Lebel, Sarah Treit & Christian Beaulieu, *A Review of Diffusion MRI of Typical White Matter Development from Early Childhood to Young Adulthood*, 32 NMR Biomedicine e3778 (Sept. 2019) [Link].

[22] Daniel J. Simmonds et al., *Developmental Stages and Sex Differences of White Matter and Behavioral Development Through Adolescence: a Longitudinal Diffusion Tensor Imaging (DTI) Study*, 92 Neuroimage 356 (May 2014) [Link].

[23] B.J. Casey, *Beyond Simple Models of Self-Control to Circuit-Based Accounts of Adolescent Behavior*, 66 Ann. Rev. Psych. 295 (Jan. 2015) [Link].

conditions of emotional arousal (e.g., anticipation of threat or reward). This developmental change also improves risk assessment, impulse control, and decisionmaking.[24]



Figure 4 – Functional connectivity maturation in the brain through late adolescence and up to 30. Dosenbach, *supra* note 24, at 1359.

As brain imaging research confirm, individuals' ability to engage in mature decisionmaking through effective impulse control, risk

---

[24] *See* Nico Dosenbach et al., *Prediction of Individual Brain Maturity Using fMRI*, 329 Sci. 1358, 1360 (Sept. 2010) [Link].

avoidance, and coordination of emotion and cognition is not fully developed until the brain is fully developed.[25]

>    2.    *Transformative brain and behavioral development primes adolescents for long-term rehabilitation.*

Trauma throughout childhood can profoundly alter standard brain development, as well as cognitive and perceptual processes.[26]   As the *Miller* Court recognized, youth "lack the ability to extricate themselves from horrific, crime-producing settings."   567 U.S. at 471.   Not only does this render youth more susceptible to circumstances such as poverty and violence that make it difficult to avoid crime, but developments in neuroscientific research have shown that trauma has a profound impact on brain development.   Adverse childhood experiences increase the risk

---

[25] Alexandra O. Cohen et al., *When Is an Adolescent an Adult? Assessing Cognitive Control in Emotional and Nonemotional Contexts*, 27 Psych. Sci. 549 (Feb. 2016) [Link]; Grace Icenogle et al., *Adolescents' Cognitive Capacity Reaches Adult Levels Prior to Their Psychosocial Maturity: Evidence for a "Maturity Gap" in a Multinational, Cross-Sectional Sample*, 43 Law Hum. Behav. 69 (Feb. 2019) [Link]; Samuel W. Hawes et al., *Modulation of Reward-Related Neural Activation on Sensation Seeking Across Development*, 147 Neuroimage 763, 766-71 (Feb. 2017) [Link]; Braams, *supra* note 6.

[26] Dylan G. Gee, *Early Adversity and Development: Parsing Heterogeneity and Identifying Pathways of Risk and Resilience*, 178 Am. J. Psychiatry 998, 998-99 (Nov. 2021) [Link].

of delayed neurocognitive maturity during late adolescence, stunted emotional development, limited self-control, and a variety of mental health conditions throughout youth and into adulthood.[27]   All of these

---

[27] See Fabienne El-Khoury et al., *Childhood Adversity Trajectories and PTSD in Young Adulthood: A Nationwide Danish Register-Based Cohort Study of More than One Million Individuals*, 136 J. Psychiatric Rsch. 274 (Mar. 2021) [Link]; Elizabeth Schilling, Robert H. Aseltine Jr. & Susan Gore, *Adverse Childhood Experiences and Mental Health in Young Adults: A Longitudinal Survey*, 7 BMC Pub. Health 30, 2 (Mar. 2007) [Link] (finding adverse childhood experiences "significantly" associated with increased prevalence of depressive symptoms, drug use, and antisocial behavior); Erin C. Dunn et al., *Developmental Timing of Child Maltreatment and Symptoms of Depression and Suicidal Ideation in Young Adulthood: Results from the National Longitudinal Study on Adolescent Health*, 30 Depress Anxiety 955, 961 (Oct. 2013) [Link] (finding "high levels of depression" and increased suicidal ideation in young adults who experienced physical or sexual abuse during adolescence); Keith Stephen Dobson et al., *The Long Shadow of Adverse Childhood Experiences (ACEs): 1. Mental Health Outcomes in a Community Sample*, 6 Am. J. Preventative Med. & Pub. Health 119, 119-21 (Sept. 2020) [Link] (summarizing studies showing adverse childhood experiences including physical or sexual abuse, domestic violence, exposure to violence in the community, experiences that involve deprivation such as neglect, the absence of a caregiver, poverty, and food insecurity contribute to anxiety, depression, aggressive behaviors, post-traumatic stress disorder, and substance abuse issues); Elizabeth M. Rollins & AliceAnn Crandall, *Self-Regulation and Shame as Mediators Between Childhood Experiences and Young Adult Health*, 12 Frontiers in Psychiatry 1, 2 (Apr. 2021) [Link] (summarizing a growing number of studies indicating that adverse childhood experiences lead to increased mental health problems in early adulthood).

factors may exacerbate poor decisionmaking and maladaptive behaviors, including criminal conduct, in youth raised in adverse environments.[28]

Fortunately, brain plasticity and the ongoing process of maturation give adolescents remarkable potential to adapt to new environments later in life. Studies have shown that rehabilitative interventions can help adolescents process traumatic experiences and develop healthier cognitive and behavioral patterns.[29] Sufficient time in less adverse settings[30] and appropriate interventions can curb risky and impulsive behaviors, especially in adolescents.[31] This speaks to the extraordinary

---

[28] Johanna Bick & Charles A. Nelson, *Early Adverse Experiences and the Developing Brain*, 41 Neuropsychopharmacology Revs. 177, 179-80 (2016) [[Link]].

