**No. 25-6158**

**UNITED STATES COURT OF APPEALS FOR THE TENTH CIRCUIT**

DWAIN EDWARD THOMAS,

*Plaintiff-Appellant*,

v.

KEVIN STITT, in his official capacity as Governor of the State of Oklahoma, *et al.*,

*Defendants-Appellees.*

On appeal from the United States District Court
for the Western District of Oklahoma
The Hon. Timothy D. DeGiusti, District Judge
No. 5:20-cv-00944

# BRIEF OF APPELLEES KYLE COUNTS, JUSTIN FARRIS, AND STEPHAN MOORE

GARRY M. GASKINS, II
*Solicitor General*
ZACH WEST
*Director of Special Litigation*
WILL FLANAGAN
MALLORY SHAMOON
*Assistant Solicitors General*
OFFICE OF ATTORNEY GENERAL
STATE OF OKLAHOMA
313 N.E. 21st Street
Oklahoma City, OK 73105
Phone: (405) 521-3921
Garry.Gaskins@oag.ok.gov
*Counsel for Defendants Kyle Counts, Justin Farris, and Stephan Moore*

**ORAL ARGUMENT IS NOT REQUESTED**

TABLE OF CONTENTS

GLOSSARY ..... vi

PRIOR OR RELATED APPEALS ..... 1

STATEMENT OF THE ISSUES ..... 1

INTRODUCTION ..... 2

STATEMENT OF THE CASE ..... 4

I. FACTUAL BACKGROUND ..... 5

A. Oklahoma's parole process ..... 4

B. Thomas's murders, sentences, and long disciplinary history ..... 9

C. DOC rehabilitative efforts ..... 12

D. Thomas's parole history ..... 13

II. PROCEDURAL HISTORY ..... 16

STANDARD OF REVIEW ..... 20

SUMMARY OF THE ARGUMENT ..... 20

ARGUMENT ..... 23

I. THE DISTRICT COURT CORRECTLY HELD THAT THOMAS'S EIGHTH AMENDMENT CLAIM WOULD REQUIRE AN UNWARRANTED EXPANSION OF THE SUPREME COURT'S DECISION IN *MILLER* ..... 23

A. Thomas's claims would require an expansion of *Miller* because *Miller* prohibits only mandatory life-without-parole sentences. ..... 26

B. Thomas's claims would require an expansion of *Miller* because *Miller* applies only to sentencing, not to the parole process. ..... 28

C. An expansion of *Miller* is not warranted here because Thomas committed three murders and his sentence is proportional to the crime. ..... 32

II. THE DISTRICT COURT CORRECTLY HELD THAT OKLAHOMA'S PAROLE PROCESS COMPLIES WITH THE U.S. CONSTITUTION. ..... 36

A. The "meaningful opportunity" standard announced in *Graham* does not extend to juvenile homicide offenders. ..... 38

**B. Thomas has been provided meaningful opportunities for parole.** ......**40**

**C. Even when the facts are viewed favorably to Thomas, his claim fails.** ......**46**

1. *The investigative reports showed Thomas's juvenile status at the time of the murders.* ......**46**

2. *Parole Board members regularly consider age when making parole decisions.* ......**47**

3. *Thomas is not prohibited from showing maturity and rehabilitation.* ......**49**

**III. THE DISTRICT COURT DID NOT ERR IN DECLINING TO EXERCISE SUPPLEMENTAL JURISDICTION OVER THOMAS'S STATE LAW CLAIM.** ......**50**

**CONCLUSION** ......**51**

**STATEMENT REGARDING ORAL ARGUMENT** ......**51**

**CERTIFICATE OF COMPLIANCE** ......**53**

**CERTIFICATE OF DIGITAL SUBMISSION** ......**53**

**CERTIFICATE OF SERVICE** ......**53**

# TABLE OF AUTHORITIES

## Cases

*Acosta v. Jani-King of Okla., Inc.*,
905 F.3d 1156 (10th Cir. 2018) ....................31

*Adams v. James*,
784 F.2d 1077 (11th Cir. 1986) ....................47

*Allen v. Muskogee*,
119 F.3d 837 (10th Cir. 1997) ....................46

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) ....................21

*Atkins v. Crowell*,
945 F.3d 476 (6th Cir. 2019) ....................29, 40

*Birch v. Polaris Indus., Inc.*,
812 F.3d 1238 (10th Cir. 2015) ....................21

*Bowling v. Dir., Va. Dep't of Corr.*,
920 F.3d 192 (4th Cir. 2019) ....................29

*Brown v. Precythe*,
46 F.4th 879 (8th Cir. 2022) ....................28, 30

*Budder v. Addison*,
851 F.3d 1047 (10th Cir. 2017) ....................42

*Cnty. Ct. of Ulster Cnty. v. Allen*,
442 U.S. 140 (1979) ....................47

*Coker v. Georgia,*
433 U.S. 584 (1977) ....................34

*Cotner v. Hopkins*,
795 F.2d 900 (10th Cir. 1986) ....................47

*Davis v. McCollum*,
798 F.3d 1317 (10th Cir. 2015) ....................20, 27

*Deherrera v. Decker Truck Line, Inc.*,
820 F.3d 1147 (10th Cir. 2016) ....................21, 46

*Enmund v. Florida,*
458 U.S. 782 (1982) ....................34

*Fields v. State*,
501 P.2d 1390 (Okla. Crim. App. 1972) ....................5

*Graham v. Florida,* 560 U.S. 48, 82 (2010) .......... 4, 23, 24, 25, 29, 32, 33, 34, 36, 38, 39, 40, 41, 49

*Greiman v. Hodges*, 79 F. Supp. 3d 933 (S.D. Iowa 2015) .......... 30

*Howard v. Coonrod*, 134 F.4th 1136 (11th Cir. 2025) .......... 29, 30, 31, 35, 39, 41

*Howard v. Coonrod*, 546 F. Supp. 3d 1121 (M.D. Fla. 2021) .......... 30

*Jones v. Mississippi*, 593 U.S. 98 (2021) .......... 23, 24, 26, 28

*Kennedy v. Louisiana*, 554 U.S. 407 (2008) .......... 32, 34

*Knox v. United States*, 400 F.3d 519 (7th Cir. 2005) .......... 40

*Miller v. Alabama,* 567 U.S. 460 (2012) .......... 3, 20, 21, 23, 26, 28, 29, 30, 32, 35, 37, 38, 39, 40, 49

*Montgomery v. Louisiana*, 577 U.S. 190 (2016) .......... 23, 24, 28, 30

*Roper v. Simmons*, 543 U.S. 551 (2005) .......... 23, 29, 32, 34

*Shehi v. Sw. Bell Tel. Co.*, 382 F.2d 627 (10th Cir. 1967) .......... 48

*Smith v. City of Enid ex rel. Enid City Comm'n*, 149 F.3d 1151 (10th Cir. 1998) .......... 20, 50

*Thomas v. Stitt*, 2022 WL 289661 (10th Cir. 2022) .......... 37

*United States v. Edwards*, 857 F.3d 420 (1st Cir. 2017) .......... 39

*United States v. Grant*, 9 F.4th 186 (3d Cir. 2021) .......... 28

*Weems v. United States*, 217 U.S. 349 (1910) .......... 32

*Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457 (2001) .......... 40

**Statutes**

OKLA. STAT. tit. 21, § 701.10 .......... 27

OKLA. STAT. tit. 57, §§ 332.1–332.21 .............................................. 5, 6, 7, 8, 9, 10, 14, 45

OKLA. STAT. tit. 57, § 571 ...........................................................................................6

**Constitutional Provisions**

OKLA. CONST. art. VI, § 10.................................................................................. 7, 10

**Rules**

FED. R. APP. P. 34...........................................................................................................51

FED. R. CIV. P. 56 ...........................................................................................................21

OKLA. ADMIN. CODE § 515:25-1-1 .................................................................................10

OKLA. ADMIN. CODE § 515:25-9-1 ...................................................................................6

**Other Authorities**

Black's Law Dictionary (12th ed. 2024) ..........................................................................39

The Bluebook: A Uniform System of Citation 59
(Columbia Law Review Ass'n et al. eds., 20th ed. 2015).............................................39

## GLOSSARY

| **Abbreviation** | **Definition** |
|---|---|
| DOC | Oklahoma Department of Corrections |
| PPB | Oklahoma Pardon and Parole Board |

## PRIOR OR RELATED APPEALS

The district court originally dismissed Plaintiff Thomas's lawsuit for failure to state a plausible claim of relief under the Eighth Amendment. This Court reversed in *Thomas v. Stitt*, No. 21-6011. App.Vol.I at 123–24.[1]

[1] All references to the Appendix refer to the Appendix and include pinpoint cites where appropriate in the following format: App.Vol.[#] at [page].

## STATEMENT OF THE ISSUES

1. Whether the Eighth Amendment mandates that States formally consider, when assessing parole, the fact that an inmate was a juvenile at the time of his crimes.

2. Whether Thomas received a meaningful opportunity for parole when he has been considered for parole every three years since 2010 and his juvenile status at the time of his crimes was apparent in the parole reports.

3. Whether the district court correctly granted summary judgment to Defendants.

## INTRODUCTION

Dwain Edward Thomas murdered his mother, his stepfather, and his step-grandfather when he was fifteen years old. At the age of seventeen, he was sentenced to life in prison, but with the possibility of parole. While in prison, Thomas has attempted to strangle a prison guard, threatened a prison guard with sexual assault, assaulted a fellow inmate, tested positive for methamphetamines, threatened to physically oppose being given a black cellmate, and possessed contraband among other things. Unsurprisingly, Oklahoma denied him parole five times. Thomas now asks this Court to declare that the State has violated the Eighth Amendment by refusing to offer him a meaningful opportunity for parole. The district court correctly granted summary judgment in favor of Defendants on Thomas's claims. This Court should affirm.

Thomas argues that the Eighth Amendment requires Oklahoma to explicitly consider the fact that Thomas was a juvenile at the time of his crime when making parole decisions. This stretches past the Supreme Court's jurisprudence. In *Miller v. Alabama*, the Court held that the Eighth Amendment forbade mandatory life-without-parole sentences for juvenile homicide offenders and required sentencers to consider an offender's youth before imposing such a sentence. 567 U.S. 460, 479–80 (2012). Thus, under *Miller* Thomas could have been sentenced to life *without* the possibility of parole and that sentence would not have violated the Eighth Amendment if the sentence was not mandatory and the judge considered his juvenile status. Thomas's

lesser punishment of life *with* the possibility of parole, therefore, does not violate the Constitution, nor is he entitled to particular parole procedures.