[29] Amy Garrett et al., *Longitudinal Changes in Brain Function Associated with Symptom Improvement in Youth with PTSD*, 114 J. Psychiatric Rsch. 161, 164-69 (July 2019) [[Link]]; C. Liston, B. S. McEwen & B.J. Casey, *Psychosocial Stress Reversibly Disrupts Prefrontal Processing and Attentional Control*, 106 Procs. Nat'l Acad. Sci. 912, 913-14 (Jan. 2009) [[Link]].

[30] Raj Chetty, Nathaniel Hendren & Lawrence F. Katz, *The Effects of Exposure to Better Neighborhoods on Children: New Evidence from the Moving to Opportunity Experiment*, 106 Am. Econ. Rev. 855, 855-56 (Apr. 2016) [[Link]]; Megan R. Gunnar et al., *Pubertal Stress Recalibration Reverses the Effects of Early Life Stress in Postinstitutionalized Children*, 116 Procs. Nat'l Acad. Sci. 23984, 23987 (Nov. 2019) [[Link]].

[31] Arielle Baskin-Sommers et al., *Toward Targeted Interventions: Examining the Science Behind Inventions for Youth Who Offend*, 5 Ann. Rev. Criminology 345, 350-61 (June 2021) [[Link]].

plasticity of the adolescent brain, demonstrating how they remain primed for further growth and rehabilitation, even after extremely adverse experiences.[32]

This means that, particularly for adolescents, their behavior reflects their lived experiences and not any inherent character traits. It is impossible to predict what the future holds for adolescents once the developmental processes described above have run their course—further reinforcing the scientific consensus (and the law) that it is unsound to sentence adolescents to life in prison with no meaningful opportunity to demonstrate that their character has changed.

Strong empirical evidence confirms that the neurobiological processes described above have demonstrable effects on adolescent behavior. These behavioral differences are observed in adolescents across cultures and continue beyond age 18. This means that not only

---

[32] Lucinda M. Sisk & Dylan G. Gee, *Stress and Adolescence: Vulnerability and Opportunity During a Sensitive Window of Development*, 44 Current Op. Psych. 286, 286-89 (Apr. 2022) [Link]; Dylan G. Gee & B.J. Casey, *The Impact of Developmental Timing for Stress and Recovery*, 1 Neurobiology of Stress 184, 185, 188 (Jan. 2015) [Link].

can adolescents change—they necessarily do change in transformative ways as a result of normal developmental processes.

Psychological studies show that extreme antisocial behavior and pathological personality traits naturally diminish in the early twenties for a majority of individuals who reach neurological adulthood.[33] These problematic traits often lessen or disappear even without external intervention.[34] This phenomenon underlies the well-established "age-crime curve," which shows that violent criminal conduct rises sharply during adolescence, peaks in the early twenties, and then recedes significantly in the early-to-mid-twenties in response to the brain and behavioral maturation processes discussed above:

---

[33] Arielle R. Baskin-Sommers et al., *Callous-Unemotional Traits Trajectories Interact with Earlier Conduct Problems and Executive Control to Predict Violence and Substance Use Among High Risk Male Adolescents*, 43 J. Abnormal Child Psych. 1529 (June 2015) [Link].

[34] *Id.*



Figure 5 – Distribution of persons arrested for violence by age. *See From Youth Justice Involvement to Young Adult Offending*, Nat'l Inst. of Just. (Mar. 2014) [Link].

Moreover, psychological traits such as antisocial risk endorsement (behaviors such as vandalizing property, engaging in physical fights, or threatening others) increase during adolescence, peak in the early twenties, and then diminish substantially into the mid-twenties and beyond. Critically, this pattern is evident in adolescents globally and across diverse cultures, suggesting that the underlying biological drivers that contribute to criminality affect all adolescents regardless of culture:



Figure 6 – Age patterns in self-reported antisocial risk taking across countries. Natasha Duell, et al., *Age Patterns in Risk Taking Across the World*, 47 J. Youth & Adolescence 1052 (May 2018) [Link].

While not all adolescents are guaranteed to desist from crime or successfully rehabilitate, the overwhelming scientific evidence shows that most, except a very small number, will.[35]  Moreover, there is no scientifically sound basis to determine at the time of sentencing which adolescents may be incapable of reform.[36]  Adolescence is a unique stage

---

[35] Casey, *Making the Sentencing Case*, *see supra* note 4, 332.

[36] *See also Roper*, 543 U.S. at 570 ("[I]t is less supportable to conclude that even a heinous crime committed by a juvenile is evidence of irretrievably depraved character.").

of development when the brain regions and processes governing the traits most relevant to criminal conduct and sentencing are immature and undergoing rapid change.    This scientific reality has direct implications for parole: decision-makers cannot provide a meaningful opportunity for release unless they understand and consider adolescent brain and behavioral development and its impacts both on the initial crime as well as the individual's future maturation and rehabilitative potential.