In *Graham v. Florida*, the Supreme Court held that a life-without-parole sentence could not be applied to a non-homicide juvenile offender and that such offenders must be provided with a meaningful opportunity to obtain release based on maturity and rehabilitation. 560 U.S. 48, 82 (2010). But Thomas committed multiple murders, and he did not receive life without parole. Instead, he was sentenced to life *with* parole and has been considered for parole five times. These cases do not apply to Thomas.

Even so, Thomas has had a meaningful opportunity for parole. The record demonstrates that Oklahoma's parole system is not a farce. Far from it. Oklahoma Pardon and Parole Board members may and do consider an inmate's age at the time of the offense as part of the individualized, holistic review they conduct for each inmate. This review includes an analysis of the inmate's conduct in prison as well as any rehabilitative steps the inmate has taken. For Thomas, specifically, his long history of misconduct in custody weighs heavily against his efforts for parole. This is not a constitutional violation.

The district court's well-reasoned order should be affirmed in full.

# STATEMENT OF THE CASE

## I. Factual Background

In 1995, Thomas murdered his mother, Sandra Thomas, stepfather, Orvel Thomas, and step-grandfather, Frank Tibbits. App.Vol.II at 232. He killed his mother and stepfather with a shotgun, and stabbed his step-grandfather to death. *Id.* He then pleaded guilty to three counts of first-degree murder. App.Vol.IV at 42–45. Thomas was fifteen (15) years old when he committed these grisly murders. *Id.* at 45–47. And he was sentenced to life in prison, but with the possibility of parole, for each murder.

In Oklahoma, a life sentence is calculated as forty-five years for purposes of determining parole eligibility. *Fields v. State*, 1972 OK CR 194, ¶¶ 32–33, 501 P.2d 1390, 1394. For crimes committed before July 1, 1998, offenders are eligible for parole after serving one-third of the sentence. OKLA. STAT. tit. 57, § 332.7(A). Thomas became parole eligible in 2010 after completing fifteen years of his first two sentences. Thus, the State Pardon and Parole Board ("Parole Board" or "PPB") has considered Thomas for parole on six different occasions—one of which occurred after the district court granted summary judgment. Each time he has been denied parole. He can be reconsidered for parole every three years. OKLA. STAT. tit. 57, § 332.7(E)(1).

### A. Oklahoma's parole process.

In Oklahoma, the parole process is conducted by the Parole Board. OKLA. STAT. tit. 57, §§ 332.1–332.21. When an individual starts his sentence at the Department of

Corrections ("DOC"), the Board is responsible for determining the inmate's eligibility for parole. App. Vol. III at 198. Board authority is bifurcated between violent and nonviolent offenders. For nonviolent offenders, the Board may grant parole directly. For violent offenders, Board members may only recommend to the Governor that the offenders receive parole. OKLA. STAT. tit. 57, § 332.7(D). If the Board recommends parole for a violent inmate, the Governor ultimately decides whether to grant parole. OKLA. ADMIN. CODE § 515:25-9-1. On the flip side, the Governor lacks the authority to grant parole unless the Board recommends that a particular inmate receive parole. Oklahoma law determines whether an inmate is classified as a violent or nonviolent offender. OKLA. STAT. tit. 57, § 571. Thomas is classified as a violent offender.

The Parole Board follows a two-step process for making its parole determinations for violent offenders. The first step is called "Stage One" or "jacket review." App.Vol.II at 279. During this stage, Board members review numerous materials prepared by an investigator. *Id.* at 282–83. The investigator, an employee of the Board, is responsible for investigating and preparing a report for the Board to consider when making a parole determination. *Id.* at 294–95; App.Vol.III at 4–5, 9. As part of that investigation, the investigator is required to interview each inmate slated for parole consideration, unless an interview is not possible or an exception applies.[2]

---

[2] The exceptions primarily include instances when the inmate is unavailable or incapable of participating, an inmate refuses to participate in an interview, or it would be unsafe to conduct an interview. App.Vol.III at 48.

App.Vol.III at 48. This allows the inmate to provide his account of the crime, as well as his side of the story on his time in prison and rehabilitation. App.Vol.V at 211. If an in-person interview is not possible, an investigator may use a telephone call, and if that is not possible, an interview questionnaire may be used. App.Vol.III at 10–11, 49.

The investigator combines the interview with DOC records to produce the comprehensive report. *Id.* at 50–73. The report includes biological information, such as the inmate's name, age, and gender; information about the crime and the sentence, including the year the case was filed and the date of sentencing; the inmate's version of the offense; the district attorney's version of the crime; the inmate's disciplinary records; information about the inmate's parole plan; and any information that the investigator deems relevant. *Id.* Within the report, the investigator recommends whether the offender should receive parole. *Id.* at 73. That recommendation is "based on the totality of information available" which includes the inmate's "criminal record;" "substance abuse and mental health history;" "documented violent behavior; the institutional record; victim impact information; and other information gained from the interview." *Id.* The report is given to the Parole Board members a few weeks before the meeting date. In addition, the Board reviews opposition and support letters from the inmate and the public. App.Vol.II at 105, 108–09, 122.

Parole Board members are not bound by this recommendation. And there are no limitations on the factors the Board may consider when making a parole decision. *See* OKLA. CONST. art. VI, § 10; OKLA. STAT. tit. 57, §§ 332–332.21. Board members

have discretion to consider age at the time of the underlying offense for parole consideration, but they are not required by statute or policy to do so. OKLA. STAT. tit. 57, § 332.7. And Board members receive training about different factors to consider when making parole decisions. App.Vol.III at 104. By law, they are required to receive at least twelve hours of training their first year on the Board and at least six hours each year afterwards. OKLA. STAT. tit. 57, § 332.1A(A). That training must include, but is not limited to, "identifying, understanding and targeting criminogenic needs, the principles of effective intervention, core correctional practices and how to support and encourage offender behavior change." *Id.* § 332.1A(B). Of course, an inmate's conduct in prison is an important factor in the Board's decision. *See* App.Vol.VIII at 44, 46 (Parole Investigator: an inmate having more than two or three misconduct violations might impact the decision "tremendous[ly]").

Here, the record reflects that some (but not all) investigative reports include the offender's age at the time of the crime. App.Vol.II at 123. Moreover, a former Board member testified that it was "common" for parole investigative reports to include the fact that an inmate was a juvenile at the time of arrest. *Id.* at 115. And even if that fact was omitted by the investigator, the report still includes the inmate's date of birth as well as the case file date—which notes the year charges were brought. App.Vol.IV at 106, 112, 118, 121, 125; App.Vol.III at 50. Multiple Board members testified that they considered an inmate's youth at the time of the offense as a factor when making parole decisions. App.Vol.II at 123 (Board member found "age of the inmate at the time of

the underlying offense" "to be an important factor in [her] decisionmaking"); *id.* at 117. One Board member testified that she would calculate the offender's age at the time of the offense by subtracting the offender's birth date from the case file year. *Id.* at 123.

Thomas asserts that "the fact that an inmate was a juvenile at the time of the offense cannot be calculated from the information required in the investigative report," Brief for Thomas ("Thomas Br.") at 16, but this claim is inconsistent with the undisputed facts. As Thomas concedes, the investigative report includes the "case file date," which consists of "the year the criminal complaint or indictment was filed," and the reception date, which is the "date of judgment or sentence." *Id.* at 15 (citing App.Vol.IV at 118, 122, 127; App.Vol.VI at 258). In addition to these dates, the report includes the inmate's date of birth. App.Vol.III at 150. So, for Thomas, the first page of each of his investigative reports includes his date of birth (1980), his case file year (1995) and the date on which he was sentenced (1997). App.Vol.IV at 106, 112, 118, 121, 125. Thus, it would have been clear to a Board member that Thomas was a juvenile at the time of his crimes and his sentencing date.

During Stage One, the offender, victim, and relevant district attorney are not allowed to speak to Parole Board members. App.Vol.IV at 140. The Board votes and if at least three members vote "yes," the inmate will move on to Stage Two. App.Vol.V at 150. If the inmate fails to garner a majority, parole is denied and the inmate must wait three years for the next opportunity. OKLA. STAT. tit. 57, § 332.7(E)(1).

Stage Two involves personal appearances before the Parole Board from the inmate and affected parties. Afterward, the Board conducts a vote. If a majority of Board members vote to recommend parole, that recommendation is sent to the Governor. App.Vol.IV at 142–43. The Governor receives the same information as the Board members, as well as explanations of the members' votes. App.Vol. IV at 185. The Governor is free to consider any factor in making his parole decision—including the age of the offender at the time of the offense. *See* OKLA. CONST. art. VI, § 10; OKLA. STAT. tit. 57, §§ 332–332.21; OKLA. ADMIN. CODE § 515:25-1-1 *et seq*.

**B. Thomas's murders, sentences, and long disciplinary history.**

Again, Thomas shot and killed his mother and stepfather and stabbed his step-grandfather to death. App.Vol.IV at 118. He pleaded guilty to three counts of first-degree murder. App.Vol.II at 180–82. For each crime, Thomas was sentenced to life with the possibility of parole. *Id.* at 184, 187, 243–68. Thomas must serve his sentences for Counts I and II concurrently and Count III consecutively. App.Vol.IV at 42–45.[3]

In DOC custody, Thomas has had a checkered history, to say the least. He has earned numerous misconduct reports including multiple Class X misconducts, which are considered the most severe level of misconduct violations under DOC disciplinary

[3] This means that if Thomas were to obtain parole on his concurrent sentences, he would then begin serving the consecutive life sentence. He would then be eligible for parole and ultimate release from prison after serving fifteen years of that sentence. App.Vol.III at 177; OKLA. STAT. tit. 57, § 332.7(I). Thomas does not challenge this aspect of his sentencing.

policy. App.Vol.II at 153, 234–35. And each of the misconduct violations occurred when Thomas was eighteen or older. *Id.* at 232–35, 244.