## III.    The Eighth Amendment Requires Meaningful Parole Consideration for Adolescent Offenders, Including Mr. Thomas.

Courts in this Circuit and around the country have held that *Graham*, *Miller*, and *Montgomery* apply with equal force to the "parole schemes" governing offenses committed during adolescence, or else "the opportunity for release requirement could exist in name only." *Makthepharak v. Kelly*, No. 23-2121-DDC, 2025 WL 1282649, at *16 & *15 n.13 (collecting cases) (D. Kan. May 2, 2025).[37]  Indeed, earlier in this

---

[37] *See also Flores v. Stanford*, No. 18 CV 2468 (VB), 2019 WL 4572703, at *9 (S.D.N.Y. Sept. 20, 2019) ("[T]he Court holds that *Graham*, *Miller*, and *Montgomery* vest in juvenile offenders sentenced to a maximum term of life imprisonment an Eighth Amendment right that attaches to those offenders' parole proceedings, which the Constitution mandates must amount to a meaningful opportunity to obtain release." (quotation cleaned up)); *Swatzell v. Tenn. Bd. of Parole*, No. 18-cv-01336,

28

case, this Court reversed the district court's dismissal of Mr. Thomas's complaint based on the very same theory espoused by the district court below. *Thomas v. Stitt*, No. 21-6011, 2022 WL 289661 (10th Cir. Feb. 1, 2022). In reversing, this Court reasoned that "the Supreme Court has not specifically addressed Mr. Thomas's argument—whether the Eighth Amendment requires the State to operate a parole system that affords a meaningful opportunity to obtain release based on demonstrated

---

2019 WL 1533445, at *5 (M.D. Tenn. Apr. 9, 2019) ("[T]o the extent that the Complaint attempts to allege that Defendant's policies, procedures, and customs violate the [Eighth Amendment] . . . because they do not provide him, a juvenile offender, with a meaningful opportunity for release, such allegations may also state a colorable § 1983 claim."); *Md. Restorative Just. Initiative v. Hogan*, No. ELH-16-1021, 2017 WL 467731, at *26 (D. Md. Feb. 3, 2017) (declining to dismiss plausible claim that state parole system deprived juvenile homicide offenders sentenced to life with parole "of the right to a meaningful opportunity for release" under the Eighth Amendment); *Wershe v. Combs*, No. 12-CV-1375, 2016 WL 1253036, at *3 (W.D. Mich. Mar. 31, 2016) (explaining "[t]he Court's discussion of a meaningful opportunity to obtain release . . . suggests that the decision imposes some requirements after sentencing" and assuming without deciding "that *Graham* requires the State to provide [plaintiff] with a meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation"); *cf. also Godinez v. Williams*, No. 21-cv-00695-RBJ, 2022 WL 1642497, at *17 (D. Colo. May 24, 2022) (explaining on sentencing challenge that "if the Colorado parole board or other state actors fail to allow Mr. Godinez a meaningful opportunity for parole or fail to consider his youth and rehabilitation, he could potentially pursue a § 1983 claim [under *Graham*] against them when such a claim is ripe").

29

maturity and rehabilitation, or whether simply making a juvenile lifer eligible for parole is enough." *Id.* at \*3. Critically, this Court observed that such an interpretation is "plausible" and that "a fair reading of the cases does not foreclose Mr. Thomas's claims." *Id.*

*Amici* respectfully submit that the indisputable scientific evidence detailed in Part II *supra*, when contextualized with the prior holdings of the Supreme Court and this Court, supports the conclusion that any parole system that fails to properly consider an individual's lessened culpability at the time of their adolescent offense, or their demonstrated maturity and rehabilitation afterwards, fails to provide any meaningful opportunity for release—contrary to the Eighth Amendment.

*Budder v. Addison*, 851 F.3d 1047 (10th Cir. 2017), provides a helpful framework for evaluating the Oklahoma parole system's failure to provide adolescents with a meaningful opportunity for release. *Budder* observed that *Graham*, *Miller*, and *Montgomery* impose both sentencing **and** parole protections for adolescents. *See Budder*, 851 F.3d at 1056-57 ("[T]he Court did not just hold that [1] it violated the Eighth Amendment to sentence a juvenile nonhomicide offender to life without parole; [2] it held that . . . a state . . . must provide that offender with a 'meaningful

opportunity to obtain release.'" (quoting *Graham*, 560 U.S. at 75)). *Budder* further clarified that "the Constitution's protections do not depend upon a legislature's semantic classifications" and that Oklahoma cannot "subvert the requirements of the Constitution by merely sentencing their offenders to terms of 100 years instead of [LWOP]." 851 F.3d at 1056. *Budder* thus confirms that the Eighth Amendment bars sentences that ***function*** as LWOP regardless of label—a principle that applies with equal force to parole regimes that nominally offer release but, in operation, deny a meaningful opportunity to obtain it.