On September 6, 1998, Thomas shoved an ODOC employee and received a Class X misconduct for battery of staff. *Id.* at 234. On January 27, 1999, Thomas fought a fellow inmate, earning another misconduct. *Id.* On April 17, 1999, Thomas received another misconduct for lying to a staff member. *Id.* On July 9, 1999, Thomas earned another Class X misconduct, that time for possession of a weapon and marijuana seeds. *Id.* On July 10, 1999, Thomas jumped on a staff member's back and tried to choke him with a microphone cord. *Id.* This dangerous attack resulted in another Class X misconduct for battery of staff. *Id.* Also on July 10, 1999, Thomas received a Class X misconduct for possession of four syringes and two shanks. *Id.* On July 14, 1999, Thomas threatened sexual assault against a DOC staff member by making the following expletive-laden threat: "open this door and I'll f*** you in the a** …. I'll f*** you like a b****." *Id.* This earned him yet another Class X misconduct. *Id.* On December 13, 1999, Thomas received yet another Class X misconduct for possession of a weapon—this time a seven-inch-long sharpened piece of metal hidden in his shoes. *Id.* And on August 2, 2000, Thomas received a misconduct for manufacturing intoxicants. *Id.*

Although Thomas's misconduct citations would decrease in frequency over the next several years, problems still arose. In 2011, for instance, he received a misconduct for the unauthorized use of state property after he was found in possession of an electrical device taken from maintenance. *Id.* In 2017, Thomas received a Class X

misconduct for possession of five cell phones and four phone chargers. *Id.* Later that year, Thomas tested positive for methamphetamines. *Id.* In fact, according to the DOC inmate profile screening form that year, Thomas admitted to daily use of both drugs and alcohol. App.Vol.VI at 174. Also that year, he received another Class X misconduct for the possession of a cell phone. *Id.* In 2017, Thomas's assessed risk level for custody was upgraded from minimum to medium.[4] App.Vol.VI at 172, 185. In 2020, he received yet another Class X misconduct, this time for selling a homemade "brew." App.Vol.II at 234. In 2022, he received two more Class X misconducts for possession of cellphones and a charger. *Id.* at 234–35.

In addition to the official misconduct violations on his record a 2000 cell assignment form reveals that Thomas demanded not to be housed with a black inmate. *Id.* at 229–30. Thomas self-identified as "an extreme white supremacist and … a member of the white identity movement." *Id.* at 211, 229–30. In his words, "it is imperative that a n***** be not forced to move into the same cell." *Id.* at 211. In that same letter, he threatened that if a black inmate were placed in his cell that he "will oppose to the best of [his] ability, even physically [if] necessary." *Id.*

[4] Per DOC policy, inmates serving life sentences are required to be housed in "no lower than medium security" due to the severity of their crimes. App.Vol.VI at 267. Thus, the change in Thomas's risk level did not cause him to move to a more secure prison.

### C. DOC rehabilitative efforts

The DOC provides a broad array of educational programming and training in an effort to rehabilitate individuals. *Id.* at 272. These programs include literacy efforts, basic education, pathways to receive a GED, and a diploma in educational services. *Id.* at 271. The content of these programs and the DOC's educational services is the same across the different security levels of prisons. *Id.* at 270. The DOC also has an interagency agreement with the Oklahoma State Department of Career Tech to provide vocational programming to inmates. *Id.* at 271–72. In addition, the DOC offers substance abuse programming, reentry into community programming, as well as religious and volunteer services. *Id.*

To his credit, Thomas has availed himself of various aspects of DOC's programming. He received his GED. He also completed several college courses through Langston University and received college achievement credits. *Id.* at 188–98, 202–04, 209–10. He also completed six months of a licensed trades program. *Id.* at 226. Further, he completed a victim impact program, an anger management program, a Bible program, and several social skills programs. *Id.* at 199–201, 212, 225. And he worked in maintenance within DOC. *Id.* at 213. In addition, Thomas has received several certifications, including as a Residential Electrician's Assistant and Commercial/Industrial Electrician's Assistant. *Id.* at 215–17.

Thomas took a collegiate assessment of academic proficiency test, as well. *Id.* at 220–21. In addition, he completed the Mechanical Code Training, and he passed his

Mechanical Journeyman examination to receive his license from the State of Oklahoma Construction Industries Board. *Id.* at 222–24. And Thomas completed the Paralegal Studies Certificate Program through the Blackstone Career Institute. *Id.* at 236.

**D. Thomas's Parole History**

Thomas became eligible for parole on his first two sentences in 2010 after serving 15 years of each sentence concurrently, which is considered one-third of a life sentence. App. Vol. IV at 128–30. Under Oklahoma law, he is thereafter given consideration for parole every three years. OKLA. STAT. tit. 57, § 332.7(E)(1). At the time of the district court's decision to grant summary judgment, Thomas had been considered and denied at Stage One of the parole process on five different occasions. App.Vol.IV at 105, 115, 117, 124, 128.[5] On each occasion, a Parole Board investigator prepared and submitted an investigative report prior to the Board's vote.

In the 2010 report, an investigator noted that Thomas was sixteen years or younger at the time of his first arrest before recommending against parole. App. Vol. II at 265. Like other investigative reports, it included Thomas's birth date, the case file year, and the date Thomas entered DOC custody—which revealed that Thomas was a juvenile at the time of his crime. *Id.* at 263. And the report included a list of programs and licenses that Thomas had completed. *Id.* at 264. The investigator recommended the Board deny parole due to the severity of the murders and Thomas's nine misconduct

---

[5] Following the district court's decision, Thomas was denied parole in October 2025.

reports, which included violent behavior and the possession of a homemade knife. *Id.* at 265. The investigator was also unable to interview Thomas that year due to staff issues. *Id.* at 263. The Board voted unanimously against parole. *Id.* at 262.

The 2013 report contained the same basic information. There was no inmate interview that year due to a temporary staff vacancy. *Id.* at 259. (Thomas's other three parole investigative reports included information from a personal interview with Thomas. *Id.* at 244, 250, 256.) This report also included information about the programs Thomas had completed while in prison. *Id.* at 260. The investigator recommended against parole based on Thomas's violent murders and accumulated misconduct reports. *Id.* at 261. The Board voted unanimously against parole. *Id.* at 266.

In 2016, an investigator recommended that the Parole Board grant Thomas parole. *Id.* at 258. The investigator observed that Thomas had been in DOC custody since he was a juvenile, and was a "[h]igh school student when arrested." *Id.* at 257–58. The investigator also emphasized the length of time since Thomas's violent behavior and highlighted the programs that he had completed. *Id.* at 258. The Board voted unanimously against parole. *Id.* at 255.

In 2019, an investigator again recommended that the Parole Board grant Thomas parole. *Id.* at 252. This investigator emphasized that Thomas was 15 years old at the time of his arrest and asserted that it had been years since his last misconduct report. *Id.* And the investigator highlighted the educational opportunities that Thomas had completed while in prison. *Id.* This time, the Board elected to deny Thomas access to

Stage Two of the parole process by a vote of 3-2. *Id.* at 253. Two of the members cited Reason A and Reason E for their no votes. *Id.* Reason A is "[t]he aggravating factors associated with the original crime, including any DA or victim protests, currently outweigh any mitigating factors in support of parole at this time." App.Vol.V at 201. And Reason E consists of a "[c]ontinued risk to the public." *Id.*

In 2022, an investigator recommended against parole for Thomas. *Id.* at 246. The report explained that Thomas had received two misconduct reports that year. *Id.* at 245. The investigator cited the violent nature of the crimes as well as Thomas's documented pattern of misconduct in making his recommendation. Combined, those factors led the investigator to believe that Thomas "is still a continued risk to the public." *Id.* at 246. The investigator also stated that Thomas was a high school student when he was arrested for the crime. *Id.* The report also included the programs and licensing programs that Thomas has completed, as well as his positive work evaluations. *Id.* The Board voted unanimously against parole. *Id.* at 243. This time, four Board members cited Reasons A and B with one member citing only Reason B. *Id.* Reason B consists of "[d]isruptive institutional behavior." App.Vol.V at 201.[6]

In sum, each of the five investigative reports contained enough information for a Parole Board member to know that Thomas was a juvenile at the time of arrest. *Id.* at

[6] Thomas states that the instances of "disruptive institutional behavior" "are instances from approximately 22 years prior." Thomas Br. at 26. That is incorrect. The 2022 investigative report states that Thomas committed a misconduct in 2017 in testing positive for methamphetamine. App.Vol.II at 251.

244, 250, 256, 259, 263. And two reports stated outright that Thomas was a juvenile at the time of arrest or entry into DOC custody, with a third providing that he was in high school at the time of the arrest. *Id.* at 246, 252, 258. Those three reports indicating Thomas's youth constitute the three most recent investigative reports in the record.

## II. Procedural History

On September 17, 2020, Thomas filed his Complaint *pro se* against the Governor, the Executive Director of the PPB, the Chair of the Oklahoma Board of Corrections, and the Director of the DOC—each in their official capacities.[7] App.Vol.I at 20–23. He alleged that Oklahoma's parole system violates the Eighth Amendment of the U.S. Constitution and Article II, Section 9 of the Oklahoma Constitution because it does not provide "a meaningful opportunity" for parole, *Id.* at 54–55, and that the Oklahoma parole statute violated the Eighth Amendment by not requiring that parole considerations include the youth of the offender. *Id.* at 57. Screening the case, a Magistrate Judge recommended dismissing Thomas's suit for failure to state a claim. *Id.* at 62–73. The judge observed that Thomas's Eighth Amendment claim was predicated on *Miller* which held that "a sentencing scheme that mandates life in prison without the possibility of parole for juvenile offenders" is unconstitutional and that sentencers must consider the offender's juvenile status before consigning him to a lifetime sentence

[7] The named parties are Kevin Stitt, Kyle Counts, Stephan Moore, and Justin Farris respectively. The latter three were automatically substituted upon taking office. OKLA. STAT. tit. 39, § 2025(D)(1).

without parole. 560 U.S. at 479–80. But in the judge's view, *Miller* was not implicated here because Thomas "was not sentenced to life without parole." App.Vol.I at 67. The district court accepted the Magistrate Judge's recommendation, dismissing the case without prejudice. *Id.* at 104–10.