Based on the facts developed below, Oklahoma's parole process nominally offers release but effectively denies adolescent offenders like Mr. Thomas any meaningful opportunity to obtain it. For one, the parole statute directs the Board to "make inquiry into the conduct and the record of the inmate during his custody in the Department of Corrections." *Thomas*, 2025 WL 2586072, at *3 (quoting Okla. Stat. tit. 57, § 332.7(L)). But the statute does not require the Board to consider an inmate's age at the time of their offense, adolescent-related diminished culpability, or subsequent maturation as mitigating factors. *See id.* Moreover, the parole investigator report provided to the Board and

Governor contains no dedicated field identifying whether the inmate was an adolescent at the time of the offense. *Id.* at *3-4. As the record below confirmed, only "***some*** investigative reports include an offender's age at the time of the offense"—meaning that many reports do not include this critical detail. *Id.* at *3 (emphasis added). This early administrative failure means that often the Board can only "calculate an offender's age at the time of the offense by subtracting the offender's birth date from the case file date"—a calculation that yields age at case filing, not age at offense—such that the Board may not even know that the individual under consideration committed their offenses during adolescence. *Id.*

Building on these early failures, at Stage I of the parole process, the Board conducts a "jacket review" based on written materials; there is no right to counsel, no personal appearance, no opportunity to speak, no guarantee of an investigator interview, and no mechanism to submit expert reports. *Thomas*, 2025 WL 2586072, at *3, *8. If the Board denies parole at Stage I—as it has done repeatedly for Mr. Thomas, *id.* at *2— the inmate never reaches Stage II, where personal appearances occur, *id.* at *3. In short, Oklahoma enables decisive determinations through a paper-driven Stage I process without counsel, testimony, or expert input,

and no hearing opportunity for Mr. Thomas or other adolescent offenders to demonstrate their maturation and rehabilitation to the Board.

Board members also receive no training on adolescent sentencing jurisprudence or on how to evaluate youth-related considerations of diminished culpability and developmental maturation. Former Board member Kelly Doyle testified "No" when asked whether she "receive[d] any training from PPB about how to consider the age of the inmate at the time of the underlying offense for parole purposes." Dkt. 126-2 at 16-17.[38] And former Board chair Adam Luck testified that he did not "believe there is any list of things board members are required to consider," such as "the inmate's age at the time of the underlying offense," when making parole recommendations. Dkt. 126-1 at 23. And finally, the Governor's authority to grant parole for individuals like Mr. Thomas lacks guidelines for evaluating an adolescent offender's transient youthfulness, and their later maturation and rehabilitation. *Thomas*, 2025 WL 2586072, at *3.

---

[38] Indeed, an unrelated grand jury investigation previously concluded that "[g]laringly absent" from the Oklahoma Board's training is "any necessity that Board members be trained in the laws that regulate the Board's function." *See* Dkt. 126-25 at 17.

33

Despite the concerning record developed below, which must be viewed in the light most favorably to Mr. Thomas given the current procedural posture, the district court went so far as to hold that Oklahoma has no obligation whatsoever to provide any adolescent-specific parole consideration program, assess developmental maturation since the time of their adolescent offense, to offer any presumption favoring release of adolescent offenders based on their demonstrated growth and rehabilitation. *Id.*; *compare id.*, *with Rainer v. Hansen*, 952 F.3d 1203, 1208-11 (10th Cir. 2020) (holding that Colorado's Juveniles Convicted as Adults Program, which evaluates "demonstrated growth and change through developmental maturity" and creates a presumption favoring early release after an adolescent offender finishes 25 years of incarceration, satisfies the Eighth Amendment).

Simply put, the district court's ruling below flies in the face of the Supreme Court's seminal precedents and this Court's rulings earlier in this case and in *Budder*. It provides a blanket license for Oklahoma's parole system to, as a practical matter, convert indeterminate life sentences into LWOP for adolescent offenders like Mr. Thomas. By holding that "[t]here are no limitations on the factors the [Board] or the

Governor may consider when considering parole," *Thomas*, 2025 WL 2586072, at *3, the district court has afforded Oklahoma's parole system carte blanche authority to disregard the undisputed developmental science outlined above, *see supra* Part II, which leaves no doubt that Mr. Thomas and other adolescent offenders have experienced transformative maturation since the time of their offenses, and have tremendous rehabilitative potential notwithstanding those offenses.

As *amici* have explained, developmental science predicts that a fifteen-year-old experiencing ongoing brain and behavioral development will, over the following decades, naturally mature and experience significant rehabilitative potential long after their offenses during adolescence. Yet Oklahoma's parole system has denied Mr. Thomas meaningful parole consideration six times over more than twenty-eight years and will almost assuredly continue doing so in the years to come, since it lacks any standards requiring consideration of the key developmental factors prescribed in *Miller*, *Graham*, and *Montgomery*. *Amici* submit that such a system fails to "ensure" that adolescents who have since matured and rehabilitated are not forced to serve

disproportionate sentences in violation of the Eighth Amendment. *Montgomery*, 577 U.S. at 212.

## CONCLUSION

For the foregoing reasons, *amici* respectfully submit that the Court should reverse the district court's grant of summary judgment.

Date:  February 20, 2026

/s/ *Raymond P. Tolentino*
Raymond P. Tolentino
Matt K. Nguyen
Cole A. Poppell
**Cooley LLP**
1299 Pennsylvania Ave. NW, Suite 700
Washington, D.C. 20004-2400
(202) 842-7800
rtolentino@cooley.com
mnguyen@cooley.com
cpoppell@cooley.com

Kathleen R. Hartnett
**Cooley LLP**
3 Embarcadero Center
San Francisco, CA 94111
(415) 693-2000
khartnett@cooley.com

Ryan Liu
**Cooley LLP**
350 S. Grand Avenue, Suite 3200
Los Angeles, CA 90071
(213) 561-3250
rliu@cooley.com

*Counsel for Amici Curiae*

## CERTIFICATE OF COMPLIANCE

This brief complies with the word limit of Fed. R. App. P. 29(a)(5) because this motion contains 6,491 words, excluding parts of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with Fed. R. App. P. 32(a) and the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century.