This Court disagreed with the initial dismissal. It held that the Supreme Court "has not specifically addressed" the question of "whether the Eighth Amendment requires the State to operate a parole system that affords a meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation, or whether simply making a juvenile lifer eligible for parole is enough." *Id.* at 123. Underlying this Court's assessment that Thomas adequately stated a claim that he had not been provided a meaningful opportunity for parole was his petition's presentation of himself as "a model prisoner." *Id.* at 117.[8] This Court further criticized the district court's order for purporting "to address complex issues of first impression without an opportunity for the parties to develop the facts and their legal arguments." *Id.* at 123. Following remand, Defendants filed a motion to dismiss, *id.* at 127, which was ultimately denied by the district court, *id.* at 255–60. Discovery ensued, after which the Defendants filed motions for summary judgment. App.Vol.II at 1, 142; App.Vol.III at 179; App.Vol.IV at 8. Eventually, the district court granted summary judgment to the various State Defendants. App.Vol.VIII at 153.

---

[8] Thomas's Complaint did not include any of his numerous misconduct violations while in DOC custody. App.Vol.I at 17–60.

In granting summary judgment, the district court carefully walked through the undisputed material facts. *Id.* at 123–30. The court found that Parole Board members, although not required to do so, may consider and have considered an inmate's age at the time of the offense when making parole decisions. *Id.* at 126–27. Indeed, the court found that two of Thomas's reports included Thomas's age at the time of his crimes. *Id.* at 127. Furthermore, the court found that each investigative report flagged that Thomas was a high school student or 16 years or younger at the time of his arrest. *Id.* Thomas's 2016 Investigative Report notes that he was a "[h]igh school student when arrested." App.Vol.II at 257. Thomas's 2019 Investigative Report says the same and adds that "Thomas was 15 at the time of his arrest." App.Vol.II at 252. And Thomas's 2022 Investigative Report also includes the notation: "High school student when arrested." *Id.* at 246.

The district court also found that Thomas has received ten Class X misconducts: for battering a DOC employee, battering another inmate, attempting to choke an employee, possessing weapons, creating homemade intoxicants, possessing contraband, and testing positive for methamphetamines. App.Vol.VIII at 128. The court also appropriately acknowledged Thomas's education and work training. *Id.* at 129–30.

Next, the district court rejected Thomas's last-second claim to have asserted a facial challenge to Oklahoma's parole statutes. *Id.* at 135. The court held that Thomas lacked standing to sue "on behalf of 'similarly situated' individuals or other juvenile offenders not before the Court." *Id.* at 135–36.

Turning to the merits, the district court considered Thomas's Eighth Amendment claim. The court agreed with Defendants that Thomas could not establish a claim under *Miller* because it "only requires that a sentencer consider a juvenile homicide offender's 'youth and attendant [characteristics]' prior to imposing a life-*without*-parole sentence." *Id.* at 147 (quoting *Miller*, 567 U.S. at 483). As Thomas was not sentenced to life without parole, *Miller* could not have been violated. Relying on this Court's statement that *Miller* "is narrowly drawn" to affect the sentencing phase only, the court refused to extend *Miller* to require certain parole procedures at a later phase. *Id.* at 148–149 (quoting *Davis v. McCollum*, 798 F.3d 1317, 1321 (10th Cir. 2015)).

The district court then considered the claim that Thomas was serving "the functional equivalent of a mandatory life-without-parole sentence." *Id.* at 149. Here, the district court found that Thomas has not established that the Parole Board would refuse to recommend him for parole regardless of the circumstances. *Id.* at 150. And the district court observed that Defendants provided evidence that some Parole Board members consider juvenile status when voting at Stage One of the parole process. *Id.* Moreover, although Thomas complained that his parole efforts were damaged by not being placed in a minimum-security prison, Thomas did not identify any programs that he was unable to participate in because of his medium-security classification. *Id.* at 151 And the district court found it significant that parole investigators continually raised Thomas's persistent history of misconduct in their reports. *Id.* at 152.

Finally, the district court declined to exercise supplemental jurisdiction over Thomas's state law claim. *Id.* at 153 (citing *Smith v. City of Enid ex rel. Enid City Comm'n*, 149 F.3d 1151, 1156 (10th Cir. 1998) ("When all federal claims have been dismissed, the court may, and usually should, decline to exercise jurisdiction over any remaining state claims.")). This appeal followed. And for the reasons below, it should be rejected.

## STANDARD OF REVIEW

This Court "review[s] summary judgment orders de novo and may affirm the district court's grant of summary judgment on any grounds adequately presented below." *Deherrera v. Decker Truck Line, Inc.*, 820 F.3d 1147, 1153–54 (10th Cir. 2016) (citation omitted). A "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Birch v. Polaris Indus., Inc.*, 812 F.3d 1238, 1251 (10th Cir. 2015) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

## SUMMARY OF THE ARGUMENT

This appeal involves a challenge to Oklahoma's parole procedures as they pertain to a triple murderer, Thomas, who was a juvenile at the time he stabbed and shot his family members. Thomas challenges these parole procedures under the Eighth Amendment and Section 1983, as well as under Article II, Section 9 of the Oklahoma Constitution. Thomas argues that under Supreme Court precedent concerning

sentencing of juvenile homicide offenders, *Miller*, 567 U.S. 460, he is entitled to certain parole procedures. Namely, he claims that it should be mandatory that the Parole Board consider his juvenile status at the time of the murders. But the district court found no Eighth Amendment violation and granted summary judgment in favor of the Defendants. For multiple reasons, the district court should be affirmed.

*First*, to hold that Thomas is entitled to certain parole procedures would necessarily require an expansion of *Miller*. *Miller* simply holds that *mandatory* sentences of life *without* parole for juvenile homicide offenders violate the Eighth Amendment. For the juvenile homicide offenders, like Thomas, who received a sentence of life *with* the possibility of parole, *Miller* is silent as to parole procedures. Furthermore, an expansion of *Miller* is not warranted here under Eighth Amendment jurisprudence because Thomas's sentence is proportional to his heinous crimes.

*Second*, the district court correctly assessed Thomas's only possible claim under *Miller*—whether he is serving the functional equivalent of a mandatory life-without-parole sentence—and found that he is not. Thomas has been considered for parole every three years since he became eligible for parole. Parole Board members are free to consider any factors, including his juvenile status at the time of the murders. His juvenile status at the time of the murders was discernable in each investigative report presented to the Parole Board. There are no reasonable inferences to be drawn from the undisputed facts that would make summary judgment inappropriate.

*Third*, the district court was well within its discretion to deny supplemental jurisdiction over Thomas's state law claim after finding no violation of federal law.

This Court should affirm the well-reasoned decision of the district court.

# ARGUMENT

## I. THE DISTRICT COURT CORRECTLY HELD THAT THOMAS'S EIGHTH AMENDMENT CLAIM WOULD REQUIRE AN UNWARRANTED EXPANSION OF THE SUPREME COURT'S DECISION IN *MILLER*.

Thomas's argument reduces to a single proposition: *Miller* entitles him to certain parole procedures; specifically, he claims that states must consider an inmate's youth or juvenile status at the time of the crime when making parole decisions. Thomas Br. at 36, 40. But that is plainly incorrect. *Miller* is silent as to parole procedures. *Miller* simply prohibits mandatory life sentences *without* the possibility of parole for juvenile homicide offenders. Thomas did not receive a mandatory sentence of life without parole. Rather, Thomas was sentenced to life in prison *with* the possibility of parole. Thus, Thomas's reliance on *Miller* is misplaced for at least two reasons: (1) Thomas did not receive a mandatory life-without-parole sentence, and (2) *Miller* does not address parole procedures. As correctly recognized by the district court, it would require an expansion of *Miller* to hold that a juvenile homicide offender sentenced to life with the possibility of parole is entitled to certain parole procedures. App.Vol.VIII at 149.

A series of Supreme Court precedents, which define Eighth Amendment protections in the context of juvenile sentencing, laid the foundation upon which Thomas seeks to rest his claim. *See Roper v. Simmons*, 543 U.S. 551 (2005); *Graham*, 560 U.S. 48; *Miller*, 567 U.S. 460; *Montgomery v. Louisiana*, 577 U.S. 190 (2016); *Jones v. Mississippi*, 593 U.S. 98 (2021). In *Roper*, the Supreme Court held that the Eighth Amendment prohibits sentencing juvenile offenders under the age of eighteen to death.

*Roper*, 543 U.S. at 568. In *Graham*, the Supreme Court held that juveniles under the age of eighteen who commit nonhomicide crimes could not, under the Eighth Amendment, be sentenced to life without parole. *Graham*, 560 U.S. at 74.

The Supreme Court expanded on *Roper* and *Graham* when it issued *Miller*. There, the Court held that mandatory sentences of life without parole for juvenile homicide offenders violate the Eighth Amendment. *Miller*, 567 U.S. at 465. Thus, under *Miller*, a sentencer must "consider[] an offender's youth and attendant characteristics" before sentencing a juvenile homicide offender to life without parole. *Miller*, *Id.* at 483. In *Montgomery*, the Supreme Court held that *Miller* applies retroactively. 577 U.S. at 212. And in *Jones*, the Supreme Court clarified that, under *Miller*, a sentencer does not need to make a separate factual finding that a juvenile defendant is permanently incorrigible before imposing a discretionary sentence of life without parole. *Jones*, 593 U.S. at 101.

Although Thomas focuses on *Miller*, throughout his brief he also quotes and relies heavily on language from *Graham*. Specifically, Thomas often incorporates the language from *Graham* that requires juvenile nonhomicide offenders to be provided with some "meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation." *Graham*, 560 U.S. at 75. Thomas's reliance on *Graham* for these propositions is equally as misplaced as his reliance on *Miller* because *Graham* applies solely to juvenile *nonhomicide* offenders. *Id.* at 82. And Thomas, of course, committed multiple homicides, murdering three family members.

In *Graham*, the Supreme Court drew a clear distinction between homicide and nonhomicide crimes:

> There is a line between homicide and other serious violent offenses against the individual. Serious nonhomicide crimes may be devastating in their harm ... but in terms of moral depravity and of the injury to the person and to the public, ... they cannot be compared to murder in their severity and irrevocability. This is because life is over for the victim of the murderer, but for the victim of even a very serious nonhomicide crime, life ... is not over and normally is not beyond repair. Although an offense like robbery or rape is a serious crime deserving serious punishment, those crimes differ from homicide crimes in a moral sense.