Date:  February 20, 2026                    */s/ Raymond P. Tolentino*
                                            Raymond P. Tolentino

                                            *Counsel for Amici Curiae*

## CERTIFICATE OF DIGITAL SUBMISSION

I hereby certify that with respect to the foregoing:

(1)    All required privacy redactions have been made per 10th Cir. R. 25.5;

(2)    If required to file additional hard copies, that the ECF submission is an exact copy of those documents; and

(3)    The digital submissions have been scanned for viruses with the most recent version of a commercial virus scanning program, CrowdStrike Falcon Sensor, and are free from viruses according to the program.

Date: February 20, 2026                      */s/ Raymond P. Tolentino*
                                              Raymond P. Tolentino

                                              *Counsel for Amici Curiae*

38

## CERTIFICATE OF SERVICE

I hereby certify that that on February 20, 2026, this document was electronically filed with the clerk of the court for the U.S. Court of Appeals for the Tenth Circuit and served through CM/ECF upon all counsel of record in this case.

Date:  February 20, 2026                    /s/ *Raymond P. Tolentino*
                                            Raymond P. Tolentino


                                            *Counsel for Amici Curiae*

# APPENDIX — LIST OF *AMICI CURIAE*

SCHOLAR AMICI[39]:

**Dr. Jeffrey Aaron** is a clinical and forensic psychologist who practices independently and teaches at the University of Virginia Medical School.  Much of his work focuses on the forensic evaluation of adolescents and the influence of adolescents' developmental status on their behavior, capacities, risk, and intervention needs.

**Dr. Apryl Alexander** is the Metrolina Distinguished Scholar in Health & Public Policy in the Department of Health Management & Policy at the University of North Carolina at Charlotte and Director of the UNC Charlotte Violence Prevention Center.  Her research focuses on violence, trauma, and clinical treatment of justice-involved adolescents.

**Dr. Jeffrey Arnett** is a Senior Research Scholar at Clark University. He has been researching and conceptualizing the age period from 18 to 25, that he termed emerging adulthood, for the past 30 years.  He is the originator of the theory of emerging adulthood (human development from

---

[39] Individual *amici* have signed this Brief in their personal capacities and not on behalf of their affiliated institutions.  Titles and institutional affiliations are for identification purposes only.

age 18-29) and has written many articles and books on this topic. In addition to emerging adulthood, his other scholarly interests include media uses in adolescence, the psychology of globalization, and responses to cigarette advertising.

**Dr. Arielle Baskin-Sommers** is a Professor of Psychology and Psychiatry at Yale University. Her work focuses on identifying and specifying the cognitive, emotional, and environmental mechanisms that contribute to antisocial behavior (e.g., substance use, criminal activity, aggression). She uses findings from her research to develop novel experimental tasks, assessments, and intervention strategies aimed at developing more humane (and scientific) approaches for addressing mental health and crime.

**Dr. Erin Bigler** is a Professor Emeritus of Psychology and Neuroscience and Founding Director of the Magnetic Resonance Imaging (MRI) Research Facility at Brigham Young University. He is associate editor for *Neuropsychology*, and was a founding associate editor for the *Journal of the International Neuropsychological Society* and for *Brain Imaging and Behavior*. Along with having written several neuropsychological tests, Dr. Bigler has published over 300 peer-

reviewed articles and authored and/or edited 11 textbooks.  He also served as the President of the National Academy of Neuropsychology and President of the International Neuropsychological Society.

**Dr. Sara Boyd** is a licensed clinical psychologist, board-certified forensic psychologist, and associate faculty at the Forensic Clinic of the Institute of Law, Psychiatry, & Public Policy ("ILPPP") at the University of Virginia.   Her primary specialties include intellectual and developmental disabilities and psychological trauma (particularly interpersonal violence) in children and adults.  She also develops and conducts trainings for forensic evaluators, mental health care providers and legal professionals, provided under the auspices of ILPPP.

**Dr. Natalie Novick Brown** is a clinical and forensic psychologist in Washington State with a national practice and a Clinical Assistant Professor (courtesy) in the University of Washington's School of Medicine, Department of Psychiatry and Behavioral Medicine.  Dr. Brown has specialized in parenting, sexual offender, and child sexual abuse evaluations as well as treating and evaluating persons with fetal alcohol spectrum disorders and other neurodevelopmental disorders.  Dr. Brown has published over 40 peer-reviewed articles and book chapters

iii

and presented at many state, national, and international conferences.

**Dr. B.J. Casey** is the Christina L. Williams Professor of Neuroscience and Chair of the Department of Neuroscience and Behavior at Barnard College, Columbia University, and a member of The Justice Collaboratory of Yale Law School. She pioneered the use of fMRI to examine the developing human brain, particularly during adolescence, accelerating the emergence of the field of developmental cognitive neuroscience. Her scientific discoveries have been published in over 250 articles in top journals, including *Nature Medicine*, *Nature Neuroscience*, *Neuron*, *PNAS*, and *Science*, cited over 74,000 times, and highlighted by NPR, PBS, NY Times, and National Geographic. She has received numerous honors, including the Association for Psychological Science Lifetime Achievement Mentor Award, the American Psychological Association Distinguished Scientific Contribution Award, and is an elected member of the American Academy of Arts and Science and the National Academy of Sciences.