*Graham*, 560 U.S. at 69 (citation modified). The Supreme Court further explained, along these same lines, that it "has recognized that defendants who do not kill, intend to kill, or foresee that life will be taken are categorically less deserving of the most serious forms of punishment than are murderers." *Id.*

Given this language, and Thomas's status as a triple homicide offender, *Graham* and its guarantee of a "meaningful opportunity" for release are simply inapplicable. *Graham*'s promise of a parole opportunity does not apply to Thomas, thus Thomas misstates the law when he claims that "a parole opportunity is a constitutional *requirement*" for juvenile offenders. Thomas Br. at 38.

Even ignoring this, *Graham*'s "meaningful opportunity" for release does not guarantee eventual release. Nonhomicide juvenile offenders, to whom *Graham* applies, are not guaranteed to be released from prison during their lifetime:

> A state is not required to guarantee eventual freedom to a juvenile offender convicted of a nonhomicide crime. ... The Eighth Amendment does not foreclose the possibility that persons convicted of nonhomicide

> crimes committed before adulthood will remain behind bars for life. It does prohibit States from making the judgment at the outset that those offenders never will be fit to reenter society.

*Graham,* 560 U.S. at 75. Thomas is attempting to jam a square peg in a round hole. Neither *Miller* nor *Graham* applies to his situation as a triple homicide offender who has been sentenced to life *with* the possibility of parole.

### A. Thomas's claims would require an expansion of *Miller* because *Miller* prohibits only mandatory life-without-parole sentences.

*Miller* dealt with two fourteen-year-olds, each sentenced to life in prison without the possibility of parole for their involvement in botched robberies that turned into killings. *Miller*, 567 U.S. at 465. What was impermissible in *Miller* was that each of these juveniles received life sentences without the possibility of parole under statutes that made those sentences *mandatory*. This mattered because the mandatory nature of the sentences precluded the sentencer from taking account of their age and the wealth of characteristics and circumstances attendant to it. *Id.* at 476.

Far from guaranteeing certain parole procedures, *Miller* does not even guarantee that parole will be an option for juvenile homicide offenders. Rather, it mandates only that a sentencer "follow a certain process—considering an offender's youth and attendant characteristics—before imposing a particular penalty." *Id.* at 483; *see also Jones*, 593 U.S. at 100 ("Under *Miller* ... an individual who commits a homicide when he or she is under eighteen may be sentenced to life without parole, but only if the sentence is not mandatory and the sentencer therefore has discretion to impose a lesser

punishment."). This Court previously recognized this in *Davis*, explaining that *Miller* "is narrowly drawn: it protects juveniles who commit crimes from the mandatory imposition of life without possibility of parole." 798 F.3d at 1321.

Here, when Thomas was sixteen years old, he killed three family members, and then he pleaded guilty to three counts of murder in the first degree. App.Vol.II at 39. Thomas was sentenced to three terms of life imprisonment *with* the possibility of parole. *See id.* Oklahoma does not have a mandatory sentencing scheme that required Thomas to be sentenced to life without parole. Rather, the choice was discretionary. *See* OKLA. STAT. tit. 214, § 701.10(A) ("the court shall conduct a separate sentencing proceeding to determine whether the defendant should be sentenced to death, life imprisonment without parole or life imprisonment."). Thus, Thomas's life sentences with the possibility (not the guarantee) of parole are not in conflict with *Miller*. The district court was correct: Thomas "cannot establish a *Miller* violation because he was a juvenile homicide offender sentenced to life *with* the possibility of parole, and *Miller* only requires that a sentencer consider a juvenile homicide offender's 'youth and attendant circumstances' prior to imposing a life-*without*-parole sentence." App.Vol.VIII at 147.

In sum, *Miller* prohibits only *mandatory* sentences of life *without* parole for juvenile homicide offenders and is not applicable to Thomas—a juvenile homicide offender sentenced to life *with* the possibility of parole. To rule for Thomas here would require inappropriately extending *Miller* far beyond its stated bounds.

### B. Thomas's claims would require an expansion of *Miller* because *Miller* applies only to sentencing, not to the parole process.

Moving on, *Miller* does not apply to the parole process itself. The central premise of *Miller* is clear: "Youth matters *in sentencing*." *Jones*, 593 U.S. at 109 (emphasis added). Just as clear is the fact that a protection against mandatory life-without-parole sentencing applies only at sentencing. *See Miller,* 567 U.S. at 474 ("But the mandatory penalty schemes at issue here prevent *the sentencer* from taking account of these central considerations." (emphasis added)); *see also Jones*, 593 U.S. at 109 ("*Miller* held that a *sentencer* must have discretion to consider youth before imposing a life-without-parole sentence." (emphasis added)). In short, *Miller* merely requires "[a] hearing where youth and its attendant characteristics are considered as *sentencing factors*" in order "to separate those juveniles who may be sentenced to life without parole from those who may not." *Jones*, 593 U.S. at 111 (quoting *Montgomery*, 577 U.S. at 210) (emphasis added).

Several circuits have determined that applying *Miller* to the parole process involves an unwarranted extension of the Supreme Court's holding. *See Brown v. Precythe*, 46 F.4th 879, 886 (8th Cir. 2022) (en banc) (stating that the "explicit language" in *Miller* and *Montgomery* "calls for rejecting" a claim that Missouri's parole procedures violate the Eighth Amendment, as *Miller* applies only at sentencing); *United States v. Grant*, 9 F.4th 186, 193 (3d Cir. 2021) (en banc) ("The *Miller* bar on mandatory LWOP sentencing regimes is a prophylactic that entitles a juvenile homicide offender to a certain sentencing process, but not a particular sentencing outcome"); *Bowling v. Dir., Va. Dep't*

*of Corr.*, 920 F.3d 192, 197 (4th Cir. 2019) (declining to extend the Eighth Amendment protections in *Roper*, *Graham*, and *Miller* "beyond sentencing proceedings"); *Howard v. Coonrod*, 134 F.4th 1136, 1144 (11th Cir. 2025) ("The Supreme Court has never extended the 'meaningful opportunity' rule to homicide offenders."); *Atkins v. Crowell*, 945 F.3d 476, 479 (6th Cir. 2019) (stating that it would "dramatically expand" *Miller* to apply the "meaningful opportunity" standard to all juvenile offenders).

In *Bowling*, Bowling was sentenced to life with the possibility of parole for capital murder when he was seventeen, and he was denied parole on an annual basis once he became parole eligible. 920 F.3d at 194. Bowling claimed that because the Virginia Parole Board was "not specifically required to consider age-related characteristics unique to juvenile offenders," the parole process violated the Eighth Amendment. *Id.* Like Thomas, Bowling asked the circuit court to extend Supreme Court precedent on the Eighth Amendment to "juvenile parole proceedings and find that it is cruel and unusual punishment for a parole board to deny juvenile offenders parole without specifically considering age-related mitigating characteristics as a separate factor in the decision-making process." *Id.* at 197. The Fourth Circuit declined to make such a holding, as doing so would require an extension of *Roper*, *Graham*, and *Miller* "beyond sentencing proceedings." *Id.* Just as in *Bowling*, Thomas asks this Court to expand Supreme Court jurisprudence. The district court below correctly declined to do so. App.Vol.VIII at 147.

In support of his argument that the constitutional protections in *Graham*, *Roper*, and *Miller* apply to homicide offenders in the parole process, Thomas cites a series of district court cases. Thomas Br. at 37. Two of these cases—*Howard v. Coonrod*, 546 F. Supp. 3d 1121 (M.D. Fla. 2021), and *Greiman v. Hodges*, 79 F. Supp. 3d 933 (S.D. Iowa 2015)—come from district courts whose governing circuits have since disagreed. *See Howard v. Coonrod*, 134 F.4th 1136, 1144 (11th Cir. 2025) ("The Supreme Court has never extended the 'meaningful opportunity' rule to homicide offenders. And indeed, all indications are to the contrary."); *Brown*, 46 F.4th at 886 (stating that the "explicit language" in *Miller* and *Montgomery* "calls for rejecting" a claim that Missouri's parole procedure violated the Eighth Amendment because *Miller* applies only at sentencing).

In *Howard*, juvenile offenders—all sentenced to life with the possibility of parole—alleged that Florida's parole system violated the Eighth Amendment. *Howard*, 134 F.4th at 1140. The Eleventh Circuit disagreed, holding that "*Graham*'s 'meaningful opportunity' rule doesn't extend to homicide offenders." *Id.* at 1145. The court explained this at length:

> [J]uvenile homicide offenders can be sentenced to life *without* parole, provided that the sentence isn't mandatory and the proper process is observed. And if the stiffer sentence of life without the possibility of parole isn't a cruel and unusual punishment, then the more lenient sentence of life *with* the possibility of parole (or another sentence that similarly provides for potential future release) can't possibly be cruel and unusual. Put simply—if a little imprecisely—the greater power to impose life *without* parole includes the lesser power to impose life *with* parole.

*Id.* at 1144. *Howard* concluded that "[t]he Commission might be a little stingy in granting inmates release from prison, but its system does not run afoul of the Eighth Amendment." *Id.* at 1140. In sum, circuit precedent weighs heavily against Thomas.

This Court's prior disagreement with the district court does not counsel differently. The concerns expressed by this Court's earlier order have been addressed. Underlying this Court's assessment that Thomas stated a claim that he had not been provided a meaningful opportunity for parole was his presentation of himself as "a model prisoner." App.Vol.I at 117. Of course, when considering a motion to dismiss, "the well-pleaded factual allegations in the complaint are accepted as true and viewed in the light most favorable to the nonmoving party." *Acosta v. Jani-King of Okla., Inc.*, 905 F.3d 1156, 1158 (10th Cir. 2018) (citation omitted). However, Thomas's Complaint did not include any of his numerous misconduct violations while in DOC custody. *See* App.Vol.I at 17–60. Furthermore, because the factual allegations must be accepted as true for motion to dismiss purposes, this Court was also under the impression that on each occasion Thomas had been considered for parole, "his parole investigators have given favorable recommendation to the PPB based on his demonstrated good behavior." *Id.* at 117–18. As explained above, *supra* pp. 17–18, this is blatantly incorrect.