**Lael E. H. Chester** is an attorney and Director of the Emerging Adult Justice Project at Columbia University's Justice Lab. Her work focuses specifically on late adolescents involved in the juvenile and adult

criminal justice systems and she has been researching innovations in practices, policies, and laws across the country for the past eight years.

**Dr. Hayley Cleary** is an Associate Professor of Criminal Justice and Public Policy at Virginia Commonwealth University. She holds a Master of Public Policy and Ph.D. in Developmental Psychology from Georgetown University. Her research lies at the intersection of social science, law, and policy. Her work, funded by the National Science Foundation and Annie E. Casey Foundation, examines adolescent behavior and decisionmaking in legal contexts, including adolescents' contact with law enforcement, courts, and correctional systems.

**Dr. Alexandra Cohen** is an Assistant Professor of Psychology and Core Faculty in Neuroscience and Behavioral Biology at Emory University. Her research focuses on understanding the neural and cognitive mechanisms underlying how emotion and motivation influence learning, memory, and brain function from childhood to adulthood. She has received funding from the American Psychological Association, the National Science Foundation, and the National Institutes of Health to support her work.

**Laura Cohen** is a Professor of Law and the Justice Virginia Long Scholar at Rutgers Law School, where she founded and directs the Center for Criminal Justice, Youth Rights, and Race; the Criminal and Youth Justice Clinic; and the New Jersey Innocence Project at Rutgers University. Her legal scholarship and policy work focus on the intersection of developmental science and adolescent justice policy and practice, particularly with regard to sentencing and parole.

**Dr. Tarika Daftary-Kapur** is an Associate Professor of Justice Studies at Montclair State University. Her research lies primarily in adolescent decisionmaking and legal competencies presently focused on plea deal decision making, and jury decision making. Dr. Daftary-Kapur is currently working on a multi-year project examining reentry experiences of adolescents sentenced to life without parole and subsequently released.

**Dr. Judith Edersheim** is the founding co-Director of the Massachusetts General Hospital's Center for Law, Brain, and Behavior, where she is an attending psychiatrist, as well as an Assistant Professor of Psychiatry at Harvard Medical School. Dr. Edersheim's work at the Center focuses on bringing insights from neuroscience, neurology, and

psychiatry into the legal arena in an effort to improve the justice system, and she lectures extensively in state and federal court settings and the teaching programs of Massachusetts General Hospital, Harvard Medical School, and Harvard Law School.

**Dr. Jeffrey Fagan** is the Isidor and Seville Sulzbacher Professor of Law and Professor of Epidemiology at Columbia University. His scholarship focuses on fairness and equity in the administration of justice. His research examines race and criminal law, capital punishment, policing and police reform, firearm violence and regulation, and adolescent crime and punishment.

**Dr. Adriana Galván** is a Professor of Psychology and the Dean of Undergraduate Education at the University of California, Los Angeles. She is also Co-Executive Director of the UCLA Center for the Developing Adolescent. Her scholarship focuses on the adolescent brain and behavior, with a focus on motivation, learning, and risk-taking and with an eye towards informing adolescent-relevant policy. She has received multiple awards, including from the Cognitive Neuroscience Society, American Psychological Association, William T. Grant Foundation, National Academy of Sciences, a Fulbright Award, and the Presidential

Early Career Award for Scientists and Engineers.

**Dr. Dylan G. Gee** is a Professor of Psychology, Psychiatry, and in the Child Study Center at Yale University. Her research examines neurodevelopmental mechanisms of early adversity and risk for psychopathology, with a focus on translation to inform evidence-based interventions and policy. She leads research on child and adolescent brain development funded by the National Institutes of Health and the National Science Foundation and has received honors for her work that include the National Institutes of Health Director's Early Independence Award, the National Science Foundation CAREER Award, and the American Psychological Association Distinguished Scientific Award for Early Career Contributions to Psychology.

**Dr. Jay N. Giedd** is the Chair of the Division of Child and Adolescent Psychiatry at the University of California, San Diego, and a professor at the Johns Hopkins Bloomberg School of Public Health. Since 1991, he has researched the biological basis of cognition, emotion, and behavior with a particular emphasis on adolescent brain maturation and decisionmaking, and the education science/neuroscience interface. His research has been cited over 100,000 times. Dr. Giedd was previously

the chief of the section on brain imaging in the Child Psychiatry Branch of the National Institutes of Health and editor-in-chief of *Mind, Brain, and Education.*

**Dr. Catherine Hartley** is an Associate Professor of Psychology and Neural Science and is Co-Director of the Institute for the Study of Decision Making at New York University. Her scholarly work focuses on understanding developmental changes in learning and decisionmaking from childhood to adulthood at both the cognitive and neural levels, with a focus on understanding mechanisms of vulnerability or resilience to psychopathology. She has received multiple awards for her work, including a National Science Foundation CAREER Award, the National Institute of Mental Health Biobehavioral Research Award for Innovative New Scientists, the Association for Psychological Science Janet Taylor Spence Award for Transformative Early Career Contributions, and the Cognitive Neuroscience Society Young Investigator Award.

**Dr. Luke Hyde** is a Professor of Psychology and former Chair of the Clinical Psychology Area of Psychology with appointments at the Institute for Social Research and the Poverty Solutions Center at the University of Michigan. He is a licensed clinical psychologist in the State

of Michigan.  He is an expert in neuroscience and the development of aggression, violence, and criminal behavior.  His research focuses on the development of high-risk behavior, the interplay of nature and nurture, and factors that promote resilience and desistance from delinquent behavior.