This Court further criticized the district court for purporting "to address complex issues of first impression without an opportunity for the parties to develop the facts and their legal arguments." *Id.* at 123. Following remand, discovery ensued, and the parties fully briefed the legal issues at summary judgment. Thus, the parties have

now had a chance to develop the facts and legal arguments. Afterward, the district court granted summary judgment to the various State Defendants. App.Vol.VIII at 121.

This Court should decline to extend the holdings of *Graham*, *Roper*, and *Miller* to a homicide offender in the parole process.

### C. An expansion of *Miller* is not warranted here because Thomas committed three murders and his sentence is proportional to the crime.

Like the district court, this Court should refuse to expand *Miller* to require certain parole procedures. The Eighth Amendment states: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." The Supreme Court has held that "[t]he standard of extreme cruelty is not merely descriptive, "but necessarily embodies a moral judgment." *Graham*, 560 U.S. at 58 (quoting *Kennedy v. Louisiana*, 554 U.S. 407, 419 (2008)). It "prohibits the imposition of inherently barbaric punishments under all circumstances." *Graham*, 560 U.S. at 59.

Supreme Court precedents usually consider punishments challenged in lawsuits "not as inherently barbaric but as disproportionate to the crime." *Id.* Indeed, "[t]he concept of proportionality is central to the Eighth Amendment." *Miller,* 567 U.S. at 469 (citation omitted). Phrased differently, "[e]mbodied in the Constitution's ban on cruel and unusual punishments is the 'precept of justice that punishment for crime should be graduated and proportioned to [the] offense.'" *Graham,* 560 U.S. at 59 (quoting *Weems v. United States*, 217 U.S. 349, 367 (1910)); *see also Miller*, 567 U.S. at 469. This does not

bode well for Thomas, given that he murdered his own mother and stepfather with a shotgun and stabbed his step-grandfather to death.

The Supreme Court's cases "addressing the proportionality of sentences fall within two general classifications." *Graham,* 560 U.S. at 59. "The first involves challenges to the length of term-of-years sentences given all the circumstances in a particular case." *Id.* The second "comprises cases in which the Court implements the proportionality standard by certain categorical restrictions on the death penalty." *Id.*

For the first classification, "the Court considers all of the circumstances of the case to determine whether the sentence is unconstitutionally excessive." *Id.* The Eighth Amendment's "narrow proportionality principle," however, "does not require strict proportionality between crime and sentence but rather forbids only extreme sentences that are grossly disproportionate to the crime."' *Id.* at 59–60 (citation modified). Considering this lenient standard, the Supreme Court has upheld sentences of 25 years to life in prison for the theft of golf clubs, a sentence of life with the possibility of parole for a defendant's third nonviolent felony, and a sentence of 40 years for possession of marijuana and distribution of marijuana. *Id.* at 60.

"The second classification of cases has used categorical rules to define Eighth Amendment standards." *Id.* This "consists of two subsets, one considering the nature of the offense, the other considering the characteristics of the offender." *Id.* For example, "[w]ith respect to the nature of the offense, the Court has concluded that capital punishment is impermissible for nonhomicide crimes against individuals." *Id.* at

60–61 (citing *Kennedy,* 554 U.S. at 437–38; *Enmund v. Florida,* 458 U.S. 782 (1982); *Coker v. Georgia,* 433 U.S. 584 (1977)). And "[i]n cases turning on the characteristics of the offender, the Court has adopted categorical rules prohibiting the death penalty for defendants who committed their crimes before the age of 18." *Roper,* 543 U.S. 551.

In the cases adopting categorical rules, the Supreme Court has taken the following approach: "[t]he Court first considers 'objective indicia of society's standards, as expressed in legislative enactments and state practice,' to determine whether there is a national consensus against the sentencing practice at issue." *Graham*, 560 U.S. at 61. "Next, guided by 'the standards elaborated by controlling precedents and by the Court's own understanding and interpretation of the Eighth Amendment's text, history, meaning, and purpose,' the Court must determine in the exercise of its own independent judgment whether the punishment in question violates the Constitution." *Id.* (internal citations omitted).

Here, Thomas has failed to make any argument or put forth any evidence concerning legislative enactments or state practices concerning parole procedures and juvenile offenders. Thomas's sentences are proportional to his horrendous crimes, and therefore they do not violate the Eighth Amendment. Thomas murdered his mother, stepfather, and step-grandfather, and he is serving two concurrent life sentences and one consecutive sentence. Despite the heinous nature of these crimes, Thomas's sentences all came with the possibility of parole. Moreover, upon becoming eligible for parole in 2010, Thomas has been considered for parole every three years. Thomas Br.

at 21. Each of his parole investigative reports notes his educational achievements in prison and his numerous significant incidents of misbehavior. App.Vol.VIII at 127–29; App.Vol.II at 243–246, 250–252, 256–258, 259–261, 263–265. The first page of each report includes information making it ascertainable that Thomas was juvenile when he committed his crimes. *Id.* at 243, 250, 256, 259, 263. And two reports stated outright that Thomas was a juvenile at the time of arrest or entry into DOC custody, with a third providing that he was in high school at the time of the arrest. *Id.* at 246, 252, 258. Moreover, under *Miller* Thomas could have been sentenced to life *without* the possibility of parole and that sentence would not have violated the Eighth Amendment if the sentence was not mandatory and the proper process was observed. App.Vol.VIII at 148 (citing *Howard*, 134 F.4th at 1144). Thus, it cannot be said that Thomas's lesser punishment of life *with* the possibility of parole violates the Constitution. *See Howard*, 134 F.4th at 1144. All in all, for a triple murderer, Thomas received a relatively lenient sentence.

Moreover, the reasons why *Miller* required a sentencer to consider an offender's juvenile status at the time of the crime do not hold the same weight in the parole context. The Supreme Court emphasized that minors were less morally culpable than adult offenders and more capable of being rehabilitated. *Miller*, 567 U.S. at 471. But when making parole decisions, states are considering adults. The question is whether an offender has, in reality, been rehabilitated by time in prison. And when considering a middle-aged man, and his conduct in prison over the course of his adulthood, it makes

little difference whether he entered custody at the age of seventeen or the age of nineteen. What matters is whether the adult in question has been truthfully rehabilitated. Here, Thomas's numerous adult misconducts provide plenty of evidence for the Parole Board to find to the contrary.

In conclusion, Thomas's sentence was proportional to his grievous crimes, and no extension of *Miller* is warranted.

## II. THE DISTRICT COURT CORRECTLY HELD THAT OKLAHOMA'S PAROLE PROCESS COMPLIED WITH THE U.S. CONSTITUTION.

Thomas alleges that the district court's view of the evidence at summary judgment was flawed "to the extent it equated proof of Thomas's lack of 'meaningful opportunity for release' with 'the functional equivalent of life without parole.'" Thomas Br. at 41. Once again conflating *Graham* with *Miller*, Thomas argues that, instead of showing the functional equivalent of life without parole, Thomas "must only show that Oklahoma's system does not afford him, and others like him, a 'meaningful opportunity for release based on demonstrated maturity and rehabilitation.'" Thomas Br. at 42.

Again, the Supreme Court established a "meaningful opportunity" standard in *Graham* that only applies to nonhomicide offenders, drawing moral and practical distinctions between murderers and non-murderers. *Graham*, 560 U.S. at 69. Further, the Court explained that even in that context States are "not required to guarantee eventual freedom to a juvenile offender convicted of a nonhomicide crime." *Graham*,

560 U.S. at 75. Rather, States must give these defendants "some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation." *Id.*

Again, the "meaningful opportunity" Thomas argues has been denied to him is not applicable to him as he is a juvenile *homicide* offender. As a juvenile homicide offender, under *Miller*, Thomas is only protected from a mandatory life-without-parole sentence. Thus, the district court correctly analyzed whether Thomas was serving the functional equivalent of a mandatory life-without-parole sentence as prohibited by *Miller*. App.Vol.VIII at 149–152. Appropriately addressing this Court's previous order, which vacated the district court's original order, the district court stated "[t]he Tenth Circuit has at least implied in this case that Miller would not permit a State to merely label a sentence as 'life-with-parole,' while operating a parole system that provides no meaningful opportunity to obtain release." App.Vol.VIII at 149 (citing *Thomas v. Stitt*, No. 21-6011, 2022 WL 289661 at *4 (10th Cir. 2022)). The district court further observed that "[a]t the time of [Thomas's] sentencing, it was mandatory that [he] be sentenced to either the death penalty, life without parole, or life with parole. Thus, it could be argued that [Thomas's] mandatory life-with-parole sentence—if paired with a sham parole system—is the functional equivalent of a mandatory life-without-parole sentence, which *Miller* barred." App.Vol.VIII at 149. This is the proper approach.

The district court next evaluated the undisputed facts to determine whether Thomas was indeed serving the functional equivalent of a mandatory life-without-parole sentence. App.Vol.VIII at 149–152. The district court found that Thomas

provided no evidence establishing a policy or practice that prevents him from being granted parole under Oklahoma's parole system. *Id.* at 149–50. Nor did he establish that the Parole Board would refuse to grant Thomas a recommendation for parole regardless of the circumstances. *Id.* at 150. The court further stated:

> The crux of [Thomas's] claims is the PPB's lack of youth-consideration during parole decisions. However, [Thomas] has not provided any evidence that the PPB refuses to consider an inmate's age at the time of the offense when considering parole recommendations for juvenile offenders like [Thomas], or that any policy or statute prevents the PPB from considering an inmate's juvenile-offender status. Conversely, Defendants have provided evidence of PPB board members actually considering youth during parole decisions. … [Thomas's] assertion that the PPB is not required to consider age at the time of the offense—but is merely permitted to do so—does not render Oklahoma's parole system unconstitutional as applied to [Thomas].

App.Vol.VIII at 150–51 (footnotes omitted). This Court should affirm that ruling.