**Dr. Catherine Insel** is an Assistant Professor of Psychology at Northwestern University, and she is a faculty fellow in the Institute for Policy Research.  Her research focuses on understanding how adolescent and late adolescent brain development shapes learning, motivation, decision making, and cognitive control, with the goal of understanding risk and resilience for mental health disorders.  Dr. Insel's work has received funding from the National Science Foundation and National Institutes of Health, and she has received awards from the Association for Psychological Science, the Flux Society for Developmental Cognitive Neuroscience, and the Association of American Medical Colleges.

**Dr. Daniel Keating** is a Professor of Psychology, Psychiatry, and Pediatrics at the University of Michigan.  His research and publications (over 200) have focused on adolescent development and neurodevelopment, with a recent specific focus on the role of brain

development on risk behavior, funded by the National Institutes of Health.  His book on the impact of early life adversity on later development, *Born Anxious* (2017), received the annual award in developmental psychology from the American Psychological Association.

**Dr. Robert Kinscherff** is a clinical, forensic psychologist and attorney serving as Executive Director of the Center for Law, Brain & Behavior at Massachusetts General Hospital.  Over a career of more than three decades, he has filled key forensic positions for the Massachusetts trial court, Massachusetts Department of Mental Health, Massachusetts Parole Board, and clinical and forensic mental health systems.  He teaches and consults nationally and internationally in practice areas including juvenile and criminal justice, violent and sexual offenders, and professional practice and policy at the nexus of neuroscience, developmental psychology, adversity and trauma, and addictions.

**Dr. Robert J. McCaffrey** is an emeritus Professor of Psychology at the University at Albany.  Dr. McCaffrey is a board-certified clinical neuropsychologist with specializations across the life-span.  He is also the past president of the National Academy of Neuropsychology, the American Board of Professional Neuropsychology, and the American

Academy of Pediatric Neuropsychology. He is a fellow of the National Academy of Neuropsychology, the American Psychological Association, the Association of Psychological Science, the American College of Professional Neuropsychology, and the American Academy of Pediatric Neuropsychology. Dr. McCaffrey was Editor-in-Chief of *Archives of Clinical Neuropsychology*, the official journal of the National Academy of Neuropsychology, and is Editor-in-Chief of *Developmental Neuropsychology: An International Journal of Life-Span Issues in Neuropsychology*.

**Tracey Meares** is the Walton Hale Hamilton Professor and a Founding Director of the Justice Collaboratory at Yale Law School that brings together an interdisciplinary group of scholars and researchers at Yale and beyond to cooperatively work toward a theory-driven, evidence-informed justice system. She has worked extensively with the federal government by serving on the National Academy of Sciences Committee on Law and Justice, a National Research Council standing committee, and the U.S. Department of Justice's Office of Justice Programs Science Advisory Board.

**Dr. Grace Mucci** is a Professor at The Chicago School in Anaheim

in the Psychology Department, an Associate Clinical (Volunteer) Professor in the Department of Pediatrics at the University of California, Irvine, and a licensed clinical psychologist and pediatric neuropsychologist currently practicing in hospital and private practice settings. She is double-boarded in Pediatric Neuropsychology through the American Board of Pediatric Neuropsychology and in Clinical Child and Adolescent Psychology through the American Board of Professional Psychology. She also serves as the Executive Director of the American Academy of Pediatric Neuropsychology.

**Dr. Ashley Nellis** is an Assistant Professor in the Department of Justice, Law, and Criminology at American University and formerly Co-Director of Research at The Sentencing Project. Her research documents the expansion of life sentences in America over the past two decades. Her research has informed policies and practices of imposing life sentences on various segments of society including: adolescents, late adolescents, victims of domestic violence, and the elderly.

**Dr. Cecil Reynolds** is an emeritus Professor of Neuroscience and Educational Psychology and distinguished research scholar at Texas A&M University, Editor-in-Chief of the peer-reviewed *Journal of*

*Pediatric Neuropsychology*, and a clinical neuropsychologist who also had a clinical practice for more than 25 years treating children, adolescents, and late adolescents.  He is in the top quarter of the Stanford list of the top 2% of scientists worldwide and the *Oxford Handbook of the History of Clinical Neuropsychology* ranks him as the 7th most influential person in the history of the field based on the impact of his published works.

**Dr. Joseph Ryan** is a Professor and Associate Dean in the School of Social Work at the University of Michigan.  He is also the Director of the Child and Adolescent Data Lab, an applied research center focused on using data to drive policy and practice decisions.  His research and teaching build on his direct practice experiences with child welfare and juvenile justice populations.

**Dr. Jennifer Silvers** is the Bernice Wenzel and Wendell Jeffrey Term Chair in Developmental Neuroscience at the University of California, Los Angeles.  She has published over 60 articles on the brain and behavioral bases of emotion, decisionmaking, and adolescent development.  Dr. Silvers has received funding from the National Science Foundation and National Institutes of Health, as well as awards from the American Psychological Association, Association for Psychological

Science, and the International Society for Developmental Psychobiology.

**Dr. Leah Somerville** is the Grafstein Family Professor of Psychology at Harvard University and faculty in the Center for Brain Science. Her research focuses on characterizing adolescent brain development, and the consequences of brain development on psychological functioning and well-being. This work integrates behavioral, computational, and brain imaging approaches, including the Human Connectome Project in Development, a large NIH-funded study on brain connectivity development.