### A. The "meaningful opportunity" standard announced in *Graham* does not extend to juvenile homicide offenders.

Thomas admits that his allegations against Oklahoma's parole system arise under *Miller*, not *Graham*. *See* App.Vol.VIII at 147; App.Vol.VII at 139 ("Mr. Thomas is not arguing that he can make out a *Graham* violation. He is simply trying to vindicate his Eighth Amendment rights in the *parole* process as first pronounced in *Miller*." (footnote omitted)). However, the "meaningful opportunity" language he asserts is drawn from *Graham*, a Supreme Court decision holding that States cannot sentence juvenile *nonhomicide* offenders to life without parole. 560 U.S. at 75. Thus, at the end of the day, *Graham*'s "meaningful opportunity" standard is inapplicable to homicide offenders like

Thomas. As the Eleventh Circuit recently recognized, "[t]he Supreme Court has never extended the 'meaningful opportunity' rule to homicide offenders." *Howard*, 134 F.4th at 1144.

Throughout his brief, Thomas claims that *Miller* adopted the "meaningful opportunity" standard when it quoted *Graham*. Thomas Br. at 3, 5, 9, 38, 42, 51, 55, 59. But that is inaccurate. Yet again, "[t]he Supreme Court has never extended the 'meaningful opportunity' rule to homicide offenders." *Howard*, 134 F.4th at 1144. Rather, "all indications are to the contrary." *Id.* After all, as explained above, "the Court in *Graham* emphasized that '[t]here is a line between homicide and other serious violent offenses against the individual.'" *Id.* at 1145 (citing *Graham*, 560 U.S. at 69).

*Miller* only mentions the phrase "meaningful opportunity" one time, in a parenthetical following a "cf." citation to *Graham*. *Miller*, 567 U.S. at 479. This is not an adoption or transposition of the standard to a separate context; it is merely a reference to a related case. *See Howard*, 134 F.4th at 1145 (stating that the "cf." is a "cryptic citation" and "entirely too thin a reed" on which to rely). Indeed, "cf." means that the "[c]ited authority supports a proposition *different from* the main proposition," although it is "sufficiently analogous to lend support." *United States v. Edwards*, 857 F.3d 420, 425 n.7 (1st Cir. 2017) (citation omitted). And Black's Law Dictionary defines "cf." as a signal meaning "[c]ompare," directing "the reader's attention to another authority … in which contrasting, analogous, or explanatory statements may be found." cf., Black's Law Dictionary (12th ed. 2024). Thus, if anything, by using a "Cf." the Supreme Court

was confirming that *Graham* and *Miller* are different or even contrasting, not the same. *See Knox v. United States*, 400 F.3d 519, 522 (7th Cir. 2005) ("[T]he [Supreme] Court dropped a 'cf.' citation to *Orozco-Prada*, which Knox says must mean that the Supreme Court endorsed its holding. But this is not what 'cf.' means ….").

If the Court intended to adopt the "meaningful opportunity" standard in *Miller*, it would have clearly and unequivocally stated that intent. *See Atkins*, 945 F.3d at 479 ("[W]e do not think the Supreme Court alters its expressed holdings in parentheticals attached to case citations."). The Supreme Court, that is, does not "hide elephants in mouseholes." *Id.* (quoting *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001)). Thus, Thomas's effort to tie *Graham*'s "meaningful opportunity" language to *Miller* fails. The district court was correct.

**B. Thomas has been provided meaningful opportunities for parole.**

Thomas argues that Oklahoma's parole system has imposed a *de facto* life-without-parole sentence upon him by not giving him a "meaningful opportunity for release." Thomas Br. at 40. This is wrong. Despite the fact that the "meaningful opportunity" standard does not apply to juvenile homicide offenders such as Thomas, the undisputed facts show that Thomas has indeed been provided a meaningful opportunity for parole several times over.

In *Graham*, the Supreme Court refrained from defining the phrase "meaningful opportunity for release." Rather, the Court left the means and mechanisms for compliance to the states. *Graham*, 560 U.S. at 75 ("It is for the State, in the first instance,

to explore the means and mechanisms of compliance"). Recently, the Eleventh Circuit noted that this standard requires merely that "some possibility of parole—however remote—must actually exist." *Howard*, 134 F.4th at 1145. Such an opportunity exists under Oklahoma's parole process, and it has been provided to Thomas.

Thomas has been thoroughly considered for parole multiple times, with varying levels of progress. App.Vol.II at 54, 58, 59, 66, 67. Indeed, at one point both an investigator and two Parole Board members opined in his favor. App.Vol.II. 65–66. The fact that Thomas is unhappy with the final outcomes does not give rise to a constitutional violation. *See Graham*, 560 U.S. at 82 ("A state need not guarantee the offender eventual release[.]"). The crux of Thomas's argument is that the Constitution is violated because in Oklahoma the Parole Board is not legally *required* to consider his youth at the time of the murders when making parole decisions. *See* App.Vol.VIII at 150. But in Oklahoma, there are no limitations on the factors the Board or the Governor may consider when making a parole decision. *Id.* at 126. Thus, although they are not required by statute to do so, Board members have discretion to consider the inmate's age at the time of the underlying offense. *Id.* Further, Thomas has provided no evidence that the Board refuses to consider an inmate's age at the time of the offense when considering parole recommendations for juvenile offenders, or that any policy or statute prevents the Board from considering an inmate's juvenile-offender status. App.Vol.VIII at 150. Nor has he pointed to any case indicating that Oklahoma's

approach is somehow unconstitutional.[9] Conversely, as recognized by the district court, Defendants have provided evidence of Board members actually considering youth during parole decisions—including during Thomas's evaluations. *Id.* at 150. Simply put, "[Thomas's] assertion that the PPB is not required to consider age at the time of the offense—but is merely permitted to do so—does not render Oklahoma's parole system unconstitutional as applied to [Thomas]." *Id.* at 150–51.

When the district court granted summary judgment, Thomas had been considered for parole every three years, starting in October of 2010, for a total of five times (October 2010, October 2013, October 2016, October 2019, and October 2022). App.Vol.II at 151–52. As explained above, each of the five times Thomas appeared on the parole docket, a parole investigator conducted an investigation and then prepared and submitted an investigative report. *Id.* at 152. He was denied parole each time, to be sure, but there is no indication or evidence whatsoever that these evaluations and votes were a sham or predetermined, nor is there any indication that the Board members and

[9] The Campaign for Fair Sentencing of Youth filed an amicus brief in support of Thomas. Doc. 60 ("Campaign Br."). It points to this Court's decision in *Budder v. Addison*, 851 F.3d 1047 (10th Cir. 2017) to imply that Thomas's sentence is a de facto "life without parole" sentence. *See* Campaign Br. at 30–31. But *Budder* is plainly inapposite here. The juvenile offender in *Budder* committed *nonhomicide* offenses, and, though he was serving life sentences with the possibility of parole, he would not be parole eligible until serving 131.75 years in prison. *Budder*, 851 F.3d at 1049–50. Thus, unlike Thomas's situation, for the defendant in *Budder*, parole was an absolute impossibility.

investigators were blatantly ignoring his age at the time of his horrendous crimes. All the evidence points the other way.

Regardless, Thomas claims "there is no way to accurately distinguish between adult and juvenile offenders at any stage of Oklahoma's parole process." Thomas Br. at 44. To the contrary, as found by the district court, an offender's birth date and case file year are available on every investigative report. App.Vol.VIII at 127. Some investigative reports go further and include an offender's age at the time of the offense, and at other times Board members calculate an offender's age at the time of the offense by subtracting the offender's birth date from the case file year. *Id.* at 126–127.

Here, in each of Thomas's five investigative reports, his birth year (1980) and case file year (1995) reveal that he was 15 years old at the time the charges were filed against him. App.Vol.IV at 106, 112, 118, 121, 125. Nevertheless, Thomas complains that only one of his investigative reports notes his age at the time of the underlying offense. Thomas Br. at 50. But that is simply not true. Thomas's 2016 Investigative Report notes that he was a "[h]igh school student when arrested." *Id.* at 257. Thomas's 2019 Investigative Report observes that "Thomas was 15 at the time of his arrest." *Id.* at 252. And Thomas's 2022 Investigative Report includes the notation: "High school student when arrested." *Id.* at 246. Moreover, the district court noted that the 2010 and 2013 Investigative Reports listed that Thomas was "16 years or younger" at the time of his first arrest. App.Vol.VIII at 127

Also documented in Thomas's parole investigative reports is the fact that Thomas has earned numerous misconducts during his incarceration with DOC—including ten Class X misconducts. App.Vol.VIII at 128; App.Vol.II at 234–35. Thomas's DOC records reflect misconducts for battering an ODOC employee; battering another inmate; three instances of possessing weapons; battering an ODOC employee by jumping on their back and trying to choke them with their microphone cord; threatening an ODOC employee in a sexual manner; testing positive for methamphetamines; making homemade intoxicants; and five instances of possessing banned cell phones. App.Vol.VIII at 128; App.Vol.II at 234–35. The violent behavior and possession of weapons occurred in Thomas's first few years in DOC custody, *after* Thomas reached adulthood. App.Vol.VIII at 128; App.Vol.II at 234. And Thomas's misconducts for testing positive for methamphetamines and making homemade intoxicants occurred in 2017 and 2020, respectively. App.Vol.VIII at 128–29; App.Vol.II at 234. Thus, there are plenty of rational bases in the record for the Parole Board to deny parole to Thomas—bases entirely of Thomas's own making. And none of this, of course, was mentioned in Thomas's original Complaint in this case.

Commonsensically, the Parole Board is required to "make inquiry into the conduct and the record of the [inmate] during his custody in the Department of Corrections, which shall be considered as a basis for consideration of said person for recommendation to the Governor for parole." OKLA. STAT. tit. 57, § 332.7(L). Here, Thomas's parole investigator recommended denying parole in 2010, 2013, and 2022.

App.Vol.II at 246, 261, 265 In each of those recommendations, the investigator referenced Thomas's multiple misconduct reports or "consistent pattern of misconducts" while incarcerated. App.Vol.VIII at 152. In the 2010 report, the investigator wrote, "Mr. Thomas is incarcerated for violent offenses for the death of three people. He has accumulated nine total misconduct reports, including four for assaultive behavior and three for possession of a homemade knife. Given the nature of his offenses, I would need to see a longer period of non-assaultive behavior to make a favorable recommendation." App.Vol.II at 265. In the 2013 report, the investigator said "No. The offender is incarcerated for three violent offenses. He has accumulated ten misconduct reports, including four for assaultive behavior, and three for possession of a homemade knife. Parole is not recommended." App.Vol.II at 261. And in the 2022 report, the investigator wrote that "parole is not recommended. Even though it is his first incarceration, the violent nature of the crimes and consistent pattern of misconducts shows that the offender is still a continued risk to the public." App.Vol.II at 246. These investigators are clearly not predisposed against Thomas but rather are weighing the favorable and damning evidence to determine whether they believe he deserves a parole recommendation.