**Dr. Elizabeth Sowell** is a Professor of Pediatrics at the Keck School of Medicine at the University of Southern California. She has been a leader in developmental cognitive neuroimaging for over 20 years and has published over 150 peer-reviewed manuscripts in leading journals, including *Nature Neuroscience*, *Nature Medicine*, and the *Lancet*, among others. Her research focuses on adolescent brain and cognitive development as well as the impact of pre- and post-natal exposures to drugs of abuse, environmental toxins (i.e., lead exposure), and family and neighborhood level socioeconomic adversity. Dr. Sowell has been continuously funded by the National Institutes of Health for over 20

years, and she is currently a principal investigator in the Adolescent Brain Cognitive Development study at Children's Hospital Los Angeles.

**Dr. Laurence Steinberg** is a Distinguished University Professor and the Laura H. Carnell Professor of Psychology and Neuroscience at Temple University. He is a Fellow of the American Academy of Arts and Sciences and was the lead scientist for the American Psychological Association on its U.S. Supreme Court *amicus* briefs in *Roper v. Simmons*, *Graham v. Florida*, and *Miller v. Alabama*. With Elizabeth Scott, he is co-author of *Rethinking Juvenile Justice*.

**Michael Umpierre** is the Director of the Center for Juvenile Justice Reform at Georgetown University, a nonprofit research center that works with jurisdictions and communities across the country to drive system transformation in youth legal and child welfare systems. His perspective is formed by decades of working as a juvenile justice administrator, national trainer and consultant, and public defender and youth advocate, including serving as the Chief of Staff of the District of Columbia's cabinet-level juvenile justice agency, Program Coordinator of the National Center for Youth in Custody, and trial attorney at the Public Defender Service for the District of Columbia.

**Dr. Kimberly Vannest** is the Chair of the Department of Education in the University of Vermont's College of Education and Social Services, and a former secondary school teacher. Her nationally and internationally recognized areas of scholarship focus on prevention and intervention for emotional and behavioral disorders in educational and clinical settings, support for the social, emotional, and behavioral health of students and educators, and single-case experimental design analysis. She has published more than 100 books, papers, software, and instructional materials to support professionals working with students with emotional and behavioral concerns and disabilities.

**Dr. Jennifer Woolard** is a Professor of Psychology and Vice Dean for Faculty Affairs in the College of Arts & Sciences at Georgetown University. Her research and action laboratory, the Georgetown Community Research Group, studies individual and family experiences with systems of care and control in order to create fair, effective, and just legal processes. Dr. Woolard testifies as an expert in adolescent and criminal cases and has presented her research findings to a wide variety of academic, legal, and policy audiences.

**Dr. Tina Zottoli** is an Associate Professor of Psychology and Director of the Legal Decision Making Lab at Montclair State University. She holds a Ph.D. in Psychology from the City University of New York, John Jay College of Criminal Justice and is a licensed clinical psychologist in the state of New York. Her scholarship centers on decisionmaking in legal contexts, with a focus on outcomes for system-involved adolescents, including late adolescents. Her work on recidivism risk in persons released from life sentences for crimes committed during adolescence has garnered national attention, and she has testified before the legislatures of several states with respect to proposed second-chance legislation for adolescents.

NONPROFIT AMICI:

The **American Academy of Pediatric Neuropsychology** ("AAPdN") is a nationwide nonprofit that advocates, educates, and supports collaboration between individuals and professional specialties focused on children, adolescents, and late adolescents. Affiliated with AAPdN, the American Board of Pediatric Neuropsychology develops specific academy-organized competencies in pediatric neuropsychology. AAPdN fosters a community of neuropsychologists who meet standards of advanced

competency and are committed to advocacy for the neuropsychological health of children, adolescents, and late adolescents.

**The Gault Center**, formerly the National Juvenile Defender Center, was created to promote justice for all adolescents and late adolescents by ensuring excellence in defense in delinquency proceedings. Through systemic reform efforts, training, and technical assistance, the Gault Center seeks to disrupt the harmful impacts of the legal system on young people, families, and communities; eliminate racial and ethnic disparities; and ensure the constitutional protections of counsel for all young people. Recognizing that the neurodevelopmental science that has supported jurisprudence around amenability, responsibility, and rehabilitation applies to late adolescents, the Gault Center's support for increased constitutional protections for young people extends beyond the delinquency system. The Gault Center (as the National Juvenile Defender Center) has participated as *amicus curiae* before the U.S. Supreme Court and federal and state courts across the country.

The **Pacific Juvenile Defender Center** ("PJDC") is a public interest nonprofit that works to improve the quality of legal representation for youth in the justice system and to address important juvenile policy

issues.  PJDC supports more than 1,600 juvenile court lawyers, appellate counsel, law school clinical programs, and nonprofit lawyers to ensure quality representation for late adolescents throughout California and around the country.  Collectively, PJDC and its members have served as counsel in thousands of juvenile court cases and *amicus* briefs.

**The Sentencing Project** is a national nonprofit established in 1986 to engage in public policy research, education, and advocacy to promote effective and humane responses to crime.  The Sentencing Project has produced a broad range of scholarship assessing extreme sentences in jurisdictions throughout the United States and has a specific interest in constitutional sentences and parole procedures for adolescents.