In sum, Thomas was given and continues to be given meaningful opportunities for parole. And his numerous instances of severe misbehavior in prison have clearly played into the repeated denial of his parole. There is simply no ground on which to claim his parole process has been a sham or a farce.

**C. Even when the facts are viewed favorably to Thomas, his claim fails.**

Thomas claims that the district court "incorrectly analyzed key facts in the light most favorable to the Defendants—not Thomas." Thomas Br. at 47. On summary judgment, though a court "must draw all factual inferences in favor of the nonmovant, those inferences must be reasonable." *Deherrera v. Decker Truck Line, Inc.*, 820 F.3d 1147, 1159 (10th Cir. 2016) (quoting *Allen v. Muskogee*, 119 F.3d 837, 846 (10th Cir. 1997)). As explained below, there are no reasonable inferences to be drawn from the undisputed facts that would make summary judgment inappropriate.

*1. The investigative reports showed Thomas's juvenile status at the time of the murders.*

As found by the district court, an inmate's birth date and case file year appear on every investigative report submitted to the Parole Board. App.Vol.VIII at 127. Thomas makes much of the possibility that, for some offenders, a delay between the date of the crime and the case file year could in theory fail to show juvenile status at the time of the crime. Thomas Br. at 50–51. But for Thomas, any delay between the offense and the charges being filed "does not conceal his juvenile-offender status because he was a minor at the time of the offense, when charges were brought against him, and when he entered DOC custody." App.Vol.VIII at 150 n.13. The birth date (1980) and case file year (1995) on each of Thomas's reports, as well as other notations concerning his age, clearly reveal that he was a juvenile at the time of his offense. The district court's findings on this point are correct. It would be unreasonable to find anything otherwise.

Because Thomas's age is readily apparent from his investigative reports, Thomas does not have standing to argue that the dates on investigative reports may not indicate juvenile status at the time of the offense "in all circumstances." Thomas Br. at 51. The district court correctly held that Thomas lacked standing to bring claims as to "similarly situated" individuals. App.Vol.VIII at 134. The court found that "[a]t times [Thomas] attempts to couch his claims as brought on behalf of all juvenile offenders, but [Thomas] has not sought class certification. Accordingly, [Thomas] lacks standing to bring claims on behalf of other third parties not before the Court." *Id.* at 134–35. The court cited plenty of cases in support. *See Cnty. Court of Ulster Cnty. v. Allen*, 442 U.S. 140, 154–55 (1979). ("As a general rule, if there is no constitutional defect in the application of the statute to a litigant, he does not have standing to argue that it would be unconstitutional if applied to third parties in hypothetical situations."); *Cotner v. Hopkins*, 795 F.2d 900, 902 (10th Cir. 1986) (affirming dismissal of an inmate's § 1983 claim that alleged prison conditions affected the constitutional rights of Oklahoma inmates because, generally, "a plaintiff must assert his own constitutional rights."); *see also Adams v. James*, 784 F.2d 1077, 1080 (11th Cir. 1986) (explaining that outside of the class-action context, a prisoner has no standing to litigate another prisoner's constitutional claims). This Court should affirm.

*2. Parole Board members regularly consider age when making parole decisions.*

The district court found that "at times[,] PPB members calculate an offender's age at the time of the offense by subtracting the offender's birth date from the case file

date." App.Vol.VIII at 127. The court quoted two former Parole Board members:

> Former PPB member Kelly Doyle testified that she calculated the inmate's age at the time of the offense because she "found it to be an important factor in [her] decision[ ]making." The offender's birth date and case file date are available on every investigative report. Former PPB member Adam Luck testified that it was "common" for parole investigative reports to include the fact that an inmate was a juvenile at the time of their arrest.

*Id.* (internal citations omitted). These are undisputed facts.

Thomas again makes much of the possibility that "[t]his calculation ... does not ... capture all inmates who were juvenile offenders." Thomas Br. at 53. Specifically, he claims, it would not capture someone who committed a crime as a juvenile and then turned eighteen before charges were filed. *Id.* Thomas argues that the "district court failed to consider these facts in the light most favorable to Thomas." *Id.* But this approach would have been unreasonable, primarily because it was not the case for Thomas himself: his juvenile status is discernable in each of his reports. In evaluating summary judgment, district courts are supposed to focus on the undisputed facts about the case in front of them—not on hypothetical and rare possibilities from other circumstances. *See Shehi v. Sw. Bell Tel. Co.*, 382 F.2d 627, 629 (10th Cir. 1967) ("Summary judgment must flow only as a matter of law from [the] undisputed facts.").

Continuing to miss the mark, Thomas argues that, regardless of the fact that Parole Board members are free to and do consider age at the time of the offense, "there is no PPB policy that addresses how, if at all, PPB members should consider an inmate's age at the time of the offense when making parole recommendations." Thomas Br. at

55. But, at risk of sounding like a broken record, *Miller* does not require that a juvenile homicide-offender's age be considered during the parole process. Again, unlike *Graham*, which ensures the possibility of parole for all juvenile nonhomicide offenders, *Miller* does not even entitle juvenile homicide offenders like Thomas to the possibility of parole, let alone certain parole procedures. Simply put, it does not in any way violate the Constitution to give Parole Board members the discretion whether to consider an inmate's age at the time of offense.

*3. Thomas is not prohibited from showing maturity and rehabilitation.*

Far afield from the Constitution, Thomas complains that he has been assigned a medium-security classification due to a DOC policy that does not take an offender's age into account. Thomas Br. at 57. The policy in question prevents inmates who are serving life sentences from progressing below medium security. *See supra* n.4. Thomas claims that this security classification makes it "harder to demonstrate rehabilitation and obtain release." Thomas Br. at 58. But neither *Miller* nor any other precedent entitles Thomas to a minimum-security classification based on his juvenile status at the time of the murders. Nor does Thomas's own behavior, which includes an attack on DOC personnel, warrant minimum-security treatment. This is not a constitutional issue. Any ruling otherwise would infringe on Oklahoma's sovereignty and ability to manage its prison systems as it reasonably sees fit.

Nevertheless, Thomas argues that the mandatory medium security rule "failed to account for Thomas's juvenile status. And his parole investigative reports did nothing

to correct that fact." Thomas Br. at 57 (internal citations omitted). This is misleading. Thomas's 2019 investigative report states that his "current security level is assessed at minimum." App.Vol.II at 252. And his 2016 report states the same. App.Vol.II at 258. Thus, his reports acknowledge his then-security level, alongside the information necessary to understand that Thomas was a juvenile when he murdered three family members. More importantly, as the district court found, Thomas "failed to show that these policies render him ineligible for parole, or that he is incapable of showing his rehabilitation as a result." App.Vol.VIII at 151. This is correct. Thomas has completed numerous programs while incarcerated, and he did not identify any programs he cannot participate in due to a medium-security classification. *Id.* at 151.

In sum, even when viewed in the light most favorable to Thomas, these facts simply do not create any issues of material fact, and summary judgment was proper.

## III. The District Court Did Not Err in Declining to Exercise Supplemental Jurisdiction over Thomas's State Law Claim.

After granting Defendants summary judgment on Thomas's Eighth Amendment claims, the district court declined to exercise supplemental jurisdiction over Thomas's claim that Oklahoma's parole system violates the Oklahoma Constitution. App.Vol.VIII at 153. The district court was well within its discretion to deny supplemental jurisdiction over Thomas's state law claim after finding no violation of federal law. *See Smith*, 149 F.3d at 1156 ("When all federal claims have been dismissed, the court may, and usually should, decline to exercise jurisdiction over any remaining

state law claims."). As explained above, the district court properly granted Defendants summary judgment and, therefore, properly declined to exercise supplemental jurisdiction on Thomas's state law claim.

## **CONCLUSION**

This Court should affirm the district court.

## **STATEMENT REGARDING ORAL ARGUMENT**

Because "the decisional process would not be significantly aided by oral argument" in this appeal, Defendants do not request it. FED. R. APP. P. 34(a)(2)(C). This case turns on a district court's eminently reasonable handling of an Eighth Amendment claim that is entirely unpersuasive and unsupported by precedent. For these reasons, the addition of oral argument would not significantly assist the Court in its deliberations.

Respectfully submitted,

s/ *Garry M. Gaskins, II*
GARRY M. GASKINS, II
*Solicitor General*
ZACH WEST
*Director of Special Litigation*
WILL FLANAGAN
MALLORY SHAMOON
*Assistant Solicitors General*
OFFICE OF ATTORNEY GENERAL
STATE OF OKLAHOMA
313 N.E. 21st Street
Oklahoma City, OK 73105
Phone: (405) 521-3921
Garry.Gaskins@oag.ok.gov
Zach.West@oag.ok.gov
Will.Flanagan@oag.ok.gov
Mallory.Shamoon@oag.ok.gov
*Counsel for Defendants-Appellees Kyle Counts, Stephan Moore, and Justin Farris*

## CERTIFICATE OF COMPLIANCE

This brief complies with the typeface requirements of Fed. R. App. P. 32 because it was prepared in a proportionally spaced font (Garamond, 14-point) using Microsoft Word 2016. The document complies with the type-volume limitation of Fed. R. App. P. 32, because it contains 12,977 words, excluding the parts exempted.

s/ *Garry M. Gaskins, II*
GARRY M. GASKINS, II

## CERTIFICATE OF DIGITAL SUBMISSION

All required privacy redactions have been made as required by 10th Cir. R. 25.5 and the ECF Manual. Additionally, this filing was scanned with the most updated Crowdstrike antivirus software.

s/*Garry M. Gaskins, II*
GARRY M. GASKINS, II

## CERTIFICATE OF SERVICE

I certify that on May 29, 2026, I caused the foregoing to be filed with this Court and served on all parties via the Court's CM/ECF filing system. No paper copies are required pursuant to 10th Cir. R. 31.5.

s/ *Garry M. Gaskins, II*
GARRY M. GASKINS, II